UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

CONCISE SUMMARY OF THE CASE

**SHORT CAPTION**: Joan Mullin, adm. of the Estate of Robert Mullin v. Karen Balicki, et.als.

**USCA NO:** 16-2896; **LOWER COURT DOCKET NO:** U.S.D.C. N.J. 3:11-cv-00247

**NAME OF JUDGES**: Hon. Mary C. Cooper and Magistrate Lois H. Goodman

**Specify who is suing whom, for what, and the subject of this action. Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court from which appeal taken:**

Plaintiff brings suit against several parties who are alleged to be the proximate cause of plaintiff's death by suicide while under the custodial care of the employees of the State of New Jersey at the prison facility known as CRAF. The employees are individually named as the State is not considered a "person" for purposes of suit under 42 U.S.C. Section 1983 and the NJ Civil Rights Act. Several parties have been dismissed from the action or, in the case of Nurse Byrd, a state employee involved in the initial intake and medical screening of plaintiff, granted summary judgment.

This appeal is limited to the dismissal of Officer Nicholas Dimler, responsible for the monitoring and oversight of plaintiff at the time of his death, and the failure to permit amendment of the complaint over the as yet non-parties named in the proposed Third Amended Complaint: Officer Robert Russo, Chief Ralph Yansek, Lt. Dudich, Sgt. B. Stern, Sgt. Thomas Spence and Officer Eric Large, each one of whom was on duty during the pertinent time frame during which Mullin was calling out for psychological help (per inmate statements), denied such help and during which the specific policies of the state including the requirement of close or constant watch, and/or even the less restrictive 15 minute monitoring, were not followed, which failures were the direct and proximate cause of plaintiff's death. Plaintiff does not appeal from the dismissal of all the other defendants or summary judgment granted to Nurse Byrd.

Plaintiff seeks monetary damages in excess of $75,000 in this action. The orders and decisions appealed from are set forth below.

**LIST and ATTACH a copy of each order, judgment, decision or opinion involved in this appeal:** (1) November 1, 2013 Order granting defendants' motion to dismiss the complaint; appeal is as to dismissal of Officer Dimler only (docket entry 154); (2) July 25, 2014 Order denying reconsideration of the dismissal (docket entry 204); (3) December 8, 2014 Order denying motion to amend the complaint to allege new facts against Officer Dimler and to implead the newly identified corrections officers (docket entry 220); the July 13, 2015 Order affirming the December 8, 2014 order and denying amendment (docket entry 230) and the May 25, 2016 Order dismissing the entire complaint (docket entry 252). All orders and decisions annexed.

**Provide a short statement of the factual and procedural background, which you consider important to this appeal:** The complaint was filed January 14, 2011. After permitting some

amendments and denying others regarding failed efforts to implead defendant corrections officer Dimler and another party, the court ultimately permitted impleader of Dimler based on discovery by Order dated September 14, 2012. Thereafter all the defendants sought to have the case dismissed on various legal grounds. Despite specifically alleging in the Second Amended Complaint (incorrectly designated the Fourth Amended Complaint) that Officer Dimler was responsible for oversight, supervision and monitoring of plaintiff, that he failed to follow policy regarding such supervision, and that he was the last officer to see plaintiff alive, among other allegations, Judge Cooper dismissed the complaint as "conclusory." The filing deadline on that motion for all papers was June 26, 2013 with a return date of July 1, 2013. On July 17, 2013, 2.5 years after filing the complaint, plaintiff received discovery contained on a disc from the state containing policies and procedures which plaintiff found supportive of her position that Dimler failed to properly monitor and supervise plaintiff by failing to conduct proper rounds. However, plaintiff counsel was not yet aware of a disc of materials provided in April 2013, also served 2.3 years after the filing of the complaint, which contained the actual investigation of the event, including statements of inmates condemning the corrections officers on duty for failing to help plaintiff despite cries and pleas for help, in particular that he was going to kill himself; details about plaintiff's housing unit and the necessity for close/constant observation; that plaintiff was a special needs inmate, that Dimler did not follow protocol as in fact pled and identifying several new corrections officers as clearly liable and showing the case to be extremely meritorious.

Due to a clerical error, the April 2013 disc was misfiled and counsel was aware only of the materials contained in the July 2013 disc at the time Judge Cooper rendered her decision dismissing Dimler as a party. On November 1, 2013, the date the order was filed plaintiff counsel received a letter from the state attorney providing cryptic responses to discovery which failed to alert counsel that there was a problem. Judge Cooper thereafter denied plaintiff's motion for reconsideration on July 25, 2014 despite plaintiff now providing supporting documents referring to the policies and procedures to show that the initial allegations were not in fact conclusory and in spite of notifying the court while the motion was pending that plaintiff had learned of the missing disc which contained revelations clearly establishing liability, not only regarding Officer Dimler but of other officers as well.

Plaintiff's motion to amend to allege new facts against Officer Dimler and to implead the newly identified corrections officers was denied on December 8, 2014 by Magistrate Goodman who, regardless of the 2.5 year delay in providing discovery by the defense held plaintiff solely responsible for "undue delay" and prejudice in moving to amend, in essence stating that the case was too old and that "it had to come to an end." Judge Cooper affirmed the decision by Order dated July 13, 2015, and ultimately the case was concluded after Nurse Byrd was granted summary judgment on May 25, 2016.

**Identify the issues to be raised on appeal:** (1) The Second Amended Complaint was not conclusory and should not have been dismissed, the appeal being limited to the dismissal of Dimler and (2) the court should have granted amendment and permitted the Third Amended Complaint as to Dimler, Russo, Yansek, Dudich, Stein, Spence and Large.

This is to certify that this Concise Summary of the Case was electronically filed with the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record

This _____ day of _____ 2016

By:_____
    SHELLEY L. STANGLER, ESQ.

## DOCKET ENTRY #: 154 - ORDER
## WITH
## MEMORANDUM OPINION – DOCKET
## ENTRY # 153

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOAN MULLIN, ADMINISTRATRIX OF THE
ESTATE OF ROBERT MULLIN, deceased,
and JOAN MULLIN, individually,

       Plaintiffs,

       v.

ADMINISTRATOR KAREN BALICKI, et
al.,

       Defendants.

CIVIL ACTION NO. 11-247 (MLC)

**O R D E R**

    For the reasons stated in the Court's Memorandum Opinion
dated November 1, 2013, **IT IS** on this  1st  day of November,
2013, **ORDERED** that the motion to dismiss by Defendants
Administrator Karen Balicki, Director Robert Patterson, Director
Marie Dunlap-Pryce, Officer Dimler, and Beatrice Teel, R.N.,
(dkt. entry no. 145) is **GRANTED**; and it is further

    **ORDERED** that the motion for judgment on the pleadings by
Defendant Jane Byrd, L.P.N., (dkt. entry no. 144) is **GRANTED IN
PART** and **DENIED IN PART** as follows:

        **GRANTED** as to the claims against Jane Byrd, L.P.N., in
her official capacity; and

        **GRANTED** as to the state common-law claims against Jane
Byrd, L.P.N.; and

**DENIED** as to the constitutional claims under 42 U.S.C. § 1983 and N.J.S.A. 10:6-1 et seq. against Jane Byrd, L.P.N., in her individual or personal capacity; and it is further

**ORDERED** that all claims against Defendants Administrator Karen Balicki, Director Robert Patterson, Director Marie Dunlap-Pryce, Officer Dimler, and Beatrice Teel, R.N., are **DISMISSED**; and it is further

**ORDERED** that the Clerk of the Court will designate the action insofar as it is brought against Defendants Administrator Karen Balicki, Director Robert Patterson, Director Marie Dunlap-Pryce, Officer Dimler, and Beatrice Teel, R.N., as **TERMINATED**; and it is further

**ORDERED** that the claims asserted against Defendant Jane Byrd, L.P.N., in her official capacity, and the state common-law claims asserted against her, are **DISMISSED**; and it is further

**NOTED** that Defendants Jane Byrd, L.P.N., and Kintock Group are the only viable defendants remaining in the action, and that the Clerk of the Court should designate the action insofar as it is brought against all other defendants as **TERMINATED**; and it is further

**ORDERED** that the motion filed on the docket under docket

entry number 146 is **ADMINISTRATIVELY TERMINATED** as unnecessary.


         s/ Mary L. Cooper
       **MARY L. COOPER**
       United States District Judge

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually,<br><br>    Plaintiffs,<br><br>    v.<br><br>ADMINISTRATOR KAREN BALICKI, et al.,<br><br>    Defendants. | CIVIL ACTION NO. 11-247 (MLC)<br><br>**MEMORANDUM OPINION** |

**COOPER, District Judge**

The Plaintiffs, Joan Mullin, individually and as administratrix

of the estate of Robert Mullin, her son, (hereinafter "Plaintiffs")

bring this action against the following individual defendants in

their "personal, individual and professional capacities" who

represent the Department of Corrections of the State of New Jersey,

South Woods State Prison, and Central Reception & Assignment

Facility: Administrator Karen Balicki (hereinafter "Balicki");

Director Robert Patterson (hereinafter "Patterson"); and Director

Marie Dunlap-Pryce (hereinafter "Dunlap-Pryce").  (See dkt. entry

no. 102, 2nd Am. Compl. (hereinafter "Compl.").)[1]  Plaintiffs

_____

[1] Before the Court is Plaintiffs' Second Amended Complaint. (See dkt. entry no. 129, 3-8-13 Order at 1; dkt. entry no. 143, 5-14-13 Order at 1 n.1.)  References to "Complaint" hereinafter refer to this Second Amended Complaint.

further bring this action against the following individuals in their "personal, individual and professional capacities": Jane Byrd, L.P.N. (hereinafter "Byrd"); Erin Marusky, R.N. (hereinafter "Marusky"); Officer Dimler (hereinafter "Dimler"); and Beatrice Teel, R.N. (hereinafter "Teel"). (See id.)  Plaintiffs also name as defendants Kintock Group and Mercer County.  (See id.)

Mercer County was dismissed from the action by stipulation of the parties on March 22, 2011.  (See dkt. entry no. 15, Stip. of Dismissal as to Mercer County.)  Plaintiffs also agreed to the dismissal of the claims against Marusky by order of the Court on May 2, 2013.  (See dkt. entry no. 139, 5-2-13 Order.)

Before the Court are the separate motions by Byrd to dismiss the claims asserted against her and by Balicki, Patterson, Dunlap-Pryce, Dimler, and Teel (hereinafter "DOC Defendants") to dismiss the claims asserted against them for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c). (See dkt. entry no. 144, Byrd's Mot. to Dismiss; dkt. entry no.

145, DOC Defs.' Mot. to Dismiss.)[2]  For the reasons that follow,
the Court will deny the part of the motion to dismiss concerning
the individual-capacity, constitutional claims against Byrd, and
the Court will grant the remainder of the separate motions to
dismiss in their entirety.

## I.   ALLEGATIONS IN THE COMPLAINT

Plaintiffs' claims are based on the suicide of Robert Mullin
(hereinafter "the decedent") while incarcerated in the State of New
Jersey.  Specifically, Plaintiffs allege that the decedent was
incarcerated for about six to eight years through January 17, 2009,

---

[2] Byrd and Dimler filed answers on October 24, 2012 and April
9, 2013 respectively.  (See dkt. entry no. 108, Byrd Answer; dkt.
entry no. 134, Dimler Answer.)   Both preserved the grounds for
dismissal at issue before the Court by raising failure to state a
claim as an affirmative defense in their answers.  With respect to
these two defendants, the motions pending are Rule 12(c) motions
for judgment on the pleadings for failure to state a claim since
these defendants have filed responsive pleadings.  See Turbe v.
Gov't of V.I., 938 F.2d 427, 428 (3d Cir. 1991) (stating that
Rule 12(b)(6) motions must be filed before a responsive
pleading, but that "[a] Rule 12(c) motion for judgment on the
pleadings may be filed after the pleadings are closed. . . .
Rule 12(h)(2) provides that a defense of failure to state a
claim upon which relief can be granted may also be made by a
motion for judgment on the pleadings."); Fed.R.Civ.P. 12(h)(2).
As to the remaining defendants who have not filed responsive
pleadings, the pending requests for relief are pursuant to Rule
12(b)(6) for failure to state a claim upon which relief may be
granted.  Counsel for Dimler described the nature of the request
for all the DOC Defendants as being pursuant to Rule 12(b)(6).
This was in error, as the filing of Dimler's answer renders that
request to be pursuant to Rule 12(c).  See Turbe, 938 F.2d at 428.
Byrd's motion was properly labeled as a Rule 12(c) motion.  Because
the standard for a Rule 12(b)(6) motion applies to both the Rule
12(c) and the Rule 12(b)(6) motions pending, see id., the Court
will hereinafter address them by reference to Rule 12(b)(6).

3

the date of his death.  (Compl. at ¶ 11.)  In May of 2008, he was
transferred from prison to a halfway house operated and managed by
The Kintock Group (hereinafter "Kintock").  (Id. at ¶ 12.)  The
decedent was to be released from Kintock around April to June of
2009 following his completion of the therapy, work studies, and
rehabilitative services.  (Id. at ¶ 13.)  However, while residing
at Kintock, the decedent had been fired from his job.  (Id. at ¶
23.)

On January 15, 2009, while at Kintock, the decedent exhibited
a deterioration in his mental status and became aggressive.  (Id.
at ¶ 14.)  Illegal substances, including cocaine and opiates, were
found in his possession.  (Id. at ¶ 15.)  Also, in the presence of
a Kintock caseworker, the decedent swallowed a handful of pills
that he identified as medication for depression.  (Id. at ¶ 16.)

The decedent was subsequently transferred to South Woods State
Prison, where he was medically evaluated, and he tested positive
for opiates and cocaine.  (Id. at ¶¶ 17–18.)  On January 16, 2009,
he was transferred to the Central Reception & Assignment Facility
(hereinafter "CRAF"), "under the custodial care, supervision,
management and control" of Balicki, Patterson, and Dunlap-Pryce
(hereinafter "Supervisory Defendants").  (Id. at ¶ 18.)  Plaintiffs
further allege that between January 15 and 17, 2009, the decedent
"also was treated by and was under the custodial care, supervision,

4

management, and control of the Trenton Psychiatric Hospital," and
its employees and staff.  (Id. at ¶ 19.)

Plaintiffs allege that Kintock's file on the decedent
indicated that he had an extensive drug history and a high risk of
abusing drugs and alcohol.  (Id. at ¶¶ 21-22.)  Also, Plaintiffs
allege that the decedent had a history of mental illness and
suicide attempts.  (Id. at ¶¶ 24, 40.)  At various points from 2005
until the time of his death, the decedent had been hospitalized for
mental illness, had used medication for his psychiatric conditions,
and had considered or attempted suicide.  (Id. at ¶¶ 40-41, 43-49.)
The Complaint alleges that this was reflected in various medical
records and intake forms; however, with the exception of the
records from Kintock, the Complaint does not allege that the
defendants had actual knowledge of these records or the information
contained therein in January of 2009.  (See, e.g., id. at ¶¶ 40-41,
43-48.)

On January 14, 2009, three days before his death, the
decedent's medical records reflect that he "was seen at South Woods
State Prison, following a transfer from Kintock to Detention/ECU,
and the diagnosis of 'mood disorder,' a family history of suicide,
and a history of being a suicide risk."  (Id. at ¶ 49.)  The
Complaint does not indicate whether the particular defendants in

5

this matter were aware of the January 14, 2009 records or their

content.

According to the Complaint, Byrd and Teel, as agents of the

Supervisory Defendants, examined and evaluated the decedent on

January 16, 2009. (Id. at ¶ 39.)  Byrd performed a nursing intake

on this date, and the decedent allegedly responded in the

affirmative to the following questions: (1) "have you ever been

hospitalized or treated for psychiatric illness"; and (2) "have you

ever considered or attempted suicide." (Id. at ¶ 50.)  The

decedent's medical records from this same date included a

"diagnosis of 'mood disorder,' a family history of suicide, and a

history of being a suicide risk." (Id.)  On January 16, 2009 at

CRAF or South Woods State Prison, Byrd cleared the decedent

medically for placement in the general prison population. (Id. at

¶¶ 51, 56.)

At approximately 4:23 AM on January 17, 2009, Dimler, who was

allegedly the corrections officer responsible for caring for and

treating the decedent, found the decedent unresponsive after the

decedent had hung himself with what limited records indicate was a

self-made noose from a bed sheet. (Id. at ¶¶ 25-26.)  After this

discovery, Teel was summoned, an unnamed officer or medical

provider performed CPR, and the decedent was pronounced dead at

4:49 AM. (Id. at ¶¶ 30-31, 57.)

6

The Complaint asserts that Kintock failed to advise or notify Byrd, Teel, and Dimler about the decedent's mental-health and substance-abuse issues.  (Id. at ¶ 56.)  The Complaint further alleges that Dimler and Teel "knew or should have known" of the decedent's history of attempted suicide, mental illness, and substance abuse from the transfer records from Kintock.  (Id. at ¶¶ 27, 33.)  The Complaint alleges that they failed to "review, evaluate, or follow" transfer records from Kintock in determining what level of care to provide to the decedent, including treatment for his intoxication and one-on-one supervision.  (Id. at ¶ 36.)  The Complaint asserts that Byrd and Teel failed to evaluate the decedent for intoxication, as was required by policy and procedure.  (Id. at ¶ 53.)  According to the Complaint, had these defendants properly evaluated the decedent and reviewed his medical records, the decedent "would have been transferred to the infirmary and/or been placed under constant supervision without the ability to harm himself."  (Id. at ¶ 54.)  Moreover, Dimler and Teel purportedly "knew that policy and procedure required direct and constant supervision and monitoring, and yet failed to abide by said policy and procedure, evidencing a gross indifference" to the decedent's welfare.  (Id. at ¶¶ 28, 34.)  Specifically, both permitted the decedent to be in a cell with materials including bed sheets that could be used to inflict self-harm.  (Id. at ¶¶ 29, 36.)

7

According to the Complaint, the decedent's history of suicide attempts, mental-health issues, and recent drug abuse were known or should have been known to Dimler, Teel, Byrd, Kintock, and the Supervisory Defendants. (Id. at ¶¶ 60-64.)  However, the individual defendants, including Teel and Dimler, failed to provide adequate supervision to the decedent. (Id. at ¶¶ 60-61.)  The Complaint alleges that the failures of these individual defendants "were the direct and proximate cause of the self-harm and suicide by" the decedent. (Id. at ¶ 55.)

The Complaint also asserts that the Supervisory Defendants failed to follow their own policy and procedure requiring them to familiarize themselves with an inmate's transfer records and failed to ensure that the decedent was properly treated and supervised for drug addiction and suicide risk. (Id. at ¶¶ 64-65.)  The Complaint also claims that these Supervisory Defendants failed to enact and enforce procedures and policies that required their staff to review transfer records or that provided for the treatment of intoxication, and these failures foreseeably led to the decedent's suicide. (Id. at ¶ 66.)

Plaintiffs initially brought this action on January 14, 2011; however, the complaint at issue before the Court is the Second Amended Complaint, which was filed September 21, 2012.  The Complaint asserts six counts pursuant to 42 U.S.C. § 1983

(hereinafter "section 1983") and the New Jersey Civil Rights Act

(hereinafter "NJCRA"), N.J.S.A. 10:6-1 et seq.:

> (1) deprivation of the decedent's constitutional rights
> under the Fourteenth, First, Fourth, Fifth, and Sixth
> Amendments of the United States Constitution (id. at ¶¶ 73-
> 94);

> (2) deprivation of the decedent's constitutional rights
> under the New Jersey Constitution, Article 12, the right to
> be free from cruel and unusual punishment, and Article 1,
> the right to due process (id. at ¶¶ 95-104);

> (3) negligent hiring, training and supervision of employees
> and agents (id. at ¶¶ 105-18);

> (4) intentional and negligent infliction of emotional
> distress (id. at ¶¶ 119-34);

> (5) abuse of process by Supervisory Defendants and Kintock
> (id. at ¶¶ 135-44); and

> (6) medical malpractice by, inter alia, Byrd and Teel (id.
> at ¶¶ 145-62).

Plaintiff seeks compensatory and punitive damages, funeral

expenses, interest, attorneys' fees, and litigation costs.

## II.  GOVERNING STANDARD

When considering a motion to dismiss for failure to state a

claim, the court must accept the facts pleaded in the complaint as

true and draw all inferences in favor of the plaintiff. Phillips

v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). "[O]nly a

complaint that states a plausible claim for relief survives a

motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

"A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that
the defendant is liable for the misconduct alleged." Id. at 678.
This plausibility standard is not a "probability requirement." The
standard merely requires "more than a sheer possibility that the
defendant has acted unlawfully." Id.; see also Phillips, 515 F.3d
at 234.

"[T]he tenet that a court must accept as true all of the
allegations contained in a complaint is inapplicable to legal
conclusions. Threadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not suffice."
Iqbal, 556 U.S. at 678. Legal conclusions "must be supported by
factual allegations." Id. at 679.

A civil-rights complaint must "'contain a modicum of factual
specificity, identifying the particular conduct of defendants that
is alleged to have harmed the plaintiffs.'" Freedman v. City of
Allentown, 853 F.2d 1111, 1114 (3d Cir. 1988) (quoting Ross v.
Meagan, 638 F.2d 646, 650 (3d Cir. 1981)).[3] The court must look
past any conclusory allegations regarding the willfulness of the
defendants' conduct or the defendants' reckless disregard of the

_____

[3] Plaintiffs assert civil-rights claims under section 1983 and
under the NJCRA, the state counterpart of section 1983 for
violation of rights secured under New Jersey's Constitution. See
Green v. Corzine, No. 09-1600, 2011 WL 735719, at *7 (D.N.J. Feb.
22, 2011). The "NJCRA is generally interpreted to be coextensive
with its federal counterpart." Id. Unless otherwise stated, the
analysis and determinations with respect to the section 1983 claims
apply equally to claims under the NJCRA.

rights of the victim; the court will focus on "the factual scenario itself to examine whether the conduct alleged, viewed most favorably to plaintiffs, is reasonably susceptible to falling within the conclusions alleged." Id. at 1115.

In situations in which more specific allegations may demonstrate that the conduct at issue falls within section 1983's ambit, district courts are required to permit amendment to the complaint. Id. at 1114. "Furthermore, when the lack of factual specificity is fairly attributable to defendants' control of required information, we have permitted the action to proceed to a reasonable amount of discovery to help [plaintiff] make the necessary showing to prove her case." Id. (internal quotation marks and citation omitted).

### III. ANALYSIS

#### A.    Official-Capacity Claims[4]

Balicki, Patterson, Dunlap-Pryce, Dimler, Teel, and Byrd (hereinafter "Movants") seek dismissal of the official-capacity claims (both state and federal) asserted against them based on state-sovereign immunity under the Eleventh Amendment. The Eleventh Amendment states, "The judicial power of the United States

---

[4] Plaintiffs have named several of the individual defendants in their "personal, individual, and professional capacities." Based on the nomenclature in our federal jurisprudence, the Court construes this to mean that the individuals are sued in their individual and official capacities.

shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend. XI. With a few exceptions, the Eleventh Amendment prevents a state entity from being a defendant in a lawsuit. This state-sovereign immunity extends to state officials who are sued for money damages in their official capacities. See, e.g., Kentucky v. Graham, 473 U.S. 159, 169-70 (1985). However, Congress can abrogate state-sovereign immunity through an unequivocal expression, or a state can waive its own immunity to suit. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999).

The parties do not dispute that Movants are state officials, and thus, when sued in their official capacities, the Eleventh Amendment issues arise. In this case, the Complaint seeks monetary damages as opposed to prospective relief against these state officials sued in their official capacities. Congress did not abrogate state-sovereign immunity in section 1983. Graham, 473 U.S. at 169 n.17. And the State of New Jersey has not waived its sovereign immunity in federal courts. Thus, none of the exceptions to the Eleventh Amendment's bar on monetary relief against state officials in their official capacity are present in this case.

12

In addition to these immunity issues, there are other deficiencies with respect to Plaintiffs' official-capacity claims pursuant to section 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  But states, and state officials in their official capacities, are not "persons" for section 1983 purposes. Will v. Mich. Dep't of State Police, 491 U.S. 58, 64-65 (1989).

Because Movants in their official capacities are immune from suit and because they are not "persons" under section 1983, the Court will dismiss the portions of the Complaint seeking relief against these state officials in their official capacities.  In fact, having realized their mistake of law, Plaintiffs have stated that they are willing to stipulate that there is no official-capacity liability in this matter.  (See dkt. entry no. 147, Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 11-13; dkt. entry no. 148, Pls.' Opp'n to Byrd's Mot. to Dismiss at 9.)  Any references in the Complaint to official-capacity liability will no longer be viable.

13

### B.   Individual-Capacity Claims

The Eleventh Amendment does not bar the individual-capacity claims, and state officials in their individual capacities are "persons" for the purposes of a section 1983 suit.  Hafer v. Melo, 502 U.S. 21, 30-31 (1991).

#### 1.   State Common-Law Claims

With respect to the common-law claims against the Movants in their individual capacities, New Jersey state law pursuant to New Jersey's Tort Claims Act (hereinafter the "TCA") limits the circumstances in which state officials and state entities can be held liable for negligence under state law.  N.J.S.A. 59:1-1 to 12-3.  Because the TCA applies only to state-law claims and "provides no immunity" from constitutional claims brought under section 1983, Tice v. Cramer, 627 A.2d 1090, 1105 (N.J. 1993), the Court will analyze the remaining individual-capacity state common-law claims separately from the constitutional claims.

Movants have asserted that the alleged conduct at issue is shielded from liability under state law by the TCA.  Specifically, Movants argue that, pursuant to N.J.S.A. 59:6-5 and 6-6, public entities and employees are immune for "failing to diagnose a mental condition, and for any decision to confine a person for mental illness."  (DOC Defs.' Mot. to Dismiss at 14; see also Byrd's Mot. to Dismiss at 8, 11.)  Those sections provide:

14

     a.   Neither a public entity nor a public employee is
liable for injury resulting from diagnosing or failing
to diagnose that a person is afflicted with mental
illness or is a drug dependent person or from failing to
prescribe for mental illness or drug dependence;
provided, however, that nothing in this subsection
exonerates a public entity or a public employee who has
undertaken to prescribe for mental illness or drug
dependence from liability for injury proximately caused
by his negligence or by his wrongful act in so
prescribing.
     b.   Nothing in subsection a. exonerates a public entity
or a public employee from liability for injury
proximately caused by a negligent or wrongful act
or omission in administering any treatment prescribed
for mental illness or drug dependence.

N.J.S.A. 59-6-5.

     Neither a public entity nor a public employee is liable
for any injury resulting from determining in accordance
with any applicable enactment: (1) whether to confine a
person for mental illness or drug dependence; (2) the
terms and conditions of confinement for mental illness
or drug dependence; (3) whether to parole, grant a leave
of absence to, or release a person from confinement for
mental illness or drug dependence.

N.J.S.A. 59:6-6.

    Courts interpret these provisions broadly, and close calls in

application are resolved in favor of immunity, not liability.  See,

e.g., Charpentier v. Godsil, 937 F.2d 859, 865 (3d Cir. 1991);

Greenway Dev. Co. v. Bor. of Paramus, 750 A.2d 764, 767 (N.J.

2000); Ludlow v. City of Clifton, 702 A.2d 506, 508 (N.J. App. Div.

1997); Perona v. Twp. of Mullica, 636 A.2d 535, 539 (N.J. App. Div.

1994).  These provisions reflect and advance New Jersey's public

policy in favor of providing immunity to public employees for their
discretionary decision making.  Perona, 636 A.2d at 539, 541.

The New Jersey Appellate Division stated that the immunity
conferred by N.J.S.A. 59:6-6 is not limited only to confinement
within a "mental institution" and that the linchpin for such
immunity "is a discretionary decision whether to confine a person
for the care and treatment of mental illness rather than the
particular type of facility in which a person may be confined."
Ludlow, 702 A.2d at 508.  Immunity is also not limited to
physicians and can apply to any public employee, including police
officers.  Perona, 636 A.2d at 539.  Additionally, immunity is not
limited to final decisions on whether to confine a person for
mental illness; it applies to all determinations in the commitment
process.  Ludlow, 702 A.2d at 508.

The broad construction of these immunities has led courts to
apply them in a wide range of circumstances.  For example, the
Appellate Division in Perona v. Township of Mullica found that
police officers were immune from suit in circumstances similar to
those presented by this case.  636 A.2d 535.  The police officers
had responded to a domestic violence complaint and learned that Mr.
Perona was attempting to prevent Mrs. Perona from taking a walk by
herself because she had written him what he interpreted to be a
suicide note.  Id. at 537.  Mrs. Perona denied having suicidal

16

intent, indicating that the note merely reflected her wishes if she
were to fail to return home -- if she decided to hitchhike for
example. Id. The officers were satisfied with her explanation and
left the Peronas' home. Shortly thereafter, Mrs. Perona attempted
suicide by walking in front of traffic on a nearby highway. Id.
The Appellate Division concluded that the officers' decision not to
take Mrs. Perona into custody or confinement was immune from
liability under N.J.S.A. 59:6-6. Id. at 541.

In Predoti v. Bergen Pines County Hospital, the Appellate
Division determined that a hospital was immune under N.J.S.A. 59:6-
6. 463 A.2d 400 (N.J. App. Div. 1983). The plaintiff, who was
diagnosed as suffering from "schizophrenia chronic undifferentiated
suicidal," was assigned to the closed ward of the hospital where he
was placed in restraints. Four days later, he was transferred to a
less-restricted open ward after responding well to treatment. Id.
at 401. Two days later, while on an escorted walk for open-ward
patients, the plaintiff detached from the group and was injured by
an automobile when he attempted to cross a highway. Id. at 402.
The court concluded that the hospital was not liable for the
plaintiff's injuries under N.J.S.A. 59:6-6 and stated, "Decisions
affecting confinement of the mentally ill are usually highly
predictive and though reasonable can lead to a demonstrably bad
result. . . . By immunizing these difficult decisions the

17

Legislature allows them to be made in an appropriate atmosphere free from the fear of suit." Id. at 402-03.

In McNesby v. State of New Jersey, Department of Human Services, the Appellate Division again ruled in favor of immunity. 555 A.2d 1186 (N.J. App. Div. 1989). The plaintiff's decedent, who had a history of psychiatric illness and suicidal tendencies, was involuntarily committed to a psychiatric hospital, and upon his admittance, the hospital took suicide precautions, which involved keeping him within the sight of a staff member at all times. However, after several days, hospital staff determined that these precautions were no longer necessary, and he was transferred into a "step-up" ward, where he was allowed intervals of unsupervised access to the hospital grounds. Id. at 1187-88. The plaintiff's decedent subsequently set himself on fire, resulting in his death, and the plaintiff brought suit against the State. The plaintiff alleged that, unlike Predoti, she was not claiming negligence based on the decision to transfer the decedent to a less restrictive ward, but rather based on the failure to properly supervise the decedent following the transfer. Id. at 1189. On those facts, the Appellate Division ruled that the State was immune from liability under N.J.S.A. 59:6-6 because the State did not simply fail to properly supervise but instead made a deliberate choice to provide the decedent with unsupervised time, which was an integral part of

18

the treatment plan to prepare him for his release to the community.
Id.

With respect to immunity under N.J.S.A. 59:6-6 in this case,
Movants argue that the gravamen of the Complaint is that the
defendants, who knew or should have known of the decedent's history
of mental illness, substance abuse, and suicidal tendencies,
cleared the decedent to be released into the general prison
population rather than isolating him or providing him with constant
supervision.  (See, e.g., Byrd's Mot. to Dismiss at 8, 12.)  Thus,
Movants contend that they are immune from suit because the claims
relate to their alleged failure to properly confine the decedent
based on his mental illness and substance abuse under N.J.S.A.
59:6-6.

Plaintiffs argue that such immunity is inapplicable here and
N.J.S.A. 59:6-6 immunity relates to "whether to commit a person for
mental illness, as well as the terms and conditions of confinement
**'for mental illness or drug dependence.'"**  (Pls.' Opp'n to DOC
Defs.' Mot. to Dismiss at 23; Pls.' Opp'n to Byrd's Mot. to Dismiss
at 11-12.)  Plaintiffs contend that the Complaint alleges that
decedent was incarcerated, not that he was confined for mental-
health treatment.  (Pls.' Opp'n to Byrd's Mot. to Dismiss at 11-12;
Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 23.)  According to
Plaintiffs, the immunity at issue applies only to confinement in

19

facilities that render treatment for mental health. (Pls.' Opp'n
to Byrd's Mot. to Dismiss at 12-13.) With respect to Byrd,
Plaintiffs further argue that part of their claims rests on her
alleged failure to review the decedent's transfer records and
follow prison protocol, and these actions are outside of the
purview of the immunity conferred by N.J.S.A. 59:6-6. (Id. at 13-
14.)

   Defendant Byrd responds that, in this case, the confinement
that results in immunity under N.J.S.A. 59:6-6 "is not the
confinement arising from criminal conduct, but rather the choice
not to confine for mental illness." (Dkt. entry no. 150, Byrd's
Reply Br. in Support of Mot. to Dismiss at 6.)[5] Byrd analogizes
her decision to release the decedent into the general prison
population to the decision of an emergency room doctor discharging
a patient from a general hospital rather than placing the patient
on suicide watch. (Id.) Byrd asserts that the case law
contradicts Plaintiffs' contention that the confinement for the
purposes of this immunity must be in a mental institution. (Id. at
6-9.) Byrd further argues that N.J.S.A. 59:6-6 applies even if
Plaintiffs cast their claims as those for negligent supervision
because "[t]he statutory immunity of N.J.S.A. 59:6-6 applies to all
actions and inactions by the defendant which related to the

_____
   [5] The DOC Defendants did not reply to the Plaintiffs'
Opposition to their motion to dismiss.

20

determination of whether to confine the decedent for mental
illness." (Id. at 10-12.)

The Court agrees with Movants and concludes that they are
immune from liability for Plaintiffs' state common-law claims based
on N.J.S.A. 59:6-6.  The case law demonstrates wide-ranging
applicability of this type of immunity.  It applies to police
officers confining (or failing to confine) individuals for mental-
health reasons.  See Perona, 636 A.2d at 541.  It applies even
where the potential confinement would not be in a mental
institution, but rather would be in police custody or in another
ward of a hospital not specific to mental health.  See id.;
Predoti, 463 A.2d at 402-03.  The Court therefore rejects
Plaintiffs' arguments that the potential confinement under this
provision must be in a mental institution.

The Court is not persuaded by Plaintiffs' attempts to remove
this case from the realm of the provision's immunity based on the
fact that the decedent was already confined because he was
incarcerated.  The decision before Movants was whether to further
confine the decedent from the general prison population as a result
of potential mental-health issues.  Movants decided against such
confinement, and therefore, their decision is one considering
"whether to confine a person for mental illness or drug
dependence."  N.J.S.A. 59:6-6.

The Court finds no merit in Plaintiffs' arguments that these
facts are outside of the provision's purview because they are
claims for negligent supervision and failure to review transfer
records.  The immunity afforded by N.J.S.A. 59:6-6 applies to all
the decisions and conduct leading up to the decision whether to
confine the individual.  See Ludlow, 702 A.2d at 508.  The
purported failure of Byrd to review the transfer records would be
conduct in the process to the ultimate confinement decision.  And a
claim of negligent supervision implies a duty to supervise, but in
this case, as in McNesby, Movants made a deliberate decision not to
supervise the decedent any more than they would the general prison
population because they did not deem such supervision necessary.
See McNesby, 555 A.2d at 1189.  For these reasons, the Court
concludes that Movants are immune from liability for the state
common-law claims.

Because the Court finds that Movants are immune from liability
in their individual capacities on the state common-law claims based
on the operation of N.J.S.A. 59:6-6, the Court need not address
their potential immunity under N.J.S.A. 59:6-5.[6]  Moreover, because
Movants are immune from liability on the New Jersey state-law

_____

[6] The DOC Defendants also reference potential immunity under
N.J.S.A. 59:6-4 without elaboration.  That section relates to the
failure to make, or to adequately make, a physical or mental
examination.  Because the Court has resolved this issue on the
applicability of N.J.S.A. 59:6-6, the Court declines to address
potential immunity under N.J.S.A. 59:6-4.

22

claims, the Court declines to consider Byrd's argument that she is
not a "person" for the purposes of the NJCRA.  (See Byrd's Mot. to
Dismiss at 16-17.)  And lastly, the Court need not address the DOC
Defendants' argument that Plaintiffs improperly filed a late Notice
of Claim, in violation of the TCA, N.J.S.A. 59:8-8 and 8-9, which
is a procedural bar to recovery.  (See DOC Defs.' Mot. to Dismiss
at 14-16.)

   **2.   Constitutional Claims**

   The immunities established in the TCA do not provide immunity
for the constitutional claims presented under section 1983.  Tice,
627 A.2d at 1105.  The Court will analyze the individual-capacity
constitutional claims for the adequacy of the pleadings and not for
immunity-type issues.

   The Court of Appeals for the Third Circuit has had occasion to
consider under which circumstances liability can be imposed under
section 1983 for prison suicides.  See Colburn v. Upper Darby Twp.,
838 F.2d 663, 667, 669 (3d Cir. 1988) (hereinafter "Colburn I");
Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991)
(hereinafter "Colburn II").  A plaintiff bringing a section 1983
claim based on a prison suicide "has the burden of establishing
three elements: (1) the detainee had a 'particular vulnerability to
suicide,' (2) the custodial officer or officers knew or should have
known of that vulnerability, and (3) those officers 'acted with

reckless indifference' to the detainee's particular vulnerability."
Colburn II, 946 F.2d at 1023.  This standard balances two competing
principles.  First, "a section 1983 claim arising from a prisoner's
suicide is not per se precluded merely because the injury resulted
from the prisoner's own self-destructive behavior."  Freedman, 853
F.2d at 1115.  And second, "a prison custodian is not a guarantor
of a prisoner's safety."  Id.

The Court of Appeals for the Third Circuit has declined to
define "reckless indifference" in this standard but stated that it
implies that there was "a strong likelihood," not just a mere
possibility, of self-harm, and this standard requires that the
custodial officials "'knew or should have known' of that strong
likelihood."  Colburn II, 946 F.2d at 1024.  Relying on the
jurisprudence of sister circuits, the Court of Appeals for the
Third Circuit stated, "Custodians have been found to 'know' of a
particular vulnerability to suicide when they have had actual
knowledge of an obviously serious suicide threat, a history of
suicide attempts, or a psychiatric diagnosis identifying suicidal
propensities."  Id. at 1025 n.1.  With respect to the phrase
"should have known," the court explained that its meaning is
distinct from its usual meaning for tort-law purposes:

> [The phrase] does not refer to a failure to note a risk
> that would be perceived with the use of ordinary
> prudence.  It connotes something more than a negligent
> failure to appreciate the risk of suicide presented by

the particular detainee, though something less than a
subjective appreciation of that risk.  The "strong
likelihood" of suicide must be "so obvious that a lay
person would easily recognize the necessity for"
preventative action; the risk of self-inflicted injury
must not only be great, but also sufficiently apparent
that a lay custodian's failure to appreciate it
evidences an absence of any concern for the welfare of
his or her charges.

Id. at 1025 (internal citation omitted).

The Court of Appeals for the Third Circuit in Colburn I and

Colburn II had the opportunity to analyze the standard for a

section 1983 claim based on a prison suicide both at the motion-to-

dismiss stage and the summary-judgment stage.  In that case,

Melinda Lee Stierheim, who was visibly intoxicated, was taken into

custody by the Upper Darby police.  Colburn I, 838 F.2d at 664.

Diane Miller, a custodial official with the Upper Darby police

department, searched her, but did not find a handgun.  Id. at 665.

About four hours later, Stierheim shot herself in her cell with a

handgun.  Id.  Stierheim's mother, Sue Ann Colburn, as the

administratrix of Stierheim's estate sued the town, the police

department, Miller, and several other individuals under section

1983 for deprivation of Stierheim's constitutional rights.  Id.

The court, in the decision on the motion to dismiss, detailed

the allegations of the complaint to determine whether they were

insufficient as a matter of law to assert section 1983 claims based

on a prison suicide against custodial officials in their individual

25

capacities. Id. at 670.[7] These facts included that: (1) the
police were familiar with Stierheim from previous encounters as a
result of her relationship with gang members; (2) the day before
her suicide, the police had been called to her apartment after she
had jumped out of a window during a fight with her boyfriend; (3)
Stierheim was depressed; (4) she had obvious scars on her wrist
from a prior suicide attempt; (5) an officer had to prevent her
from swallowing three Valium pills that she had in her purse; (6)
she was detained "for her own protection" by police; and (7) Miller
discovered a round of ammunition in Stierheim's pocket. Id. On
the basis of these facts, the court ruled that it could not
conclude that these allegations were insufficient as a matter of
law to state a section 1983 individual-capacity claim against
Miller, the custodial official who had searched Stierheim and had
failed to discover the handgun in her possession. Id.

Following the remand in Colburn I and further development of
the record during discovery, the court granted summary judgment in
favor of the defendant. Colburn II, 946 F.2d at 1027. Further
discovery revealed that the incident where Stierheim jumped out a
window the day before her suicide did not appear to be a suicide

---

[7] The court was relying not only on the complaint but also on
the plaintiff's memorandum in opposition to the motion to dismiss,
which detailed specific facts that could be asserted in an amended
complaint depending on the court's ruling on the motion to dismiss.
Colburn I, 838 F.2d at 670.

attempt but rather an effort to escape from her boyfriend.  Id. at
1026.  She accepted help from police officers in getting down when
they arrived.  Id.

   With respect to the other allegations regarding what Miller
knew on the night in question, the court explained that while a
trier of fact may infer that scars on Stierheim's arms were the
result of a suicide attempt, the record demonstrated that no one
noticed these scars on the evening of her suicide.  Id.  Nothing in
the record developed through discovery indicated "that Stierheim
had ever been diagnosed as suffering from a mental illness
characterized by a high risk of self-inflicted harm" or that there
was any other indication that Stierheim was vulnerable to suicide.
Id.  While the plaintiff had relied on Stierheim's intoxication as
an indicator of vulnerability to suicide, the court noted its
agreement with the majority of other circuits, "which have refused
to recognize intoxication as a factor sufficient to trigger the
duty to guard against self-inflicted injury."  Id.  The court
further reasoned that Stierheim's possession of a bullet -- that
was discovered by Miller during the search -- without more, was not
an indicator of suicidal tendencies.  Id. at 1027.  Finally, the
court concluded that, while consumption of a large quantity of
drugs could manifest suicidal intent, the three pills that Miller

27

believed that Stierheim had tried to swallow were insufficient to

"make it apparent that a detainee is on the verge of suicide." Id.

The court was convinced, following the development of the

record through discovery, "that no fair-minded jury could conclude

. . . that Stierheim had a particular vulnerability to suicide of

which Miller should have been aware." Id. Thus, the court

affirmed the district court's grant of summary judgment in favor of

Miller. Id.

Following Colburn I and Colburn II, the Court of Appeals for

the Third Circuit has had several opportunities to apply the

standard for section 1983 claims based on prison suicides. In

Freedman v. City of Allentown, the court found that the plaintiffs'

allegations that the decedent prisoner had prominent scars on his

wrists, when viewed in the light most favorable to the plaintiffs,

amounted merely to negligence and did not state a viable section

1983 claim. 853 F.2d at 1116. While there were allegations that

the decedent prisoner had suicidal tendencies and had previously

attempted suicide, the allegations did not suggest that this was

known to the individual police officers but rather that the

probation officer knew about the decedent's suicidal past and

failed to mention it to the officers. Id. at 1115. For these

reasons, the court affirmed the dismissal of the complaint against

the police officers. See id. at 1116.

28

Similarly, in Kulp v. Veruete, following discovery, the court affirmed the district court's grant of summary judgment where the defendants had recognized that the decedent had some emotional issues and potentially "passive suicidal thoughts," but two counselors, after extended evaluations, did not think it was necessary to place the decedent on suicide watch. 267 Fed.Appx. 141, 144 (3d Cir. 2008).

Where the allegations in the complaint demonstrate concrete, direct knowledge on the part of the defendant officials of the decedent's suicidal tendencies and an inexplicable disregard of the warning signs, a motion to dismiss should be denied. For example, in Tatsch-Corbin v. Feathers, the complaint averred that the decedent was released into the general prison population as opposed to being placed on suicide watch even though: the defendant officials had specific, direct knowledge of the decedent's history of mental-health issues and suicide attempts; the decedent indicated he was considering killing himself to an intake officer; and the decedent made additional suicide threats to prison officials as he was escorted to and from a hearing the day before his suicide. 561 F.Supp.2d 538, 540-542 (W.D. Pa. 2008). The United States District Court for the Western District of Pennsylvania concluded on these facts that a jury could find that

officials acted with deliberate indifference to the decedent's
condition and, thus, denied the motion to dismiss.  Id. at 544.

Plaintiffs in this case argue that the standard for section
1983 liability in prison suicide cases is established by the facts.
Plaintiffs assert that Defendants' "failure to follow protocol
despite specific knowledge that it could lead to self-inflicted
harm, including the failure to properly monitor and supervise the
inmate in his cell and/or allow bedsheets in the cell among other
failures can amount to deliberate indifference sufficient to impose
individual liability." (Pls.' Opp'n to DOC Defs.' Mot. to Dismiss
at 19.)

The Court will consider this standard with respect to the
allegations against the defendants individually.  According to the
Complaint, Dimler was responsible for supervising the decedent once
he had been released into the general prison population through the
time of his suicide.  (Compl. at ¶ 26.)  Teel was the medical
provider responsible for the decedent's care and supervision from
the time he was placed in the general prison population until his
death.  (Id. at ¶ 32.)  Dimler and Teel "knew or should have known
of the history of suicide and psychiatric illness suffered by" the
decedent and that the decedent was an addict at a high risk for
suicide.  (Id. at ¶¶ 27, 33, 62.)  According to the Complaint, both
disregarded the decedent's risk of suicide and violated policy and

30

procedure, by failing to adequately monitor the decedent, allowing
him to be in his cell with materials that could harm him, and
failing to intervene to prevent the suicide. (Id. at ¶¶ 28-29, 34-
35, 60, 61.) The Complaint also asserts that Dimler and Teel
failed to review the transfer records from Kintock in order to
determine what level of supervision was required. (Id. at ¶ 36,
62.) Dimler and Teel also purportedly failed to evaluate the
decedent for intoxication as was required by prison policy and
procedure. (Id. at ¶ 53.)

The Court finds that the conclusory allegations with respect
to Dimler and Teel are insufficient as a matter of law and fail to
demonstrate -- even when viewed with all inferences in Plaintiffs'
favor -- that they would have had any reason to be concerned about
the decedent's risk of suicide. See Freedman, 853 F.2d at 1114
(stating that court must look past conclusory allegations). With
respect to the allegations that Dimler and Teel failed to review
the transfer records or evaluate the decedent for intoxication, the
Court finds that these conclusory allegations, even if taken as
true, would merely establish negligence and would fall short of the
reckless indifference required by Colburn II. 946 F.2d at 1023.
Plaintiffs have not pled -- beyond conclusory statements that
merely restate the legal standard -- actual knowledge on the part
of Dimler or Teel. Id. at 1025 n.1. Nor have Plaintiffs pled that

31

they "should have known" of the decedent's vulnerability to
suicide, as the Complaint fails to point to any actions of the
decedent that would have alerted Dimler or Teel to the fact that he
was a suicide risk.  Plaintiffs have not alleged how Teel and
Dimler, in the course of their duties, would have been aware of the
decedent's particular vulnerability.  This "should have known"
standard requires "something more than a negligent failure to
appreciate the risk of suicide," and the Complaint, viewed in the
light most favorable to Plaintiffs, does not provide allegations
capable of satisfying this standard.  Id. at 1025.  Therefore, the
Complaint will be dismissed in its entirety as to Dimler and Teel.

In contrast, the Court finds that the Complaint, when viewed
in the light most favorable to Plaintiffs with all inferences drawn
in their favor, states a claim against Byrd in her individual
capacity under section 1983 for a prison suicide.  The Complaint
alleges that Byrd performed a nursing intake on January 16, 2009
and noted that the decedent had answered in the affirmative to
questions regarding whether he had a history of suicidal tendencies
and whether he had been hospitalized or treated for psychiatric
illness.  (Compl. at ¶ 50.)  Despite this, Byrd purportedly cleared
the decedent to be placed into the general prison population.  (Id.
at ¶ 59.)  The Court finds that these specific allegations of
Byrd's basis for knowledge of the decedent's vulnerability to

32

suicide are sufficient to overcome a motion to dismiss.  Colburn II
-- in reliance of the jurisprudence of other circuits --
specifically states that actual knowledge may be based on a history
of suicidal tendencies.  946 F.2d at 1025 n.1.  Plaintiffs have
adequately pled a section 1983 individual-capacity claim against
Byrd following a prison suicide based on her actual knowledge of
the decedent's particular vulnerability.

    Plaintiffs request that, if the Court deems any of the claims
insufficient (for example the individual-capacity claims against
Dimler and Teel), the Court permit additional discovery to assist
in the development of the claims in the Complaint.  (Pls.' Opp'n to
Byrd's Mot. to Dismiss at 15-16; Pls.' Opp'n to DOC Defs.' Mot. to
Dismiss at 24.)  The Court concludes that the lack of specificity
is not "fairly attributable to the defendants' control of required
information."  See Freedman, 853 F.2d at 1114.  The Court finds
that these allegations seek to impose liability against these
defendants on a negligence standard, which is not permitted for
prison suicide cases.  Therefore, the Court declines to permit
discovery to allow development of the claims against Dimler and
Teel.

**C.  Supervisory Liability**

    With regard to the liability of the Supervisory Defendants,
Plaintiffs refer to federal jurisprudence on section 1983 municipal

33

liability under <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978). (<u>See</u> Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 14-16.) In contrast to state government defendants, the Eleventh Amendment does not bar damage awards against municipalities and municipal officials in their official capacity. <u>Monell</u>, 436 U.S. at 690 n.54, 55. Likewise, municipal officers named in their official capacities are "persons" for section 1983 purposes. <u>Id.</u> at 690 n.55.

The one municipal defendant here -- Mercer County -- was dismissed from the action by stipulation of the parties on March 22, 2011. (<u>See</u> Stip. of Dismissal as to Mercer County.) Plaintiffs and Movants consistently treat all the individual defendants as state officials, not municipal officials. As discussed, these officials enjoy immunity under the Eleventh Amendment when sued in their official capacity. Thus, Plaintiffs' citations to municipal liability under <u>Monell</u> and its progeny are irrelevant. (<u>See</u> Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 14-16.)

Notwithstanding <u>Monell</u>'s inapplicability, supervisory liability under section 1983 is possible. However, such liability must be premised on the supervisory defendant's personal involvement in the wrongs; "it cannot be predicated solely on the operation of respondeat superior." <u>Rode v. Dellarciprete</u>, 845 F.2d

34

1195, 1207 (3d Cir. 1988); see also Polk Cnty. v. Dodson, 454 U.S.
312, 325 (1991).

There are two theories under which supervisory liability may
be premised for section 1983 purposes. A.M. v. Luzerne Cnty. Juv.
Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004).  First, "[i]ndividual
defendants who are policymakers may be liable under § 1983 if it is
shown that such defendants, with deliberate indifference to the
consequences, established and maintained a policy, practice or
custom which directly caused [the] constitutional harm."  Id.
(internal quotations and citation omitted).  Second, "a supervisor
may be personally liable under § 1983 if he or she participated in
violating the plaintiff's rights, directed others to violate them,
or, as the person in charge, had knowledge of and acquiesced in his
subordinates' violations."  Id.; see also Rode, 845 F.2d at 1207.
This second theory essentially requires that the acts or omissions
of the supervisor were the "moving force" behind the harm.  Sample
v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989); Jackson v. Taylor,
No. 05-823, 2006 WL 2347429, at *2 (D. Del. May 12, 2006).
"Allegations of participation or actual knowledge and acquiescence,
however, must be made with appropriate particularity."  Rode, 845
F.2d at 1207.

The DOC Defendants argue that, based on the foregoing, the
Complaint is deficient with respect to the Supervisory Defendants –

35

- Balicki, Patterson, and Dunlap-Pryce.  Specifically, the DOC
Defendants argue that the Complaint lacks specific facts regarding:
(1) the conduct of the Supervisory Defendants; and (2) which policy
or procedure they failed to follow or implement.  (DOC Defs.' Mot.
to Dismiss at 12-14.)  Plaintiffs counter that the alleged facts
demonstrate "both the direct knowledge and participation of the
Supervisory Defendants in obtaining and reviewing transfer records
of inmates in their facilities" and that the Supervisory Defendants
failed "to enact, implement and enforce policies and procedures"
for: (1) the review of transfer records; and (2) the treatment of
individuals with addiction/intoxication issues or who pose a risk
of self-harm/suicide.  (Pls.' Opp'n to DOC Defs.' Mot. to Dismiss
at 18.)  Plaintiffs claim that this "foreseeably led to the suicide
of Mullin and which evidenced a gross indifference and reckless
disregard for the rights of" the decedent.  (Id.)  Plaintiffs argue
that it is unreasonable to expect them to be able to identify the
exact policy at issue, as, without discovery, Plaintiffs do not
have access to internal department policies and procedures.  (Id.
at 19.)

     The Court of Appeals for the Third Circuit has addressed
claims against supervisory defendants in the prison suicide context
under similar facts.  In Colburn I, despite allowing the claims to
proceed over a motion to dismiss against the custodial official who

was personally involved in alleged wrongdoing, the court dismissed

the claims against the supervisory defendants -- the police

commissioner of Upper Darby Township and the mayor of Upper Darby -

- in their individual capacities because the complaint lacked

allegations that these supervisory defendants were personally

involved in any of the activities related to the decedent's

suicide.  Colburn I, 838 F.2d at 673.

    The Court finds the Complaint in this case to be similarly

deficient with respect to the Supervisory Defendants.  The

Complaint identifies Balicki, Patterson, and Dunlap-Pryce as

"supervisory official[s]."  (Compl. at ¶¶ 2-4.)  The Complaint

alleges that the decedent was in the custodial care of the

Supervisory Defendants and that agents of the Supervisory

Defendants examined the decedent.  (Id. at ¶¶ 37, 39.)  The

Complaint alleges that the Supervisory Defendants "knew or should

have known based on daily intake records at their disposal that"

the decedent was being transferred to their care and that he had a

history of suicide attempts, psychiatric problems, and drug abuse.

(Id. at ¶ 63.)  Under policy and procedure, Plaintiffs aver that

the Supervisory Defendants were required to know the status of

inmates brought into their facilities and to review the transfer

records.  (Id. at ¶ 64.)  Plaintiffs allege that the Supervisory

Defendants failed to review these records and to ensure that the

37

decedent was properly treated as a suicide risk.  (Id. at ¶ 65.)
Finally, Plaintiffs assert that the Supervisory Defendants failed
to enact and enforce policies and procedures requiring the review
of transfer records and the proper treatment of those who had
addiction problems or who were a suicide risk.  (Id. at ¶ 66.)

The Court finds that, as in Colburn I, these allegations are
insufficient to survive a motion to dismiss.  The Complaint lacks
any allegations that these Supervisory Defendants were personally
involved in the actions at issue.  See Colburn I, 838 F.2d at 673.
Plaintiffs do not allege that these Supervisory Defendants
participated, directed, or acquiesced in the violation of the
decedent's rights.  See A.M., 372 F.3d at 586.

While Plaintiffs also seek to hold the Supervisory Defendants
liable under the policy or practice theory of supervisory
liability, see id., the Court finds that the Complaint is far too
conclusory with respect to any deficiencies in any policy or
practice.  And while Plaintiffs have argued that it is unreasonable
to expect them to identify the policy or procedure without
discovery, the Court will not allow a fishing expedition into the
operations of the state department of corrections absent any
indication by Plaintiffs that such discovery will be fruitful.  For
these reasons, the Court will dismiss the claims asserted against
the Supervisory Defendants in their entirety.

D.    **Punitive Damages**

Plaintiffs have requested punitive damages against the

individual defendants.   Punitive damages are available for section

1983 claims when the conduct of the defendant "involves reckless or

callous indifference to the federally protected rights of others."

Smith v. Wade, 461 U.S. 30, 56 (1983).   This is true even when the

underlying liability standard for compensatory damages is that of

recklessness.   Id.   Where the facts allege reckless conduct, and

the allegations of the complaint with respect to that conduct are

found to be sufficient to withstand a motion to dismiss, a court

may decline to dismiss punitive-damage claims at the motion-to-

dismiss stage.   See, e.g., Tatsch-Corbin, 561 F.Supp.2d at 545.

The claims asserted against the majority of the defendants

will be dismissed, thereby resulting in the dismissal of the

punitive-damage claims against these defendants as well.   However,

with respect to Byrd, the Court has found that the Complaint

adequately pleads a claim for relief.   Therefore, the Court

declines to dismiss Plaintiffs' request for punitive damages

asserted against Byrd at his juncture.

**IV.   CONCLUSION**

The Court for the reasons stated above, will (1) grant the

motion to dismiss by Balicki, Patterson, Dunlap-Pryce, Dimler and

Teel, (2) deny the motion for judgment on the pleadings by Byrd

insofar as it concerns individual-capacity, constitutional claims

asserted against her, and (3) otherwise grant Byrd's motion.

Remaining before the Court in this matter are Plaintiffs' claims

against Kintock (which did not move to dismiss any claims) and the

constitutional claims against Byrd in her individual capacity.  The

Court will issue an appropriate Order.


                              ___s/ Mary L. Cooper_____
                              **MARY L. COOPER**
                              United States District Judge


Date:      November 1, 2013

# DOCKET ENTRY #: 204 - ORDER

## WITH

## MEMORANDUM OPINION – DOCKET

## ENTRY # 203

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOAN MULLIN, ADMINISTRATRIX OF
THE ESTATE OF ROBERT MULLIN,
deceased, and JOAN MULLIN, individually,

    Plaintiffs,

    v.

ADMINISTRATOR KAREN BALICKI, et
al.,

    Defendants.

CIVIL ACTION NO. 11-247 (MLC)

**O R D E R**

For the reasons stated in the Court's Memorandum Opinion dated July 25, 2014,

**IT IS** on this 25th day of July, 2014, **ORDERED** that the motion for reconsideration of

the Court's November 1, 2013 Order (dkt. entry no. 185) is **DENIED**; and it is further

    **ORDERED** that the plaintiffs are **GRANTED LEAVE** to file a separate notice of

motion concerning leave to amend the complaint and assert new claims, as well as

separate briefs and exhibits in support thereof, before the Magistrate Judge **BY AUGUST**

**22, 2014** in accordance with the Federal Rules of Civil Procedure and the Local Civil

Rules.

              s/ Mary L. Cooper
              **MARY L. COOPER**
              United States District Judge

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually, | CIVIL ACTION NO. 11-247 (MLC) |
| Plaintiffs, | **MEMORANDUM OPINION** |
| v. | |
| ADMINISTRATOR KAREN BALICKI, et al., | |
| Defendants. | |

**COOPER, District Judge**

Joan Mullin, individually and as administratrix of the estate of Robert Mullin, her son, ("Plaintiffs") seeks reconsideration of this Court's Order dated November 1, 2013 (dkt. entry no. 185, Notice of Mot. for Reconsideration) in which the Court granted in part and denied in part the defendants' motion to dismiss and motion for judgment on the pleadings (collectively "motions to dismiss"). (See dkt. entry no. 154, 11-1-13 Order.) For the reasons that follow, that motion for reconsideration is denied.

## I. BACKGROUND

The Court, for the purposes of judicial economy, will not repeat the facts, procedural history, and reasoning of the Court's November 1, 2013 Opinion ("Opinion") and Order ("Order") and instead incorporates them by reference. (See dkt. entry no. 153, 11-1-13 Op.; 11-1-13 Order.) Following the Opinion and Order, on November 13, 2013, Plaintiffs filed a

motion for reconsideration and to amend the Second Amended Complaint. (See dkt. entry no. 155, 11-13-13 Notice of Mot.) Because the motion for leave to amend should have been "pursued in a separate motion before the Magistrate Judge," this Court denied the motion without prejudice on November 15, 2013. (Dkt. entry no. 158, 11-15-13 Order at 2.) This Court granted Plaintiffs leave to refile the motion for reconsideration before this Court and to file a separate motion for leave to amend before the Magistrate Judge "**AFTER THE SEPARATELY-FILED MOTION FOR RECONSIDERATION HAS BEEN RESOLVED.**" (Id. at 3.) Plaintiffs then filed a motion for reconsideration of the Opinion and Order on November 25, 2013. (See dkt. entry no. 160, 11-25-13 Notice of Mot.) On March 4, 2014, after briefing on the motion for reconsideration was complete, Plaintiffs' counsel filed a letter to this Court seeking to reopen the motion on the basis of "additional evidence" that Plaintiffs' counsel had in her possession since before the Court issued its Opinion and Order but that she had misplaced. (Dkt. entry no. 182, 3-4-14 Pls.' Counsel Letter at 2.) On March 31, 2014, this Court denied the motion for reconsideration without prejudice and permitted Plaintiffs to refile the motion presenting the new evidence. (Dkt. entry no. 184, 3-31-14.) On April 24, 2014, Plaintiffs filed the instant motion for reconsideration. (See Not. of Mot. for Reconsideration.)

Plaintiffs seek reconsideration as to two aspects of the Opinion and Order: (1) the dismissal of all of the claims against Officer Dimler ("Dimler"); and (2) the dismissal of the claims under the New Jersey Tort Claims Act against Nurse Byrd ("Byrd"). (See dkt. entry no. 186, Pls.' Br. in Supp. of Mot. ("Pls.' Br.") at 1.) The purported basis of the motion is

2

"new facts which were not before the Court and unknown to plaintiff at the time the motions were filed and opposition briefed." (Id.) There appear to be two sets of information that came to Plaintiffs' attention following the briefing of the motions to dismiss. According to Plaintiffs' counsel, "[o]n July 17, 2013 the State Defendants supplied the policies and procedures, among other documents, which finally established that Dimler and Byrd were in violation of various policies and failed to properly perform their ministerial functions." (Id. at 8.) Additionally, Plaintiffs' counsel claims that she had received discs of discovery information from the defendants in April 2013, but that she "misplaced and misfiled" one of the discs. (Id.) The information on this disc apparently related to "the investigation into the suicide," and the misplaced disc was not discovered until after February 26, 2014. (See id.; 3-4-14 Pls.' Counsel Letter at 2.) On the basis of this new information, Plaintiffs intend to seek to amend the Second Amended Complaint and add new allegations in a Third Amended Complaint, which Plaintiffs submitted as an exhibit to this motion. (See Pls.' Br. at 2; dkt. entry no. 187, Proposed Third Am. Compl.)

The new allegations that arise from these new sources of information relate to specific policies of the Department of Corrections that impose various obligations on Byrd and Dimler that they allegedly failed to follow. (See Pls.' Br. at 2-3.) According to Plaintiffs, Byrd was required to, inter alia, ensure that Robert Mullin ("Mullin"), the decedent, was "seen by a mental health professional prior to his placement in detention and that he be placed on Close or Constant Watch" based on the fact that Byrd "obtain[ed] a positive response to a mental health item in that [Mullin] answered in the affirmative when asked if he had ever tried to

3

commit suicide and whether he had ever been treated for a psychiatric disorder." (Id. at 3.) Byrd also allegedly "failed to utilize the proper assessment mechanisms in place by policy, failed to see to it that decedent was evaluated by a psychologist or psychiatrist upon transfer, failed to document the type of watch necessary, all a direct and proximate cause of decedent's death." (Id. at 5.) With respect to Dimler, Plaintiffs allege that Mullin was transferred to a Close Custody Unit, which was "for inmates placed on either Administrative or Disciplinary Segregation, Protective Custody or Suicide watch," and that internal procedures require that inmates in Close Custody be monitored either every fifteen minutes ("Close Watch") or continuously ("Constant Observation") depending on the inmate. (See id. at 3-4.) Plaintiffs claim that the internal procedures required that Mullin be placed on Constant Observation. (Id. at 4.) Dimler purportedly failed to monitor Mullin "either on Constant Watch or Close Watch." (Id. at 5.) Essentially, Plaintiffs' contention is that Dimler was on notice regarding Mullin's vulnerability to suicide by virtue of his placement in the Close Custody Unit and that because of this placement, Dimler was required by internal policy and procedure to monitor Mullin more frequently than was done. (See id. at 5-6.)

Plaintiffs also wish to assert claims against new defendants. (Id. at 1.) Seemingly, this would include "Officer Russo." Plaintiffs allege, based on the statements of other inmates, that "Mullin requested to see a psychiatrist, and told Officer Russo that he wanted to kill himself, but was ignored and humiliated by Officer Russo." (Id. at 5.) Officer Russo purportedly refused Mullin's requests and said "Shut up. You might as well kill yourself."

4

(Id. at 5-6.)  Plaintiffs do not identify the source of this information or why that was not

available earlier, but the Court assumes that this information came from the misplaced disc.

## II.     STANDARD OF REVIEW

Plaintiffs have moved for reconsideration pursuant to Local Civil Rule 7.1 ("Rule

7.1").  Reconsideration is considered "an extraordinary remedy" that should granted

"sparingly."  Daminao v. Sony Music Entm't, Inc., 975 F.Supp. 623, 634 (D.N.J. 1997)

(quoting N.L. Indus., Inc. v. Commercial Union Ins. Co., 935 F.Supp. 513, 516 (D.N.J.

1996)).  Pursuant to Rule 7.1(i), "a motion for reconsideration shall be served and filed within

14 days after the entry of the order or judgment on the original motion," and "[a] brief setting

forth concisely the matter or controlling decisions which the party believes the Judge or

Magistrate Judge has overlooked shall be filed with the Notice of Motion."  "The word

'overlooked' is the operative term in the Rule."  Bowers v. Nat'l Collegiate Athletic Ass'n,

130 F.Supp.2d 610, 613 (D.N.J. 2001).  To succeed on such a motion, Plaintiffs "must show

more than a disagreement with the court's decision."  Daminao, 975 F.Supp. at 634 (quoting

Panna v. Firstrust Sav. Bank, 760 F.Supp. 432, 435 (D.N.J. 1991)).  And, in general, Rule 7.1

"does not contemplate a Court looking to matters which were not originally presented."  Id.

(quoting Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F.Supp. 159, 162 (D.N.J.

1988)).

"Reconsideration motions . . . may not be used to relitigate old matters, or to raise

arguments or present evidence that could have been raised prior to the entry of judgment."

N.L. Indus., Inc., 935 F.Supp. at 516.  Reconsideration motions should only be granted

"where (1) an intervening change in the law has occurred, (2) new evidence not previously available has emerged, or (3) the need to correct a clear error of law or prevent manifest injustice arises." <u>Id.</u> (citing <u>N. River Ins. Co. v. CIGNA Reinsurance Co.</u>, 52 F.3d 1194, 1218 (3d Cir. 1995)).

Plaintiffs here rely upon the second ground for reconsideration, "new evidence." Notably, "[n]ew evidence is not the equivalent of evidence that a party simply obtains after an adverse ruling." <u>Physicians Healthsource, Inc. v. Janssen Pharm., Inc.,</u> No. 12-2132, 2013 WL 2460345, at *3 (D.N.J. June 6, 2013) (citing <u>Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,</u> 602 F.3d 237, 252 (3d Cir. 2010)). Motions for reconsideration are not a means to expand the record before the court. <u>Bowers</u>, 130 F.Supp.2d at 613. Generally speaking, "courts should reject new evidence not presented when the court made its original decision." <u>Physicians Healthsource, Inc.,</u> 2013 WL 2460345, at *3. Following a decision on a motion to dismiss, courts in this district have denied motions for reconsideration where new allegations are offered under the guise of "new evidence." <u>See, e.g., id.</u>

## III. DISCUSSION AND ANALYSIS

Plaintiffs argue that this Court, in rendering the Opinion and Order, improperly parsed "the factual allegations in determining whether plaintiff could prove the lack of supervision or the failure to abide by policy and procedure in the supervision and management of [Mullin]" and that this "was an exceptionally harsh and restrictive view of the pleading standards which plaintiff contends does not comport with the law." (Dkt. entry no. 201, Pls.' Reply Br. at 18-

19.)  The Court disagrees with this assessment, particularly given the nature of Plaintiffs'

claims and the potential immunities at play.  In the Opinion, the Court explained:

> A civil-rights complaint must "'contain a modicum of factual specificity,
> identifying the particular conduct of defendants that is alleged to have harmed
> the plaintiffs.'" Freedman v. City of Allentown, 853 F.2d 1111, 1114 (3d Cir.
> 1988) (quoting Ross v. Meagan, 638 F.2d 646, 650 (3d Cir. 1981)).  The court
> must look past any conclusory allegations regarding the willfulness of the
> defendants' conduct or the defendants' reckless disregard of the rights of the
> victim; the court will focus on "the factual scenario itself to examine whether
> the conduct alleged, viewed most favorably to plaintiffs, is reasonably
> susceptible to falling within the conclusions alleged." Id. at 1115.

(11-1-13 Op. at 10-11.)  And, with respect to the state-law immunities under New Jersey's

Tort Claims Act, the Court stated, "Courts interpret these provisions broadly, and close calls

in application are resolved in favor of immunity, not liability." (Id. at 15.)  Given the type of

claims at issue and the highly conclusory language used in the Second Amended Complaint,

the Court does not agree with Plaintiffs' charge that the Opinion was "exceptionally harsh" or

"restrictive."

Plaintiffs further contend that the Second Amended Complaint is not "conclusory."

Specifically, they assert that their "newly discovered evidence . . . supports the already pled

allegations before the Court and would tend to show that the Court did overlook the

allegations" relating to Dimler and Byrd. (Pls.' Reply Br. at 10.)  According to Plaintiffs,

"discovery has established that in fact these allegations were not conclusory." (Id. at 26.)  The

Court believes that Plaintiffs are confused by the nature and significance of a determination

that the pleadings were "conclusory."  The Court's characterization of the pleadings as

"conclusory" means that the words chosen by Plaintiffs were insufficiently specific to provide

7

the requisite notice to the defendants. Whether discovery could ultimately prove or even support the allegations does not alter their conclusory nature in the first instance, and it is the words chosen, and not the potentially available proof, that the Court considers on a motion to dismiss. Therefore, the "new evidence" submitted by Plaintiffs does not change the Court's determination that some of the language used by Plaintiffs in the Second Amended Complaint was "conclusory."

The purported new evidence before the Court is (1) the policies and procedures that Dimler and Byrd allegedly failed to follow and (2) information relating to the knowledge of Dimler and other yet-unnamed defendants regarding Mullin's vulnerability to suicide. Plaintiffs first argue that the Court erred in concluding that Dimler and Byrd were entitled to immunity on the state-law claims pursuant to N.J.S.A. 59:6-6, which confers immunity on public employees for injuries resulting from their determination "whether to confine a person for mental illness or drug dependence [or] the terms and conditions of confinement for mental illness or drug dependence." (Pls.' Br. at 11.) Plaintiffs contend that this immunity is reserved for "high level judgment or policy decisions" and does not apply to Dimler or Byrd in the handling of their ministerial duties. (See id. at 12-13 (citing N.J.S.A. 59:3-2; Kolitch v. Lindedahl, 100 N.J. 485 (1985); Longo v. Santoro, 195 N.J. Super. 507 (N.J. App. Div. 1984)); see also Pls.' Reply Br. at 24.) Additionally, Plaintiffs argue that the dismissal of the constitutional claims against Dimler should be vacated because "new evidence and proposed amended factual allegations" demonstrate Dimler's actual knowledge of Mullin's vulnerability to suicide. (Pls.' Br. at 15.) The gist of Plaintiffs' new evidence of this

8

knowledge is that Mullin was transferred to a Close Custody Unit, and policy required

supervision of inmates in this unit at a minimum of fifteen minute intervals.  The fact that

Mullin was in this unit, and Dimler was aware of his existence in this unit, indicates —

according to Plaintiffs — that Dimler was on notice that Mullin required close supervision.

(Id. at 16-17.)

    The defendants respond that reconsideration is not warranted and is improper because

Plaintiffs' motion is based not upon the "legal sufficiency" of the Second Amended

Complaint but rather upon "allegations as set forth in an entirely new and unfiled Complaint."

(Dkt. entry no. 189, Byrd's Opp'n at 14; see also dkt. entry no. 196, Attorney General's

Opp'n at 10 ("The court's Order and Opinion addressed solely whether certain claims in the

Second Amended Complaint should be dismissed for failure to state a claim, and these new

documents in no way did or would possibly have touched on that analysis.").)

    The Court concludes that this "new evidence" does not warrant reconsideration of the

Court's Opinion and Order.  The Second Amended Complaint, as written, remains conclusory

and insufficiently specific with respect both to Dimler's knowledge and to the alleged policies

and procedures that conveyed "ministerial" duties on Byrd and Dimler, which they allegedly

failed to follow.  (See dkt. entry no. 102, 2d Am. Compl.)   This new evidence, which

provides many missing details relating to Plaintiffs' allegations relating to policy and

procedure and Dimler's knowledge, is external to the Second Amended Complaint.  In

evaluating a motion to dismiss, the Court typically does not look outside of the complaint.

See Borough of Moosic v. Darwin Nat'l Assur. Co., 556 Fed.Appx. 92, 95 (3d Cir. 2014)

9

("Generally, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."); A.D. Bedell Wholesale Co. v. Phillip Morris Inc., 263 F.3d 239, 266 (3d Cir. 2001) ("It is black-letter law that [a] motion to dismiss for failure to state a claim . . . is to be evaluated only on the pleadings." (internal quotation marks and citation omitted)). Thus, the Court properly relied upon the allegations in the Second Amended Complaint. Plaintiffs have merely come forward with new allegations and have not demonstrated that the Court "overlooked" anything in the first instance. See Physicians Healthsource, Inc., 2013 WL 2460345, at *3 ("Plaintiff is seeking to assert new allegations . . . . In that regard, under the standard, Plaintiff has not raised any basis for which I would reconsider my prior rulings."). For this reason, reconsideration is not warranted.

What Plaintiffs truly seek to do is to amend the Second Amended Complaint. At this stage in the litigation, Plaintiffs must move for leave before the Magistrate Judge and may not amend as of right pursuant to Federal Rule of Civil Procedure 15(a). The decision whether to grant leave to amend is discretionary. See Lorenz v. CSX Corp., 1 F.3d 1406, 1413 (3d Cir. 1993). Leave to amend should be "freely given" unless there is a justification for denying such leave, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Id. at 1413-14 (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

The Court does not purport to opine on whether the Magistrate Judge should exercise the discretion to grant leave to amend in these circumstances other than to make note of a few

considerations.[1]  With respect to the "new evidence" relating to policies and procedures, the

parties do not dispute that this information was in fact at Plaintiffs' counsel's "disposal" as of

July 17, 2013, after the briefing on the motions to dismiss was completed but before the Court

rendered a decision.  (See Pls.' Br. at 8.)  The Court issued its Opinion and Order on

November 1, 2013.  Plaintiffs have offered absolutely no explanation why they did not bring

this information to the Court's attention or attempt to amend the Second Amended Complaint

prior to that date, over four months after Plaintiffs' counsel was aware of the information,

which counsel describes as "critical."  (Pls.' Reply Br. at 8.)[2]  With respect to the new

evidence relating to the investigation into Mullin's suicide, Plaintiffs' counsel misplaced or

misfiled the disc containing this information but located it after February 26, 2014 — nearly

four months after the Court rendered its decision.  Plaintiffs' counsel promptly notified the

Court about this discovery on March 4, 2014.  (See 3-4-14 Pls.' Counsel Letter.)

 The foregoing demonstrates that two sets of new information came to the Court's

attention through very different circumstances.  As a result, the new allegations that Plaintiffs

---

[1]     Despite the substantial briefing on the futility or sufficiency of the requested amendments or
the significance of the external documents, the Court declines to consider such arguments on this
motion for reconsideration of its dismissal of most of the claims in the Second Amended Complaint.
(See Attorney General's Opp'n at 11-15; Byrd's Opp'n at 11-14.)  These arguments may or may not
be appropriate considerations for the Magistrate Judge, depending on the manner in which these
arguments are presented.

[2]     Plaintiffs argue that "Defendants have been dilatory in their discovery obligations in this case,
and should not be heard to complain of the plaintiffs' clerical error or moving faster to advise the
Court to reopen the Motion for Dismissal based on the July 2013 evidence."  (Pls.' Reply Br. at 8.)
The Court is unimpressed by Plaintiffs' comparison of the parties' obligations vis-à-vis one another to
the parties' obligations to the Court.  Moreover, the Court invested considerable time evaluating the
motions to dismiss, and Plaintiffs' counsel's disregard for the waste of judicial resources is
disconcerting.

seek to add in a Third Amended Complaint may require different treatment depending on when that information became available to Plaintiffs' counsel. The Magistrate Judge, in applying the <u>Foman</u> factors, which include "undue delay," may exercise the discretion to draw a distinction between the information Plaintiffs' counsel learned of in July of 2013 as opposed to the information discovered in February or March of 2014. The Court does not intend to guide the Magistrate Judge's discretion but rather seeks to aid the Magistrate Judge by providing some direction to the parties in advance. To assist the Magistrate Judge, Plaintiffs would be wise to indicate, for each new allegation in the proposed Third Amended Complaint, where the information underlying that allegation came from and when Plaintiffs' counsel became aware of it. It is entirely unclear from the briefing which new allegations are based on the July 2013 discovery and which are based on the misplaced discovery found in February or March of 2014. The Magistrate Judge may view such distinctions as relevant, and therefore, the Court suggests that Plaintiffs clarify this on any subsequent motion for leave to amend the pleadings.

## IV. CONCLUSION

For these reasons, Plaintiffs' motion for reconsideration (dkt. entry no. 185) is denied. The Court will issue an appropriate Order.

  _s/ Mary L. Cooper_____
  **MARY L. COOPER**
  United States District Judge

Date:    July 25, 2014

# DOCKET ENTRY #: 220 - ORDER

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, Administratrix of the Estate of Robert Mullin, deceased, and individually, <br><br> Plaintiff, <br><br> v. <br><br> STATE OF NEW JERSEY, et al., <br><br> Defendants. | Civil Action No. 11-247 (MLC) <br><br><br> ORDER DENYING MOTION FOR <u>LEAVE TO AMEND COMPLAINT</u> |

Presently before the Court is a Motion to Amend (the "Motion"), filed by Plaintiff, Joan

Mullin ("Plaintiff"), individually and as Administratrix of the Estate of Robert Mullin, deceased

("Decedent"). [Docket Entry No. 206]. By way of the Motion, Plaintiff seeks leave to file the

proposed Third Amended Complaint (the "Third Amended Complaint" or "TAC"), adding new

causes of action, facts, and additional parties based on what she alleges is newly discovered

evidence. Defendants Balicki, Paterson, Dunlap-Pryce, and Dimler (the "DOC Defendants")

have opposed the Motion [Docket Entry No. 211], as has Defendant Jane Byrd ("Nurse Byrd")

[Docket Entry No. 210]. The Court has considered the Motion on the papers submitted, without

oral argument, pursuant to Rule 78. For the reasons set forth below, the Court denies Plaintiff's

Motion for leave to file the Third Amended Complaint.

## I.    BACKGROUND AND PROCEDURAL HISTORY[1]

On January 17, 2009, Decedent committed suicide while incarcerated in a facility

---

[1] The Court assumes the parties' familiarity with the facts of this case and therefore addresses only those facts pertinent to an understanding of the issues raised by the Motion.

operated by the New Jersey Department of Corrections ("DOC").   On January 14, 2011,

Plaintiff filed suit against various defendants, alleging violations of Decedent's civil rights,

pursuant to 28 U.S.C. §§ 1983 and 1985 and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1, *et*

*seq.*, and asserting state law claims of negligence, emotional distress, abuse of process, and

medical negligence stemming from Decedent's death.   [Docket Entry No. 1].

The procedural history of this case is lengthy and tortured.   From the outset, this case has

had repeated and prolonged motion practice.   Defendant Mercer County filed a motion to

dismiss on March 9, 2011 [Docket Entry No. 7], and was dismissed without prejudice by

stipulation filed on March 22, 2011.   [Docket Entry No. 15].

Defendants State of New Jersey, New Jersey Department of Corrections, South Woods

State Prison, Central Reception and Assignment Facility, Balicki, and Byrd moved to dismiss the

Complaint on or about April 19, 2011.   [Docket Entry 25].   Defendant Trenton Psychiatric

Hospital filed a separate motion to dismiss on May 19, 2011.   [Docket Entry No. 27].   In

response, Plaintiff filed opposition, as well as her first and second applications for leave to

amend the complaint, by way of two separate cross-motions seeking to add newly discovered

facts and additional defendants.   [Docket Entry Nos. 31, 34, 35].   The cross-motions were

referred to the undersigned to be decided [Docket Entry No. 40], and were granted by order

dated November 28, 2011, insofar as they sought to supplement the facts but denied as to new

parties for failure to provide sufficient facts to state a plausible claim (the "November 28

Order").   [Docket Entry No. 43].   The First Amended Complaint was filed on December 1,

2011.   [Docket Entry No. 45].

Plaintiff then moved for reconsideration of that portion of the November 28 Order that

2

denied leave to add Dimler and Teel as defendants.  [Docket Entry No. 46].  On December 16,

2011, Defendants Balicki, Dunlap-Pryce and Paterson filed another motion to dismiss.  [Docket

Entry No. 51].  That motion was denied without prejudice in light of the pending motion for

reconsideration.  [Docket Entry No. 57].  The undersigned granted reconsideration but affirmed

the prior ruling on June 19, 2012.  [Docket Entry No. 80].  Plaintiff appealed that decision,

citing newly discovered evidence.  [Docket Entry No. 85].  The appeal was denied without

prejudice on July 9, 2012, as procedurally improper for relying on evidence not presented in

support of the motion; Plaintiff was granted leave to re-file the appeal and a separate motion for

leave to amend.  [Docket Entry No. 89].

    As a result, Plaintiff filed another motion for leave to amend the complaint on July 16,

2012 [Docket Entry No. 91], and a new appeal.  [Docket Entry No. 92].  The June 19 Order

was affirmed on August 2, 2012.  [Docket Entry Nos. 94-95].

    In the interim, Plaintiff filed a motion for leave to serve a late notice of tort claim on

Nurse Byrd.  [Docket Entry No. 69].  Nurse Byrd opposed and filed a cross-motion to dismiss.

[Docket Entry No 74].  The cross-motion was denied without prejudice on April 5, 2012

[Docket Entry No. 77], and the motion for late tort notice was granted on August 30, 2012.

[Docket Entry No. 99].  By order dated September 14, 2012, the Court also granted Plaintiff's

July 16 motion to amend the complaint [Docket Entry No. 101], and Plaintiff filed her newest

amended complaint, designated as the Fourth Amended Complaint, on September 21, 2012.[2]

---

[2] When Plaintiff filed the two separate cross-motions to amend in response to the various Defendants' motions to dismiss, she filed two different proposed amended complaints as exhibits to the cross-motions, designated as the proposed Second and Third Amended Complaints, leading to confusion as to the proper name of the current proposed pleading.  The Court corrected the record in the March 8, 2013 Order, so that the currently operative pleading is the Second Amended Complaint, rather than the Fourth.  [Docket Entry No. 129].

[Docket Entry No. 102].

Defendants Balicki, Dunlap-Pryce, and Paterson filed yet another motion to dismiss on November 25, 2012. [Docket Entry No. 111]. Nurse Byrd filed her own motion to dismiss on November 29, 2012. [Docket Entry No. 114]. By Order dated May 14, 2013, those motions were denied without prejudice, and leave was given to re-file [Docket Entry No. 143]; Nurse Byrd re-filed the motion to dismiss on May 20, 2013. [Docket Entry No. 144]. Defendants Balicki, Paterson, Dunlap-Pryce re-filed their own motion to dismiss on June 6, 2013, which was joined by Defendants Dimler and Teel (collectively, the DOC Defendants' and Nurse Byrd's motions are referred to as the "Motions to Dismiss"). [Docket Entry No. 145].

Throughout this entire period, the undersigned was engaged in case management. On February 23, 2012, the Court conducted a status conference call with counsel with regard to Plaintiff's request for emergent discovery necessary for her affidavit of merit. The Court also addressed the then-pending first motion for reconsideration.

An Initial Conference was conducted on November 26, 2012, at which the Court set a schedule for fact and expert discovery, as well as dispositive motions and amendments to pleadings. According to that schedule, any motions to amend the pleadings or add new parties was to be filed by no later than January 25, 2013, and all fact discovery was to be completed by May 17, 2013. *See* Order entered November 27, 2012 [Docket Entry No. 113]. The deadline for fact discovery was extended to July 31, 2013 during a status conference call on March 28, 2013, but the Court expressly denied leave to extend the time to amend because there had already been a number of amendments to the pleadings, noting that any further amendments must be on a showing that the request was based on information that Plaintiff did not know, and

4

could not have known, prior to the January 25, 2013 deadline. *See* Orders dated January 28, 2013 [Docket Entry No. 119] and April 5, 2013 [Docket Entry No. 133].

During calls conducted on June 18, 2013, September 24, 2013, November 18, 2013, and January 28, 2014, the undersigned urged counsel to proceed with discovery. As is clear from the record on the present Motion, the DOC produced documents, including documents on discs, on or about April 13, 2013. Counsel's Certification in Support of Notice of Motion to Amend the Complaint ("Stangler Cert.") ¶ 6 [Docket Entry No. 206-2]; Certification in Support of Plaintiff's Reply on the Motion to Amend the Complaint ("Stangler Reply Cert.") ¶ 4 [Docket Entry No. 212-1]. The DOC made a further production on or about July 17, 2013 (the "July 2013 Production"). Stangler Cert. ¶ 6. A supplemental production was then made on or about October 23, 2013. *See* Exhibit 2 to the Declaration of Daniel Vannella ("Vannella Decl.") [Docket Entry No. 211-1 at 10]. Apparently Plaintiff had some concern about having received the October 23 production because she asked that it be produced again, which was done on or about January 6, 2014. Exhibit 3 to the Vannella Decl. [Docket Entry No. 211-1 at 13].

On November 1, 2013, the Court issued a 40-page decision granting in large part the Motions to Dismiss. [Docket Entry No. 153]. The claims against Balicki, Paterson, Dunlap-Pryce, Dimler, and Teel were dismissed. The state law claims against Nurse Byrd and the claims against her in her official capacity were dismissed, leaving only the §1983 claims as to Nurse Byrd. [Docket Entry No. 154]. Thus, as of November 1, 2013, "Defendants Jane Byrd, L.P.N., and Kintock Group [were] the only viable defendants remaining in the action." [Docket Entry No. 154].

On November 13, 2013, Plaintiff moved for reconsideration, citing for the first time the

5

information obtained by way of the July 2013 Production. [Docket Entry No. 155]. In addition, and by the same motion, Plaintiff sought leave to amend the complaint yet again. By Order dated November 15, 2013, the Court instructed Plaintiff to re-file the motion for reconsideration as a separate motion, with the motion to amend awaiting a determination of the reconsideration. [Docket Entry No. 158].

Accordingly, Plaintiff re-filed the motion for reconsideration on November 23, 2013. [Docket Entry No. 160]. That motion was fully briefed on January 2, 2014 [Docket Entry Nos. 174-175]; by letter dated March 4, 2014, however, Plaintiff sought leave to supplement the record to include evidence from a newly discovered disc that had previously been misfiled. [Docket Entry No. 182]. Plaintiff was given leave to re-file the motion for reconsideration, and did so on April 24, 2014. [Docket Entry Nos. 184, 185]. By Order and Opinion issued on July 25, 2014, the Court denied reconsideration but gave Plaintiff leave to file a motion to amend the complaint. [Docket Entry No. 203]. The present Motion followed.

By her current Motion, Plaintiff seeks to file the proposed Third Amended Complaint, a copy of which is attached to the Motion as Exhibit B. [Docket Entry No. 207-5]. Plaintiff seeks to add new facts to support her claims. She also seeks to add back in certain claims, such as the state law claims that were dismissed as to Nurse Byrd. In addition, she proposes to re-join certain defendants that have been dismissed, including defendants Balicki, Paterson, Dunlap-Pryce, Marusky, and Dimler. The proposed Third Amended Complaint would also add six new defendants that were not previously named and have never been served, including Officer Robert Russo, Chief Ralph Yansek, Lt. Dudich, Sgt. B. Stern, Sgt. Thomas Spence, and Officer Eric Large. Finally, the proposed new pleading would add a new count asserting a

6

claim of Civil Conspiracy against the proposed new defendants, incorrectly designated as a second Count Six.

## II.    ARGUMENTS OF THE PARTIES

### A. Plaintiff's Arguments

Plaintiff point to various documents in support of her motion to amend:   Plaintiff's Brief in Support of Motion to Amend the Complaint ("Plaintiff's Brief") [Docket Entry No. 207]; the Stangler Cert. [Docket Entry No. 206-2]; the TAC [Docket Entry No. 207-5]; Letter Reply is support [Docket Entry No. 212]; and the Stangler Reply Cert. [Docket Entry No. 212-1].   In addition, Plaintiff has referred to the record submitted on the motion for reconsideration.   The following is a brief synopsis of the arguments made by Plaintiff, as culled from those various documents.

Plaintiff's Motion is premised on the fact that she became aware of or was provided with critical discovery after the Motions to Dismiss were fully briefed.   According to Plaintiff, that discovery would have led Judge Cooper to make a different decision on those motions because it provides additional facts and evidence as to the various failures committed by Defendants in the time leading up to the suicide of Decedent.   Plaintiff quotes language from the decision on the motion for reconsideration, and interprets that language as Judge Cooper's tacit approval of the sufficiency of the claims in light of the new evidence.   Plaintiff's Brief at 11-12 ("[T]he District Court concedes that the July 2013 materials indicate a claim on the merits") and at 19 ("Judge Cooper implied that a meritorious claim exists.").

As a threshold matter, Plaintiff argues that this Motion must be liberally granted to allow for a resolution of the dispute on the merits, rather than based on procedural technicalities.

Plaintiff contends that this is so particularly when the amendment is necessary because of an oversight rather than any bad faith. Plaintiff contends that under Rule 15, there is a strong presumption in favor of allowing amendments. Plaintiff's Brief at 17-18. She rejects the notion, put forward by Nurse Byrd, that there is a higher burden after judgment has been entered. Reply at 3.

As set forth in the moving papers, Plaintiff received a production of documents from the DOC on or about April 13, 2013. Stangler Cert. ¶ 6. That production included two discs containing DOC documents responsive to Plaintiff's requests. Stangler Reply Cert. ¶ 4. Plaintiff indicates that the contents of one disc was printed and reviewed; the other disc was misfiled and never reviewed (the "Misplaced Disc"). Stangler Cert. ¶ 6. The Misplaced Disc was not located until February 2014, after Plaintiff's counsel realized from a phone call with defense counsel that she was missing something. Plaintiff's Brief at 10.

Additional material information was produced by the DOC on or about July 17, 2013. Stangler Cert. ¶ 6. At the time of this supplemental production, the Motions to Dismiss had already been filed and were returnable.

Plaintiff's counsel recognized that the information contained in the July 2013 Production was pertinent to the issues raised on the Motions to Dismiss. She argues that the decision not to bring the new information to the attention of the Court as part of the Motions to Dismiss was "not contumacious or done in bad faith." Plaintiff's Brief at 11. Rather, she made the decision not to raise the new discovery while the motions were pending for a number of reasons. Plaintiff's Brief at 12. First, she believed the record was closed and any request to re-open it would be rejected. Plaintiff's Brief at 12, 19. Second, her assessment was that the pleadings as

submitted on the motions were sufficient to withstand dismissal. Plaintiff's Brief at 12, 19. In

addition, she felt that other facts that were relevant were still missing from the July 2013

Production. Plaintiff's Brief at 12. Plaintiff's counsel also states that she believed that "the

July 2013 policies did not support the claims in the complaint, and believed that exploration of

those documents would await discovery." Plaintiff's Brief at 19. While counsel recognizes

this strategy may have been mistaken, she argues it does not give rise to undue delay sufficient to

deny the Motion, nor should the inconvenience to the Court from preparing a 40-page decision

that Plaintiff now seeks to render moot serve as the basis for denial. Plaintiff's Brief at 12;

Reply at 4.

Plaintiff further argues that there could be no prejudice to Defendants from allowing the

amendment. Discovery has not been completed. Defendants, including those to be added for

the first time, have been on notice of the claims and the possibility that they would be named, for

quite some time. Plaintiff's Brief at 20. As to Nurse Byrd, there can be no surprise, since

Plaintiff only seeks to amend to add support for the dismissed state law claims so that they can

be reinstated. Reply at 2.

Finally, Plaintiff takes the position that the amendments should relate back to the date of

the filing of the original complaint. Plaintiff's Brief at 23-26. She posits that this situation falls

squarely within Rule 15(c): the amendments relate to the same transactions and conduct; the

new defendants were on notice in light of the investigation the DOC must have conducted or

notice should be imputed given that they have the same counsel as the existing defendants; and

they should have known they would have been named but for a mistake, *i.e.*, Plaintiff's inability

to identify them earlier. Plaintiff's Brief at 25-27.

**B. Defendants' Arguments**[3]

Defendants take issue with the proposed amendment for a number of reasons.   They

argue that the delay in bringing the Motion is undue, and the explanation given makes no sense.

They also point to the prejudice they will suffer if the amendment is allow to proceed.   Nurse

Byrd further argues that the proposed amendment is futile as to her.

The DOC Defendants contend that the proposed new defendants have had no notice that

they might be sued. Letter Brief on behalf of the DOC Defendants in Opposition to the Motion to

Amend ("DOC Opposition") at 1 [Docket Entry No. 211].   The Attorney General does not

represent those individuals and has apprised Plaintiff's counsel of that fact.   DOC Opposition at

1.  Indeed, the DOC Defendants argue that the Attorney General cannot be deemed to act on

behalf of proposed defendants simply because they are or were state actors.   DOC Opposition at

2. There is a process by which representation must be requested, that request must be evaluated,

and if proper, granted.   None of this has been done with regard to the proposed new defendants.

In their submission, the DOC Defendants also ask the Court to disregard what Plaintiff

has described a mere oversight, going in great detail through the timeline of production of the

discs, as well as the related correspondence and contemporaneous briefing.   *See* DOC

Opposition at 3-5.   While the DOC Defendants take pains to say they do not intend to attack

counsel personally, they point to the various interactions and say it is simply not reasonable for

Plaintiff not to have known that the April 2013 production included the documents that Plaintiff

now asserts are critical to the litigation.

---

[3] The DOC Defendants and Nurse Byrd filed separate opposition but make a number of the same arguments; their submissions will therefore be addressed together in this section.

10

In particular, the DOC Defendants point to the cover letter, dated April 19, 2013, detailing by Bates number the documents that were being produced.  *See* DOC Opposition at 4; Docket Entry No. 175 at 2.   According to the DOC Defendants, Plaintiff acknowledged that she had received the discovery by email dated September 24, 2013.   DOC Opposition at 3. Defendants ask how Plaintiff did not notice that the documents she had reviewed began with Bates number 0306, and why she did not ask where the first 305 pages were.   DOC Opposition at 11.

They also point to the fact that the Special Investigation Division report, which Plaintiff says was misplaced and is critical to her claims, was specifically referenced by the DOC Defendants in their production in response to Plaintiff's supplemental document requests on October 23, 2013 (the "October 23 Production").   DOC Opposition at 3-4; *see also* Exhibit 2 to the Vannella Decl. [Docket Entry No. 211-1 at 10] (identifying the SID report, previously produced, as responsive to Request 6, and giving the Bates numbers for the report).   Counsel for Plaintiff received a second copy of the relevant portion of the October 23 Production attached to the DOC Defendants' December 2013 submission to the Court, and yet another copy at the request of Plaintiff's counsel in January 2014.   DOC Opposition at 11; Vannella Decl. Exhibit 3 [Docket Entry No. 211-1 at 13].   Thus, the DOC Defendants argue that it is difficult to understand how Plaintiff was not aware of the production of the SID report, at least sufficiently to make further inquiry.   Ultimately, they ask "what more did plaintiff need to figure it out?" DOC Opposition at 13.

Nurse Byrd takes this a step further, noting that the Misplaced Disc has no bearing on the claims as to her, and the only new information Plaintiff relies on in support of reasserting the

11

dismissed claims is contained in the July 2013 Production, which Plaintiff admits she had at least

3 ½ months prior to the Court's ruling on the Motions to Dismiss.    Defendant Jane Byrd's Brief

in Opposition to Plaintiff's Motion to Amend the Complaint ("Byrd Opposition") at 5.

     Defendants also take issue with the fact that Plaintiff waited until the Motions to Dismiss

were decided before raising the Misplaced Disc or the July 2013 Production and the need to

incorporate them into the pleadings.    DOC Opposition at 8; Byrd Opposition at 3.    They take a

different view of Judge Cooper's decision on reconsideration, in particular with regard to the

failure to bring this information to the Court's attention while the motion was pending.    DOC

Opposition at 9 n.5.    Nurse Byrd points to the Court's 40-page opinion on the Motion to

Dismiss, and notes that the Court's efforts would be in vain if the amendment were allowed.

Byrd Opposition at 4.    Nurse Byrd would almost certainly file another motion to dismiss the

state law claims based on immunity.

     Nurse Byrd also points out that while the Motions to Dismiss were pending, the

undersigned conducted status conferences on June 18 and September 24, 2013.    At no point

during those conferences did Plaintiff indicate that there was outstanding discovery that could

impact the motions or ask for the Court's assistance in getting these critical documents.    Byrd

Opposition at 5-6.

     According to Nurse Byrd, there is a heightened standard the Court should apply when

considering a motion for leave to amend after judgment has been entered on the pleadings.    In

such cases, Nurse Byrd contends that the presumption for liberality disappears.    Byrd

Opposition at 6.    Otherwise, Defendants argue, Plaintiff would be allowed to engage in seriatim

theories, adjusting and amending based upon the briefing and decisions.    Byrd Opposition at 7

Although the DOC Defendants advise that they do not oppose the amendment based on futility, Nurse Byrd does.   She argues that the state law tort claims asserted against her have been dismissed based on a finding of immunity, and nothing in the July 2013 Production changes that, especially at this late date.   Byrd Opposition at 7-8, 13-14.

Defendants disagree with Plaintiff's assertion that there would be no prejudice if the amendment were allowed.   They point to the resources spent both by the parties and the Court in addressing repeated motions to amend, dismiss, and reconsider.   DOC Opposition at 14-16; Byrd Opposition at 7-9.   Allowing Plaintiff to add new defendants and claims, and to reassert claims that have been dismissed, would necessitate significant expansion of discovery, particularly with regard to the proposed new defendants.   This would further delay resolution and increase costs, with resulting prejudice.   DOC Opposition at 14-18.   It would also put Nurse Byrd in the position of having to litigate the issue of immunity yet again.   Byrd Opposition at 8-9.

Ultimately, Defendants contend that Plaintiff's own lack of diligence in reviewing the discovery that was produced, in making inquiry if something was missing, and in notifying the Court if there was a changed circumstance, require denial of the motion.   Byrd Opposition at 9-10.

## III.   STANDARD OF REVIEW

Whether to grant a motion for leave to amend is within the sound discretion of the court. *See, e.g., Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1994).   Pursuant to Rule 15, a party may amend once as a matter of course within a specified period of time. Fed. R. Civ. P. 15(a)(1).   Once the allotted time has passed, a party may amend only with

13

written consent of the adverse party or with leave of court.   Fed. R. Civ. P. 15(a)(2).   Requests

for leave under Rule 15 are denied only where the court finds "undue delay, bad faith or dilatory

motive on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or]

futility of amendment."   *See Foman v. Daivs*, 371 U.S. 178, 182 (1962).

Delay alone is not sufficient to deny a request for leave to amend, *Cureton v. NCAA*, 252

F.3d 267, 273 (3d Cir. 2001); "[h]owever, at some point the delay will become undue, placing an

unwarranted burden on the court, or will become prejudicial, placing an unfair burden on the

opposing party."   *Id.* (internal citations omitted).   The burden is on the moving party to

"demonstrate that its delay in seeking to amend is satisfactorily explained."   *Harrison Beverage

Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 468 (D.N.J. 1990) (internal quotes omitted).

For prejudice to become "undue," it must rise to such a level that the non-moving party

would be "unfairly disadvantaged or deprived of the opportunity to present facts or evidence."

*Harrison*, 113 F.R.D. at 468 (internal quotations omitted).   In evaluating the extent of any

alleged prejudice, the court looks to the hardship on the non-moving party if the amendment

were granted.   *Cureton v. NCAA*, 252 F.3d 267, 273 (3d Cir. 2001).   "Specifically, [courts]

have considered whether allowing an amendment would result in additional discovery, cost, and

preparation to defend against new facts or theories."   *Id; see also Fourte v. Countrywide Home

Loans, Inc.*, 2009 WL 2998110 (D.N.J. Sept. 15, 2009) ("In gauging prejudice, the Court should

consider whether an amendment would require the opponent to expend significant additional

resource to conduct discovery and prepare for trial or significantly delay the resolution of the

dispute.") (internal citations omitted).

Pursuant to Rule 15(c)(1)(B), an amendment to a pleading relates back to the filing date

of the original pleading when "the amendment asserts a claim or defense that arose out of the

conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading."

In addition, an amendment may relate back when:

> the amendment changes the party or the naming of the party against whom a claim
> is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by
> Rule 4(m) for serving the summons and complaint, the party to be brought in by
> amendment:
>> (i) received such notice of the action that it will not be prejudiced in
>> defending on the merits; and
>> (ii) knew or should have known that the action would have been brought
>> against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)((1)(C)(i)-(ii).   The relation back mechanism is designed to facilitate

resolution of a claim on the merits by allowing a plaintiff to sidestep a statute of limitation that

would otherwise prevent the addition of new claims or parties.   *See Glover v. FDIC*, 698 F.3d

139, 145 (3d Cir. 2012).   Although a critical aspect of relation back is a common core of

operative facts, "the touchstone for relation back is fair notice, because Rule 15(c) is premised on

the theory that a party who has been notified of litigation concerning a particular occurrence has

been given all the notice that statutes of limitations were intended to provide."   *Glover*, 698 F,3d

at 146 (internal citations omitted).


**IV.    ANALYSIS**

The general rule is that leave to file amendments is to be liberally granted, in the absence

of certain factors, such as undue delay, prejudice, bad faith or futility.   *See, e.g.*, *Prince v.*

*Aiellos*, Civ. No. 09-5429, 2012 WL 1883812, at *6 (D.N.J. May 22, 2012).   Defendant Nurse

Byrd argues that the liberal standard evaporates once judgment on the pleadings has been

entered.   Byrd Opposition at 6-7.   Plaintiff disagrees, pointing out that Nurse Byrd relies on

cases outside of the Third Circuit for this proposition.   Reply at 3.

While the Third Circuit has not expressly ruled that the liberality standard disappears

after judgment has been entered, a number of cases within this Circuit make clear that as a case

progresses, a heightened standard may apply.   Although courts typically grant these requests

liberally, this standard becomes less flexible as the case proceeds and dispositive motions are

decided in a defendant's favor.   *See, e.g., In re Human Tissue Products Liability Litigation*,

2009 WL 737048 (D.N.J. Mar. 18, 2009) (relying on *Werner v. Werner*, 267 F.3d 288 (3d Cir.

2001)); *see also Reginella Construction Co., LTD., v. Travelers Casualty and Surety Co. of

America*, 971 F.Supp.2d 470, 479 (W.D. Pa. Sept. 5, 2013) *aff'd* 568 Fed. Appx. 174 (3d Cir.

2014).   At that point, the burden on a party seeking to amend becomes heavier as "the interests

in judicial economy and finality of litigation may become particularly compelling."   *Cureton v.

NCAA*, 252 F.3d 267, 273 (3d Cir. 2001); *In re Human Tissue Products Liability Litigation*, 2009

WL 737048 at *6 (D.N.J. Mar. 18, 2009).   In this instance, however, the Court finds that the

distinction is immaterial because the amendment at issue should not be allowed under either a

liberal standard or a heightened one.

Nurse Byrd has also argued that the proposed amendment is futile.   The issues that are at

the heart of the Motion, however, relate to delay and prejudice, and the Court therefore turns to

those issues first.

That there has been delay is beyond dispute.   Plaintiff received the productions at issue

in April and July 2013 but did not raise the relevance of the new information to the Court while

the Motions to Dismiss were pending, nor did she seek leave to amend.   Instead, she only did so

16

after those motions had been granted in large part.   When she finally alerted the Court to the fact

that there was allegedly new evidence that would impact the ruling on the Motions to Dismiss, it

was by way of a motion for reconsideration.   At the time, Judge Cooper noted that Plaintiff did

so without offering any explanation whatsoever for having waited so long.   The question,

therefore, is whether Plaintiff has now sufficiently explained the reasons for that delay such that

the amendment should be allowed to proceed.

At the outset, the Court notes that there really are two elements of delay at issue:   that

which relates to the information contained in the July 2013 Production, which Plaintiff now

contends had a direct bearing on the issues to be decided by the Motions to Dismiss then pending

before Judge Cooper, and Plaintiff's delay with regard to the information contained on the

Misplaced Disc, of which counsel says she was unaware until February 2014.

The Court begins its analysis with the July 2013 Production and Plaintiff's failure to

advise Judge Cooper that the documents produced were relevant to the issues raised in the

pending Motions to Dismiss.   Plaintiff offers several belated explanations for this failure.   She

indicates first that the Motions to Dismiss were already fully briefed and she did not believe she

could re-open the record.   Second, she states that she believed that her position on the Motions

to Dismiss was strong and sufficient, without any need to bring the information contained in the

July 2013 Production to the Court's attention.   Finally, she says that she believed that

"exploration of those documents would await discovery."   Plaintiff's Brief at 19.

It is difficult to understand the first reason.   Plaintiff has not refrained from seeking

leave from the Court for various reasons, including to re-open the record on a motion.   In fact,

she did so on the motion for reconsideration after the record was complete, when she sought

17

leave to add information found on the Misplaced Disc.  *See* Plaintiff's March 4, 2014 letter to

the Court [Docket Entry No. 182].

The second reason is more revealing.   Plaintiff's counsel made a tactical decision not to

bring the information contained in the July 2013 Production to the Court's attention because she

deemed it unnecessary.   In her brief and on Reply, Plaintiff says several times that she believed

her position was sufficiently strong and the additional information was not needed.   Plaintiff's

Brief at 12, 19; Reply at 4.   It was only after she was unsuccessful and much of the complaint

was dismissed that she decided to introduce the new information from the July 2013 Production,

by way her motion for reconsideration.

Plaintiff offers no explanation as to what she means when she says she believed that

exploration of the July 2013 Production would "await further discovery," and the Court draws no

conclusion from it.   Instead, the Court looks to what actions Plaintiff actually took.

When Plaintiff received the July 2013 Production, she had several options.   She could

have alerted the Court to the fact that it impacted the pending Motions to Dismiss.   She could

have asked Judge Cooper for leave to supplement the record on the Motions to Dismiss or to

cross-move to amend.   She could have notified the undersigned that she wanted to seek leave to

amend.   She did none of these things, instead waiting until the Motions to Dismiss were largely

granted, and then asking for a "do-over."   Not only was this delay but it was clearly undue.

Next, the undersigned turns to the question of the Misplaced Disc.   There is no dispute

that this information was produced to Plaintiff in April 2013.   Plaintiff suggests that the relevant

inquiry is not when she received the production but rather, when she became aware of it.   She

contends that when the production was made, the disc at issue was placed into the wrong file and

18

never reviewed.   Counsel has stated in the March 4, 2014 letter to the Court that she did not

discover the error until February 26, 2014, and that she acted promptly thereafter to bring the

issue to the attention of the Court.   [Docket Entry No. 182].

Defendants ask the Court to look not at when counsel actually became aware of the

Misplaced Disc but instead, to consider the many opportunities Plaintiff had to realize that the

disc was missing and to follow up or at least make inquiry.   Despite the many opportunities, no

inquiry was made until counsel for defendants made Plaintiff's counsel aware of the oversight

during a conversation in February 2014.

Defendants give a detailed chronology of the many clues that should have alerted

Plaintiff's counsel to the fact that something was missing.   First, there was the cover letter that

accompanied the April 2013 production.   The letter specifically indicated that the production

included bates numbered documents in the range of 0001-0392, including 0001-305, which were

being produced as confidential under the Consent Protective Order.   [Docket Entry No. 175 at

2].   In this regard, Defendants ask how it could not have occurred to anyone that they had

documents in the Bates range of 0306-0918 but not from 0001-0305.   DOC Opposition at 12.

They also point to the supplemental production made in October 2013.   In that production,

Defendants refer to and rely on the SID report, which Plaintiff now claims is so critical to her

case that she should be allowed to amend again.   The document is referred to by name and by

bates number; if Plaintiff did not have a copy of the SID report or of documents in that bates

range, she should have realized as much when she reviewed the October production.

Defendants also point out that the October production was provided to Plaintiff two additional

times, first with the DOC Defendants' December 30, 2013 submission to the Court, and then

19

again, in January 2014, when Plaintiff's counsel asked for another copy.   At no point did

Plaintiff ask any follow up questions or make any inquiry as to the contents of the Misplaced

Disc.   Thus, Defendants argue that it is Plaintiff's own lack of diligence that caused the delay,

and this should not be excused.   The undersigned agrees.   There were repeated opportunities,

and repeated clues, that should have made a diligent attorney aware that something was missing.

That there was no inquiry made, and no follow-up, leads to the inescapable conclusion that the

delay with regard to the Misplaced Disc was in fact undue.

       This does not end the inquiry, however.   The Court next looks to whether there would be

prejudice if the amendment were allowed.   Defendants point to the many motions that they have

had to litigate in this case, and indeed, there have been many.   All defendants, including Mercer

County, which was ultimately dismissed by stipulation, filed motions to dismiss; the DOC

Defendants and Nurse Byrd have filed multiple motions to dismiss.   They have also opposed

numerous motions to amend, filed by Plaintiff separately or as cross-motions, and have had to

brief opposition to several motions for reconsideration and an appeal.   At this point, they ask the

Court to intercede by denying the Motion and putting a stop to what seems like an endless cycle.

       The DOC Defendants further object to Plaintiff's adding completely new defendants at

this late stage of the litigation.   They vigorously reject the notion, put forward by Plaintiff, that

the Office of the Attorney General represents these new individual defendants.   The DOC

Defendants' counsel points to the process in place for the Attorney General's office to represent

state actors when they are sued, and say that this process has not been invoked and cannot be

unless and until those individuals are actually served.   They also object to the idea that the

claims in the complaint can relate back as to these individuals.

20

Nurse Byrd is particularly cogent in this regard, noting that all of the state law claims

against her have been dismissed as a result of the prolonged motion practice.   She has prevailed

on her immunity claims, which were dismissed by the November 1, 2013 Order.   The Motion

seeks to revive all of those claims, and would lead to another round of motions to dismiss, all to

the detriment of Nurse Byrd.

The undersigned finds that there would in fact be prejudice to the defending parties if the

amendment would allowed to proceed.   The current defendants, as well as those who have

already been dismissed, have spent significant resources on this litigation, and they would

essentially be forced back to square one.

Furthermore, there is nothing beyond speculation to support the notion that the proposed

new defendants are on notice of the action or the claims against them, or that there would not be

prejudice to them in defending on the merits.   Plaintiff has failed to articulate a sufficient basis

for these claims to relate back under Rule 15(c).

Finally, the Court considers the impact any amendment would have on the case itself and

on the judicial economy of the Court.   The Complaint was originally filed on January 14, 2011.

In the almost four years since the filing, the undersigned has conducted at least eight

conferences.   During that time, the Court has considered at least four motions to dismiss, four

motions for leave to amend (including two cross-motions), three motions for reconsideration, one

motion for leave to serve late notice of a tort claim, and one appeal – not counting the additional

motions that were re-filed at the Court's instruction to address procedural issues.   Each time, the

parties engaged in extensive briefing, and the Court had to spend time considering the issues and

delivering a decision.   While Plaintiff makes light of any prejudice to the Court resulting from

21

her delay in notification of new evidence, twice referring to it as no more than an
"inconvenience," the undersigned is not as dismissive of the time that was spent in preparing a
40-page opinion, which would be rendered moot if the amendment were allowed to proceed.
*See also* July 25, 2014 Memorandum Opinion at 11 n.2 ("[t]he Court invested considerable time
evaluating the motions to dismiss, and Plaintiffs' counsel's disregard for the waste of judicial
resources is disconcerting.") [Docket Entry No. 203].

    While the Court is not insensitive to the possibility of human error in any document
production, the delay caused by the repeated errors, oversights, and strategy decisions here can
only be described as undue.    Furthermore, allowing the amendment at this point of the litigation,
after so much motion practice, would only cause further delay, to the prejudice of the parties.
Accordingly, the Motion is denied.[4]

---

[4] Because the Court has found that the amendment should not go forward based on undue delay and substantial
prejudice, the Court does not reach futility in terms of the immunity arguments raised by Nurse Byrd.  The
undersigned does note, however, that although Plaintiff asserts that "the District Court concedes that the July 2013
materials indicate a claim on the merits," that statement is without citation.   Plaintiff's Brief at 12.  Indeed, Judge
Cooper, in the July 25 Opinion, seemed to take great care not to express any view on the merits of a motion to
amend.

V.    **CONCLUSION**

For the foregoing reasons, and for good cause shown,

**IT IS** on the **8th** day of **December, 2014,**

**ORDERED** that the Motion to Amend the Complaint [Docket Entry No. 206] is

DENIED.



_____
**LOIS H. GOODMAN**
**United States Magistrate Judge**

# DOCKET ENTRY #: 230 - ORDER
## WITH
## MEMORANDUM OPINION – DOCKET ENTRY # 229

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JOAN MULLIN, administratrix of the ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually, | : : : : : | CIVIL ACTION NO. 11-247 (MLC) |
|  | : | **O R D E R** |
| Plaintiff, | : : |  |
| v. | : : |  |
| ADMINISTRATOR KAREN BALICKI, et al., | : : : |  |
| Defendants. | : : |  |
| _____ | : |  |

For the reasons stated in the Court's Memorandum Opinion, dated July 13, 2015, **IT**

**IS** on this     13th     day of July, 2015, **ORDERED** that the Magistrate Judge's December

8, 2014 Opinion and Order **(dkt. 220),** from which Plaintiff appeals **(dkt. 221),** is

**AFFIRMED;** and it is further

**ORDERED** that the Clerk of the Court will designate the appeal **(dkt. 221)** as

**TERMINATED.**

       s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JOAN MULLIN, administratrix of the ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually, | : : : : : | CIVIL ACTION NO. 11-247 (MLC) |
|  | : | **MEMORANDUM OPINION** |
| Plaintiff, | : : |  |
| v. | : : |  |
| ADMINISTRATOR KAREN BALICKI, et al., | : : |  |
|  | : : |  |
| Defendants. | : |  |

**PLAINTIFF,** Joan Mullin, administratrix of the estate of her son, Robert Mullin,

earlier moved before the Magistrate Judge for leave to amend the second amended

complaint to add new causes of action, facts, and additional parties ("Motion to Amend").

(Dkt. 207 at 1, 9–15 (sealed).)  Plaintiff asked the Magistrate Judge to permit amendment,

because she had located a misfiled disc ("Misfiled Disc") produced in discovery on April

13, 2013.  (Id. at 17.)  Plaintiff did not realize this error, however, until February of 2014.

(Id. at 25.)

**PLAINTIFF** also received supplemental discovery documents concerning

"policies and procedures covering a variety of issues" ("Supplemental Discovery") on

July 17, 2013.  (Id.)  During the time that Plaintiff received and located the Misfiled Disc

and Supplemental Discovery, motions to dismiss were pending before this Court.  (See,

e.g., dkt. 154.) Both the Misfiled Disc and the Supplemental Discovery were relevant, in

Plaintiff's view, to the then-pending motions to dismiss. (See dkt. 207 at 16–17.)

Plaintiff did not bring this to the Court's attention, however, until after the Court decided

the pending motions to dismiss. (Dkt. 154.) Thereafter, Plaintiff moved for

reconsideration of the decision, which this Court denied. (See dkt. 204.)

     **THE MAGISTRATE JUDGE** denied the Motion to Amend by an Opinion and

Order dated December 8, 2014 ("12-8-14 Opinion and Order"). (Dkt. 220.) The

Magistrate Judge, in support of this ruling, explained that: (1) "Plaintiff's own lack of

diligence … caused the delay" related to the discovery of the Misfiled Disc, especially in

light of the "repeated opportunities, and repeated clues, that should have made a diligent

attorney aware that something was missing"; and (2) permitting Plaintiff to amend the

complaint would commit "prejudice to the defending parties" who had already "spent

significant resources on this litigation ..." (Id. at 20–21.)

     **THE MAGISTRATE JUDGE** held that Plaintiff's delay was "undue" because,

upon receiving and locating the Misfiled Disc and Supplemental Discovery, Plaintiff

failed to: (1) alert "the Court … that it impacted the [then] pending Motions to Dismiss";

or (2) request "leave to supplement the record on the Motions to Dismiss or to cross-

move to amend." (Id. at 18.) The Magistrate Judge also rejected Plaintiff's argument

that the proposed amendments were sufficiently related to the original complaint to

permit amendment under Federal Rule of Civil Procedure ("Rule") 15(c). (Id. at 9, 21.)

With respect to the expenditure of judicial resources, the Magistrate Judge noted that the

Court had previously "considered at least four motions to dismiss, four motions for leave

2

to amend (including two cross-motions), three motions for reconsideration, one motion

for leave to serve late notice of a tort claim, and one appeal – not counting the additional

motions that were re-filed at the Court's instruction to address procedural issues." (Id. at

21.)  Based on the foregoing, the Magistrate Judge concluded:

> [T]he delay caused by the repeated errors, oversights, and strategy
> decisions here can only be described as undue.  Furthermore, allowing the
> amendment at this point of the litigation, after so much motion practice,
> would only cause further delay, to the prejudice of the parties.

(Id. at 22.)

**PLAINTIFF** timely appealed the 12-8-14 Opinion and Order pursuant to Rule 72

and Local Civil Rule 72.1(c).  (Dkt. 221.)

**THE COURT** carefully reviewed and considered the papers submitted by the

parties and the 12-8-14 Opinion and Order.  The Court resolves the appeal without oral

argument pursuant to Local Civil Rule 78.1(b).

**IT APPEARS** that a motion for leave to amend a pleading is non-dispositive, and

thus, may be entered by a magistrate judge.  See 28 U.S.C. § 636(b)(1)(A).  A district

court, upon reviewing non-dispositive matters, may modify, vacate, or reverse magistrate

judge decisions that are "clearly erroneous or contrary to law."  Id.; see also Jackson v.

Chubb Corp., 45 Fed.Appx. 163, 166 n.7 (3d Cir. 2002) (internal quotation and citation

omitted).  A finding is clearly erroneous when, although there may be some evidence to

support it, the reviewing court on considering all of the evidence is left with the definite

and firm conviction that a mistake has been committed.  See Kounelis v. Sherrer, 529

F.Supp.2d 503, 518 (D.N.J. 2008).  A ruling is contrary to law if the Magistrate Judge

misinterpreted or misapplied applicable law. See Gunter v. Ridgewood Energy Corp., 32 F.Supp.2d 162, 164 (D.N.J. 1998). The reviewing district court under the clearly erroneous standard of review will not reverse the Magistrate Judge's determination even if the court might have decided the matter differently. See Wortman v. Beglin, No. 03-495, 2007 WL 2375057, at *2 (D.N.J. Aug. 16, 2007).

PLAINTIFF argues on appeal that, inter alia: (1) "delay in and of itself is not a basis to deny amendment of the Complaint absent real prejudice"; and (2) "[t]here is no prejudice to the defendants in granting the amendment." (Dkt. 223 at 9 (sealed); see also dkt. 223-2 at 5 (sealed).)

DEFENDANTS Karen Balicki, Robert Paterson, Marie Dunlap-Pryce, Officer Dimler, and Jane Byrd (collectively, "Defendants") oppose the appeal and argue, inter alia, that the Magistrate Judge: (1) "properly considered interests of judicial economy and finality of litigation"; and (2) "correctly found that Plaintiff's proposed amendments were unduly delayed and prejudicial." (Dkt. 224 at 1, 13; dkt. 225 at 1, 5; see also dkt. 153 at 1; dkt. 94 at 1.)

THE COURT acknowledges that a party seeking to amend a pleading 21 days after its filing must apply for "the court's leave," which is to be "freely give[n] … when justice so requires." Fed.R.Civ.P. 15(a)(1)–(2). A court may deny leave to amend a pleading, however, upon a finding of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962).

4

**THE COURT** finds that the Magistrate Judge's conclusions were not clearly erroneous or contrary to law because here: (1) Plaintiff offers no reasonable explanation for the delay in notifying the Court as to the significance of the Misfiled Disc and Supplemental Discovery; and (2) permitting the amendment would unduly prejudice Defendants and place an unwarranted burden on the Court.  (Dkt. 223-1 at 5 (sealed) (Plaintiff acknowledging "in hindsight … the better course of action would have been to advise the Court during the pendency of the Motions to Dismiss that the [Supplemental Discovery] supported plaintiff's pleadings.").)  See also Jang v. Bos. Sci. Scimed, Inc., 729 F.3d 357, 368 (3d Cir. 2013) (holding that the district court "did not abuse its discretion in denying [a] post-judgment motion for reconsideration and leave to amend" where movant "could have moved to amend his complaint at any time before" the district court granted dismissal); Cureton v. NCAA, 252 F.3d 267, 272–73 (3d Cir. 2001) ("A district court may deny leave to amend a complaint if a plaintiff's delay in seeking amendment is undue … or prejudicial to the opposing party.").  Accordingly, the Court will affirm the 12-8-14 Opinion and Order, because the Magistrate Judge did not commit any mistake or misinterpret or misapply any applicable law.  See Wortman, 2007 WL 2375057, at *2; Gunter, 32 F.Supp.2d at 164.

**THE COURT** will issue an appropriate order.

_s/ Mary L. Cooper_
**MARY L. COOPER**
United States District Judge

**Dated:** July 13, 2015

5

# DOCKET ENTRY #: 252 - ORDER
## WITH
## MEMORANDUM OPINION – DOCKET
## ENTRY # 251

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOAN MULLIN, ADMINISTRATRIX OF
THE ESTATE OF ROBERT MULLIN,
deceased, and JOAN MULLIN, individually,

CIVIL ACTION NO. 11-247 (MLC)

**ORDER & JUDGMENT**

    Plaintiff,

    v.

ADMINISTRATOR KAREN BALICKI, et al.,

    Defendants.

For the reasons stated in the Court's Memorandum Opinion, dated May 25, 2016, **IT**

**IS** on this     25th     day of May, 2016, **ORDERED** that the motion by Defendant Jane

Byrd, LPN, for summary judgment **(dkt. 234)** is **GRANTED**; and it is further

    **ADJUDGED** that **JUDGMENT IS ENTERED** in favor of Defendant Jane Byrd,

LPN, and against Plaintiff; and it is further

    **ORDERED** that the action insofar as it had been brought against the defendants State

of New Jersey, Department of Corrections of the State of New Jersey, South Woods State

Prison, Trenton Psychiatric Hospital, and Kintock Group should be designated as being

**TREMINATED** pursuant to previous orders and amended pleadings; and it is further

    **ORDERED** that the Clerk of the Court – as no viable claims remain – designate the

action as **CLOSED.**

                  s/ Mary L. Cooper
                  **MARY L. COOPER**
                  United States District Judge

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually, | CIVIL ACTION NO. 11-247 (MLC) |
| Plaintiff, | **MEMORANDUM OPINION** |
| v. | |
| ADMINISTRATOR KAREN BALICKI, et al., | |
| Defendants. | |

**COOPER, District Judge**

Plaintiff Joan Mullin, individually and as administratrix of the estate of her son, Robert Mullin ("Mullin"), commenced this action against the following defendants in their "personal, individual and professional capacities" who represent the Department of Corrections of the State of New Jersey, South Woods State Prison, and Central Reception and Assignment Facility ("CRAF"): Administrator Karen Balicki; Director Robert Patterson; and Director Marie Dunlap-Pryce. (See dkt. 102.)[1] Plaintiff further brought this action against the following defendants in their "personal, individual and professional capacities": Jane Byrd, LPN ("Byrd"); Erin Marusky, RN ("Marusky"); Officer Dimler; and Beatrice Teel, RN. (See id.) Plaintiff also named the Kintock Group and Mercer County as defendants. (See id.)

---

[1] The Court will cite to the documents filed on the Electronic Case Filing System ("ECF") by referring to the docket entry numbers by the designation of "dkt." Pincites reference ECF pagination.

Byrd now moves for summary judgment on all claims asserted against her.  (See dkt. 234.)  Plaintiff opposes the motion.  (See dkt. 241.)  The Court will determine the motion on the papers and without oral argument pursuant to Local Civil Rule 78.1(b).  For the reasons stated below, the Court will grant Byrd's motion.

## BACKGROUND

### I.   Factual History

The Court assumes the parties' familiarity with the facts underlying this action and will provide a brief overview of the facts pertaining to this motion.[2]  Plaintiff's allegations arise out of Mullin's suicide while incarcerated at CRAF.  (See generally dkt. 45.)

### A.   CRAF Medical Screening Policy

Pursuant to CRAF's medical screening policy, a newly admitted inmate is screened by the medical staff within four hours of arrival.  (See dkt. 234 at 6; dkt. 241 at 11; see also dkt. 241-24 at 2–8.)  The medical screening is documented in CRAF's electronic medical records.  (See dkt. 234 at 6; dkt. 241 at 13.)  If an inmate responds affirmatively to a mental health item during the screening, the inmate is flagged as "special needs" and the screening nurse must immediately refer the inmate to the Lead Psychologist or designee for further mental health evaluations.  (See dkt. 234 at 6; dkt. 241 at 13.)  This psychological follow-up must occur within seventy-two hours of the medical screening.  (See dkt. 234-5 at 27.)  If the screening nurse makes a referral of an "emergent nature," the inmate will be placed under "close or constant watch."  (See dkt. 234 at 6; dkt. 241 at 11.)  An emergent referral requires

---

[2] The Court incorporates by reference its November 1, 2013 Memorandum Opinion, which provides a detailed account of the facts and procedural history of this action.  (See dkt. 153.)

2

a psychological evaluation of the inmate within four hours of the medical screening. (See dkt. 234-5 at 27–28.) The inmate will remain under "close or constant watch" until such an evaluation is made. (See id.)

Byrd's testimony indicates that she had knowledge of these policies. (See dkt. 234-5 at 19–23; dkt. 241-14 at 3.) For those policies that Byrd could not recall, she testified that her practice was always to report to her supervisor. (See dkt. 241-15 at 8.) Byrd was trained on how to identify special needs inmates, and was aware of the electronic medical recording requirements regarding special needs inmates. (See dkt. 234-5 at 19; dkt. 241-14 at 5.) Byrd testified that before beginning each medical screening, she checked the inmate's medical records for any mental health history. (See dkt. 241-14 at 8–10.) Byrd stated that she did not read an inmate's entire electronic medical record, but rather searched for whether the inmate was designated as special needs at another facility, or otherwise had a mental health history indicator on the file. (See id.)

Byrd also testified that she was aware of the repercussions of designating an inmate as special needs, i.e., that it would trigger "specific actions regarding how one is to be handled in an administrative detention." (See dkt. 241-14 at 14.) Byrd also knew that she was required to document when an inmate exhibited signs of self-harm or a desire to harm others, and to immediately report it to her supervisor. (See dkt. 234-5 at 20.) Byrd testified that she did not determine inmates' housing assignments, and that this was the role of her supervisor. (See dkt. 241-14 at 4.) Byrd also testified that she did not have control over when the psychologist would see an inmate, besides referring an inmate to her supervisor when she felt the inmate needed emergent care. (See dkt. 241-14 at 12.)

3

### B.    Mullin's January 2009 Intake

In January 2009, Mullin was removed from a halfway house and taken into the custody of the New Jersey Department of Corrections after being found under the influence and in possession of cocaine and opiates. (See dkt. 234 at 5; dkt. 241 at 6–7.) Mullin was taken to CRAF on January 14, 2009. (See dkt. 234 at 4.) Mullin first met with a social worker and requested to be placed on special needs status for his anxiety. (See id. at 5–6.) The social worker listed him on the special needs roster and referred him to a psychiatrist for possible anxiety medication. (See id.; dkt. 241 at 9.) On January 16, 2009, Byrd conducted a four-hour medical screening of Mullin. (See dkt. 234 at 6; dkt. 241 at 10.) The mental health portion of the intake and Mullin's responses are reproduced below:

| Question | Answer |
|---|---|
| Are you currently or have you ever been on psychiatric medication? | No |
| Have you ever been hospitalized or treated for mental illness? | Yes, anxiety and depression – 2006 |
| Are you thinking about killing yourself? | No |
| Have you ever attempted suicide? | Yes, 4 years ago |
| Has any member of your immediate family made a serious suicide attempt or committed suicide? | No |
| Did you hold a position of authority in the community? | No |
| Was your case a shocking crime or given media attention? | No |
| Do you feel hopeless about your future? | Yes |
| Have you experienced a significant loss, such as the loss of a job you valued or the loss of a significant relationship, or death of someone close to you in the past 6 months? | No |

(Dkt. 241-12 at 3.)

4

During the screening, Byrd noted that Mullin did not refuse to answer questions, and did not cry, talk to himself, have noticeable scars on his wrist or neck, or appear agitated. (See id.) Following Byrd's screening, Marusky cleared Mullin for placement in CRAF's Temporary Close Custody Unit. (See dkt. 234 at 7.)[3] On January 17, 2009, Mullin committed suicide in his cell. (See dkt. 153 at 6.) He was pronounced dead at 4:49 a.m. (See id.)

## II.    Procedural History

Plaintiff filed the second amended complaint on September 21, 2012. (See dkt. 102.) Plaintiff alleged several federal constitutional claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), as well as analogous claims under the New Jersey Constitution pursuant to the New Jersey Civil Rights Act ("NJCRA"). (See id. at 9–14.) See also N.J.S.A. 10:6-2. Plaintiff also set forth various claims arising under common law, such as negligent hiring, intentional and negligent infliction of emotional distress, abuse of process, and medical malpractice. (See dkt. 102 at 9–14.)

Mercer County was dismissed from the action by stipulation of the parties on March 22, 2011. (See dkt. 15.) Plaintiff agreed to the dismissal of the claims against Marusky by order of the Court on May 2, 2013. (See dkt. 139.) All claims against Administrator Karen Balicki, Director Robert Patterson, Director Marie Dunlap-Pryce, Officer Dimler, and Beatrice Teel, RN were dismissed on November 1, 2013 by way of the Court's order and

---

[3] The Temporary Close Custody Unit is designated for inmates who are removed from the general population for disciplinary or administrative reasons including rule infractions, alleged violations of prohibited acts, protective custody, or for special observation. (See dkt. 234 at 7.) Pursuant to CRAF policy, inmates in close custody are monitored by a custody officer every fifteen minutes. (See dkt. 234-6 at 6.)

memorandum opinion ("11-1-13 Order & Opinion"). (See dkt. 153; dkt. 154.) The 11-1-13

Order and Opinion also dismissed all common law claims against Byrd. (See id.) Kintock

Group was dismissed from the action by stipulation of the parties on November 13, 2015.

(See dkt. 246.) Thus, Byrd is the only remaining defendant, and the only remaining viable

claims are the alleged constitutional violation under the Eighth Amendment and the

analogous provision of the New Jersey Constitution.

## DISCUSSION

### I.    Legal Standard

#### A.    Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment is proper "if the

movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are those "that

could affect the outcome" of the proceeding, and "a dispute about a material fact is genuine if

the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving

party." Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (internal citation and

quotation omitted).  This evidence may include "citing to particular parts of materials in the

record" or a "showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the

fact." Fed.R.Civ.P. 56(c)(1)(A)–(B).

If the movant demonstrates an absence of genuinely disputed material facts, then the

burden shifts to the non-movant to demonstrate the existence of a genuine issue for trial. See

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non–moving party, there is no genuine issue for trial." Id. (internal quotation marks omitted). The non-movant must show the existence of issues for trial by referring to the record. See Fed.R.Civ.P. 56(c)(1).

When determining whether a genuine dispute of material fact exists, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor. See Scott v. Harris, 550 U.S. 372, 380 (2007); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). If the non-movant fails to demonstrate that at least one genuine factual dispute exists for trial, then the Court must determine whether the movant is entitled to judgment as a matter of law. See McCann v. Unum Provident, 921 F.Supp.2d 353, 357 (D.N.J. 2013). "A movant is entitled to judgment as a matter of law if, at trial, no reasonable jury could find for the non-moving party." Id.

## B.    Section 1983

A plaintiff may have a cause of action under Section 1983 for certain violations of constitutional rights. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . .

42 U.S.C. § 1983.

To state a claim for relief under Section 1983, a plaintiff must allege: (1) the violation of a right secured by the Constitution or laws of the United States; and (2) that the alleged

deprivation was committed or caused by a person acting under color of state law. See

Harvey v. Plains Twp. Police Dep't, 635 F.3d 606, 609 (3d Cir. 2011). "The traditional

definition of acting under color of state law requires that the defendant in a § 1983 action

have exercised power possessed by virtue of state law and made possible only because the

wrongdoer is clothed with the authority of state law." West v. Adkins, 487 U.S. 42, 49

(1988) (internal quotation omitted). Further, "a public employee acts under color of state law

while acting in his official capacity or while exercising his responsibilities pursuant to state

law." Id. at 50.

This Court discussed at length in its 11-1-13 Opinion the circumstances under which

the United States Court of Appeals for the Third Circuit ("Third Circuit") recognizes that a

court may impose liability under Section 1983 for prison suicides. (See dkt. 153 at 23–33.)

See also Colburn v. Upper Darby Twp., 946 F.2d 1017 (3d Cir. 1991) (hereinafter "Colburn

II"); Colburn v. Upper Darby Twp., 838 F.2d 663 (3d Cir. 1988). A plaintiff bringing a

Section 1983 claim based on a prison suicide must establish three elements: "(1) the detainee

had a particular vulnerability to suicide, (2) the custodial officer or officers knew or should

have known of that vulnerability, and (3) those officers acted with reckless indifference to

the detainee's particular vulnerability." Colburn II, 946 F.2d at 1023 (internal quotation

omitted).

A particular vulnerability to suicide exists if the suicide was "a strong likelihood,

rather than a mere possibility." Colburn II, 946 F.2d at 1024. The Third Circuit defined a

strong likelihood as follows:

8

The strong likelihood of suicide must be "so obvious that a lay person would
easily recognize the necessity for preventative action; the risk of self-inflicted
injury must be not only great, but also sufficiently apparent that a lay
custodian's failure to appreciate it evidences an absence of any concern for the
welfare of his or her charges.

Id. at 1025 (internal citation and quotation omitted).

"[I]t is clear that mere negligence on the part of prison officials is insufficient to

establish a claim pursuant to § 1983." Kulp v. Veruete, 267 Fed.Appx. 141, 143 (3d Cir.

2008); see also Hinton v. United States, No. 14-854, 2015 WL 737584 (M.D. Pa. Feb. 20,

2015) (granting summary judgment for prison officials because there was not "strong

likelihood" that decedent might have committed suicide, as decedent had not demonstrated

suicidal ideation in six years).

### C.   NJCRA

The NJCRA provides, in part:

Any person who has been deprived of any substantive due process or equal
protection rights, privileges or immunities secured by the Constitution or laws
of the United States, or any substantive rights, privileges or immunities
secured by the Constitution or laws of this State . . . may bring a civil action
for damages and for injunctive or other appropriate relief.

N.J.S.A. 10:6-2.

The NJCRA is interpreted as analogous to Section 1983.  See, e.g., Szemple v. Corr.

Med. Servs., 493 Fed.Appx. 238, 241 (3d Cir. 2012); Trafton v. City of Woodbury, 799

F.Supp.2d 417, 443 (D.N.J. 2011); Rezem Family Assocs., LP v. Borough of Millstone, 423

N.J.Super. 103, 115 (N.J. App. Div. 2011).  Plaintiff bases the NJCRA claim on Article I,

Paragraph 12 of the New Jersey Constitution, which provides, in relevant part: "Excessive

bail shall not be required, excessive fines shall not be imposed, and cruel and unusual

9

punishment shall not be inflicted." N.J. Const. Art. I, Para. 12. This provision of the New

Jersey Constitution is interpreted as corresponding to the Eighth Amendment. See Edwards

v. Power, No. 07-4121, 2014 WL 5092916, at *5 (D.N.J. Oct. 10, 2014); see also State v.

Des Marets, 92 N.J. 62, 82 (1983).

## II.    Analysis

### A.    Section 1983

Plaintiff is first required to show that Mullin had a "particular vulnerability to

suicide." See Colburn II, 946 F.2d at 1024. "[T]he requirement of reckless or deliberate

indifference implies that there must be a strong likelihood, rather than a mere possibility, that

self-inflicted harm will occur." Id. (internal quotations omitted). In support of this first

factor, Plaintiff argues that there was a strong likelihood of suicide in the present case

because Mullin was a special needs inmate, "had a history of suicide," and answered "yes" to

when asked if he felt hopeless during the medical screening. (See dkt. 241-1 at 11.)

Byrd argues that Mullin was classified as special needs due to his anxiety. (See dkt.

244 at 6.) She further argues that Mullin denied wanting to hurt himself, was not currently

taking any psychiatric medications, and did not present himself with any emergent conditions

or suicidal ideation that would require an immediate psychological referral. (See dkt. 234-1

at 9.)

The Court finds that Mullin's previous suicide attempt reflects past suicidal ideation.

See Estate of Cills v. Kaftan, 105 F.Supp.2d 391, 398 (D.N.J. 2000). But the Third Circuit

instructs that a decedent's particular vulnerability to suicide must be a "strong likelihood" for

the purpose of Section 1983 liability to attach. Colburn II, 946 F.2d at 1024. Here, Mullin

10

indicated during his medical screening that he did not want to harm himself. (See dkt. 241-12 at 3.) This answer was consistent with Mullin's statement to a nurse and the social worker two days prior. (See dkt. 234-1 at 7.) Mullin had no other suicide attempts in the intervening years. (See id.) He was not "acting irate, talking to himself, crying, [or] belligerent" during the medical screening, and thus immediate psychological help was not necessary under CRAF policy. (See dkt. 241-14 at 12.)

Moreover, Mullin's acknowledgement of feeling hopeless about his situation is not unusual given the circumstances: he had previously been serving his sentence in a halfway house, and was sent to CRAF for a violation of probation when he was found in possession and under the influence of cocaine and opiates. (See dkt. 240 at 6.) Although Mullin's past suicide attempt may illustrate a mere possibility of suicide, Plaintiff has not presented further evidence showing that this suicide attempt made Mullin's suicide a "strong likelihood" as required under Colburn II. See Colburn II, 946 F.2d at 1024. The Court, when viewing this evidence in favor of Plaintiff, does not find that there was a strong likelihood of suicide given the facts above.

Plaintiff must next show that the strong likelihood of suicide was so obvious that a layperson would easily recognize the necessity for preventative action. See id. at 1025. "Custodians have been found to 'know' of a particular vulnerability to suicide when they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." Id. at n.1. Here, Plaintiff argues that Byrd knew or should have known of the strong likelihood of suicide because Mullin was designated as a special needs inmate "within hours prior to his

11

evaluation by Nurse Byrd." (See dkt. 241-1 at 9.)  At the same time, Plaintiff argues that

Byrd was under a "duty to specifically put in the chart the classification of Mullin as a

Special Needs inmate." (See id. at 10.)  Byrd argues that she could not know of a strong

likelihood of suicide in this case because "Mullin did not demonstrate any suicidal ideation

in the four-year period prior to his death." (Dkt. 234-1 at 7.)

A fair reading of the record indicates that an inmate can be designated as special

needs when he or she "meets criteria of axis I and/or axis II disorder per the most recent

edition of the Diagnostic and Statistical Manual (DSM) which interferes with the inmate's

ability to meet the functional requirements of prison life without mental health treatment."

(See dkt. 241-24 at 3.)  Thus, special needs status does not equate to suicide risk.  Here, there

was no obvious suicide threat, no history of repeated suicide attempts, or no psychiatric

diagnosis identifying suicidal propensities.  Colburn II, 946 F.2d at 1025 n.1.  It is also

inapposite that Byrd herself did not designate Mullin as special needs, as the social worker

had already added Mullin to the special needs roster two days prior.  (See dkt. 234 at 5–6;

dkt. 241 at 9.)  Moreover, pursuant to CRAF policy, Byrd indicated that Mullin required a

psychological follow-up because of his affirmative response to one of the mental health

items during her screening.[4]  Even if the Court found that there was a strong likelihood of

suicide in this case, the Court cannot conclude that a reasonable jury would find that Byrd

___

[4] Plaintiff also argued that Byrd was "specifically aware that the failure to properly designate the inmate and notify mental health could result in suicide." (See dkt. 241-1 at 10.) This argument is conclusory. See Colburn II, 946 F.2d at 1027 ("Only an exercise in impermissible judicial hindsight could justify holding [these officers] responsible for [the subsequent] suicide."). The record indicates that Mullin was already designated as a special needs inmate by the social worker, and that Byrd had requested a psychological follow-up for Mullin. (See dkt. 234 at 5–6; dkt. 241 at 9.)

12

knew or should have known of this strong likelihood based upon Mullin's designation as special needs.

Lastly, Plaintiff must show that the prison officers "acted with reckless indifference to the detainee's particular vulnerability." See Colburn II, 946 F.2d at 1023 (internal quotations omitted). "[T]here can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." Id. at 1025. The record reflects that Byrd understood the CRAF policies on medical screenings and the mental health needs of inmates. See Background, Section I.A., supra. There is no evidence indicating that Byrd deviated from these policies, i.e., acted culpably, with respect to Mullin. Rather, the record indicates that Byrd followed protocol by properly indicating that Mullin required a psychological follow-up because of his special needs status and his affirmative response to one of the screening questions. This was the extent of Byrd's interaction with Mullin; she played no role in his placement within CRAF. Thus, the Court finds that the alleged conduct of Byrd does not amount to reckless or deliberate indifference.

The Court concludes that Plaintiff has not presented evidence from which a jury could reasonably conclude that: (1) Mullin had a particular vulnerability to suicide; (2) Byrd knew or should have known of the decedent's particular vulnerability to suicide; and (3) Byrd acted with reckless indifference to that vulnerability, such that Byrd is liable under Section 1983.

**B.   NJCRA**

Claims asserted under the NJCRA are analyzed analogously to Section 1983 claims. See Discussion, Section I.C., supra. Moreover, Plaintiff has alleged violations of Article 1, Paragraph 12 of the New Jersey Constitution, which corresponds to the Eighth Amendment. See id. Because Plaintiff's Eighth Amendment claim under Section 1983 fails, and Plaintiff has not presented another theory of liability under the NJCRA, the Court will grant Byrd's motion for summary judgment as to the NJCRA claims asserted against her.

## CONCLUSION

The Court, for the reasons stated, will grant the pending motion for summary judgment and enter judgment in favor of Defendant Byrd. The Court will issue an appropriate order and judgment.

　　　　　　　　　　　　　　　　 _s/ Mary L. Cooper_____
　　　　　　　　　　　　　　　　**MARY L. COOPER**
　　　　　　　　　　　　　　　　United States District Judge

**Dated:**　　　　May 25, 2016