# United States Court of Appeals

*for the*

# Third Circuit

Case No. 16-2896

JOAN MULLIN, Administratrix of the Estate of Robert Mullin, deceased
and Joan Mullin, individually

– v. –

ADMINISTRATOR KAREN BALICKI; ROBERT PATERSON; DIRECTOR
MARIE DUNLAP-PRYCE; JANE BYRD, LPN; ERIN MARUSKY, R.N.;
OFFICER DIMLER; NURSE BEATRICE TEEL; KINTOCK GROUP;
COUNTY OF MERCER; JOHN DOES 4-10, (as yet identified and unknown
governmental, county, or state officials, supervisors, agents or employees);
ABC ENTITIES 1-10, (as yet identified and unknown governmental, county,
or state officials, supervisors, agents or employees)

Joan Mullin,

*Appellant*

ON APPEAL FROM ORDERS ENTERED IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY, TRENTON AT NO. 3:11-CV-00247
THE HONORABLE MARY L. COOPER, U.S.D.J.

## BRIEF AND APPENDIX
## ON BEHALF OF APPELLANT JOAN MULLIN
## VOLUME I OF IV (PAGES A1-A100)

LAW OFFICES OF SHELLEY L. STANGLER, P.C.
*Attorneys for Appellant Joan Mullin*
155 Morris Avenue, Suite 202
Springfield, New Jersey 07081
(973) 379-2500

*On the Brief:*
  SHELLEY L. STANGLER, ESQ.

# TABLE OF CONTENTS

**Page**

I. SUBJECT MATTER JURISDICTION & APPELLATE JURISDICTION ...........................................................................1

II. STATEMENT OF ISSUES ................................................2

III. RELATED CASES AND PROCEEDINGS ...................................3

IV. STATEMENT OF THE CASE ............................................3

   A. FACTS.........................................................3

      1. Plaintiff's Knowledge of the Facts & Discovery.......................8

      2. State Discovery and the "Missing Disc" Discovery.................10

      3. The July 2013 Discovery ...........................................13

      4. The October 23, 2013 Discovery Letter ...................................15

      5. The Allegations in the Second Amended Complaint and Proposed Third Amended Complaint ........................................16

   B. PROCEDURAL HISTORY .................................................17

   C. RULINGS PRESENTED FOR REVIEW ........................................22

      1. The November 1, 2013 Order Dismissing the Complaint ........22

      2. The July 25, 2014 Order Denying Reconsideration .................24

      3. The December 8, 2014 Order Denying Leave to Amend.........25

      4. The July 13, 2015 Order Affirming the December 8, 2014 Order ........................................................30

      5. The May 25, 2016 Order on Summary Judgment of Nurse Byrd .......................................................31

V. SUMMARY OF ARGUMENT................................................31

i

VI.   LEGAL ARGUMENT ..................................................................................32

POINT I

IT WAS CONTRARY TO LAW TO DISMISS THE SECOND
AMENDED COMPLAINT AS TO DIMLER .............................................32

A.    Standard of Review .........................................................32

B.    The Second Amended Complaint was Factually Sufficient ..............32

C.    The Immunities Under the Tort Claims Act were not Applicable ......39

POINT II

THE ORDER DENYING RECONSIDERATION WAS CONTRARY
TO LAW AND AN ABUSE OF DISCRETION ..........................................41

A.    Standard of Review .........................................................41

B.    Standard for Reconsideration .............................................41

C.    Basis for Reconsideration .................................................42

      1.    Significant new evidence .........................................42

      2.    Use of extrinsic evidence appropriate ......................44

      3.    The court overlooked the law on pleading standards &
            Title 59 immunities .................................................44

D.    Manifest Injustice Resulted from the Dismissal .................45

POINT III

IT WAS AN ABUSE OF DISCRETION TO DENY AMENDMENT
OF THE COMPLAINT ...............................................................46

A.    Standard of Review .........................................................46

B.    Standard for Motion to Amend .........................................46

C.    There was no Prejudice to Defendants.................................49

D.    The Amendment Relates back to the Filing of the Complaint............50

       1.    The State's fictitious defendant rules apply ..............................50

       2.    The amendment relates back ..................................51

  E.    Dismissal Does Not Operate to Preclude Amendment ......................55

POINT IV

IT WAS AN ABUSE OF DISCRETION FOR THE DISTRICT
COURT TO AFFIRM THE MAGISTRATE'S DECISION
DENYING AMENDMENT ...........................................................56

  A.    Standard of Review ...........................................................56

  B.    Standard of Review for the District Court ..........................................56

  C.    The Magistrate's Decision Should have been Reversed .....................57

  D.    Relation Back Applied .......................................................58

  E.    Amendment on Post-Judgment Pleadings was to be Allowed............59

CONCLUSION .........................................................................60

## VOLUME I

                                                                 **Page**

Notice of Appeal filed by plaintiffs Joan Mullin, as Administratrix
    of the Estate of Robert Mullin, and Robert Mullin individually…... ....    A1

November 1, 2013  Opinion on Dismissal of the Second Amended
    Complaint…………………………………………………………….    A3

November 1, 2013 Order of Dismissal on the Second
    Amended Complaint…………………………………………….    A41

July 25, 2014 Opinion on Reconsideration of Dismissal
    of Second Amended Complaint………………………………    A44

July 25, 2014 Order on Reconsideration of Dismissal
    of Second Amended Complaint………………………………    A56

December 8, 2014 Order denying amendment of the Complaint…………    A57

July 13, 2015 Opinion affirming Magistrate Order denying amendment…    A80

July 13, 2015 Order affirming  Magistrate Order denying  amendment…    A85

May 25, 2016 Opinion granting summary judgment to Nurse Byrd………    A86

May 25, 2016 Order granting summary judgment to Nurse Byrd... ………    A100

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                                                      **<u>Page</u>**

<u>Adams v. Gould,</u>
  739 F. 2d 858 (3d Cir. 2011) ................................................41,49,55,56,57,60

<u>Alston v. Parker,</u>
  153 F.3d 299 (3d Cir. 2004) ..........................................................................38

<u>Anderson v. City of Bessemer City,</u>
  470 U.S. 564 (1985)........................................................................................56

<u>Andrews v. Goodyear Tire & Rubber Co., Inc.,</u>
  191 F.R.D. 59 (D.N.J. 2000) .........................................................................56

<u>Arthur v. Maersk, Inc.</u> ,
  434 F.3d 196 (3d Cir. 2006) ...........................................................46,49,52,54

<u>Ashcroft v. Iqbal,</u>
  129 S. Ct. 1937 (2009)....................................................................................32

<u>Bechtel v. Robinson,</u>
  886 F. 2d 644 (3d Cir. 1989) ...................................................................46,48

<u>Bell Atlantic Corp. v. Twombly,</u>
  550 U.S. 544 (2007).............................................................................32,33,35

<u>Bjorgung v. Whitetail Resort LP,</u>
  550 F.3d 263 (3d Cir. 2008) ..........................................................................50

<u>Boileau v. Bethlehem Steel Corp.,</u>
  730 F.2d 929 (3d Cir. 1984) ..........................................................................49

<u>Bullock v. Beard,</u>
  2010 WL 1507228 (M.D. Pa. April 14, 2010) ..............................................36

<u>Carroscosa v. McGuire,</u>
  2007 WL 1456205 (D.N.J. May 15, 2007).....................................................45

**Page**

Cataldo v. Moses,
    361 F. Supp. 2d 420 (D.N.J. 2004)................................................56

Colburn v. Upper Darby Twp.,
    838 F.2d 663 (3d Cir. 1988) ("Colburn I") ............................23,34,35,38,44

Colburn v. Upper Darby Twp.,
    946 F.2d 1017 (3d Cir. 1991)("Colburn II") .....................................23,35,44

Continental Cas. Co. v. Dominick D'Andrea, Inc.,
    41 F.R.S. 3d 19 (3d Cir. 1998) ......................................................57

Cooper v. Shumway,
    780 F.2d 27 (10th Cir. 1985) ........................................................55

Cornell & Co., Inc. v. Ocean Safety & Health Review Commission,
    573 F. 2d 820 (3d Cir. 1978) .................................................... 47-48

Costa v. Josey,
    388 A.2d 1019 (App. Div.), *aff'd,* 401 A.2d 526 (1979) .............................40

Cureton v. NCAA,
    252 F.3d 267 (3d Cir. 2001) ...............................................48,57, 58

Derienzo v. Harvard Industries, Inc.,
    357 F.3d 348 (3d Cir. 2004) ........................................................51

District Council 47, American Federation of State,
    County and Municipal Employees v. Bradley,
    795 F.2d 310 (3d Cir. 1986) ........................................................35

Donnelly v. Johns Manville Salzo Corp,
    677 F.3d 339 (3d Cir. 1982) ........................................................44

Dussouy v. Gulf Coast Investment Corp.,
    660 F.2d 594 (5th Cir. 1981) .......................................................57

Erickson v. Pardus,
    551 U.S. 89 (2007).................................................................35

**Page**

Estate of Bailey by Oare v. County of York,
    768 F.2d 503 (3d Cir. 1985) ..........................................................................33

Farrell v. Votator Div. of Chemetron Corp.,
    299 A.2d 394 (1973).....................................................................................51

Fitzgerald v. Palmer,
    219 A.2d 512 (1966)....................................................................................40

Fletcher – Harlee Corp. v. Pote Concrete Contractors Inc.,
    482 F.2d 247 (3d Cir. 2007) ..........................................................................33

Foman v. Davis,
    371 U.S. 178 (1962)....................................................................21,46,49,55,57

Freedman v. City of Allentown,
    853 F. 2d 1111 (3d. Cir. 1988) .............................................................22,34,37

Fuller v. Rutgers, The State University,
    381 A.2d 811 (App. Div.), *certif. den*., 384 A.2d 840 (1978)......................59

Gabapentin Patent Litigation,
    312 F. Supp. 2d 653 (D.N.J. 2004)................................................................56

Garvin v. City of Philadelphia,
    354 F.3d 215 (3d Cir. 2003) ..........................................................................59

Grayson v. Mayview State Hosp.,
    293 F.3d 103 (3d Cir. 2002) ..........................................................................33

Hall v. Pennsylvania State Police,
    570 F.2d 86 (3d Cir. 1978) ............................................................................35

Harrison Beverage Co. v. Dribeck Importers, Inc.,
    133 F.R.D. 463 (D.N.J. 1990) ...............................................................47,48,50

**Page**

Heyl v. Patterson International Inc. v.
F.P. Rich Housing of the Virgin Islands, Inc.,
    663 F.2d 419 (3d Cir. 1981), *cert. den. sub.nom.*,
    455 U.S. 1018 (1982)....................................................................48

In Re Burlington Coat Factory Securities Litigation,
    114 F.3d 1410 (3d Cir. 1977) .................................................46,60

In re Human Tissue Products Liability Litigation,
    2009 WL 737048 (D.N.J. March 18, 2009) ................................48

In re K-Dur Antitrust Litigation,
    338 F. Supp. 2d 517 (D.N.J. 2004)...........................................24

Jang Boston Sci Scimed, Inc.,
    729 F.2d 357 (3d Cir. 2013) .......................................................50

Jordan v. Fox, Rothschild, O'Brien & Frankel,
    20 F.3d 1250 (3d Cir. 1994) .......................................................33

Kolitch v. Lindedahl,
    497 A.2d 183 (1985).....................................................................40

Kost v. Kozakiewicz,
    1 F.3d 176 (3d Cir. 1993) ...........................................................33

Krupski v. Costa Crocieres,
    560 U.S. 538 (2010).....................................................................52

Kulp v. Veruete,
    167 Fed. Appx 911 (3d Cir. 2006).........................................37,38

Kulp v. Veruete,
    267 Fed. Appx. 141 (3d Cir. 2008).........................................23,35

Lazaridis v. Wehmer,
    591 F.3d 666 (3d Cir. 2010) .......................................................41

**Page**

Leatherman v. Tarrant County Narcotics,
    507 U.S. 163 (1993)....................................................................22,34,35

Long v. Atlantic City Police Dept.,
    670 F.3d 436 (3d Cir. 2012) .........................................................41

Longo v. Santoro,
    480 A.2d 934 (App. Div. 1984)..................................................39,40

Lorenz v. CSX Corp.,
    1 F. 3d 1406 (3d Cir. 1993) ..........................................................46

Lowe v. Zarghemi,
    731 A.2d 14 (N.J. 1999) ..............................................................29

Ludlow v. City of Clifton,
    702 A.2d 506 (N.J. App. Div. 1997) ............................................40

Mann v. Palmerton Avenue School District,
    33 F. Supp. 3d 530 (M.D. Pa. 2014)..............................................36

Marcinczyk v. State of New Jersey,
    5 A.3d 785 (2010)........................................................................39

Markowitz v. Northeast Land Co.,
    906 F.2d 100 (3d Cir. 1990) .........................................................33

Max's Seafood Café v. Quinteros,
    176 F.3d 669 (3d Cir. 1999) .........................................................45

McNesby v. State of New Jersey, Department of Human Services,
    555 A.2d 1186 (N.J. App. Div. 1989) .................................... 40-41

Mears v. Sandoz Pharmaceuticals,
    693 A.2d 558 (App. Div. 1997).....................................................51

Mele v. Federal Reserve Bank of New York,
    359 F.3d 251 (3d Cir. 2004) .........................................................44

**Page**

M.G. v. Crisfield,
     547 F. Supp. 2d 399 (D.N.J. 2008)................................................................32

Morse v. Lower Merion School District
     12 F.3d 902 (3d Cir. 1997) ..........................................................................33

Moser v. Bascelli,
     865 F. Supp. 249 (E.D. Pa. 1994)............................................................33,34

National Hockey League v. Metropolitan Hockey Club,
     427 U.S. 639 (1976).......................................................................................44

Nealman v. Laughlin,
     2016 WL 4539203 (M.D Pa. August 31, 2016) ...........................................33

Nichols v. Maynard,
     2006 WL 3161488 (11th Cir. 2006) .............................................................36

North River. Ins. Co. v. CIGNA Reins. Co.,
     52 F.3d 1194 (3d Cir. 1995) .........................................................................41

Omnipoint Commc'ns Enters, L.P. v. Newtown Twp.,
     219 F.3d 240 (3d Cir. 2000) .........................................................................32

Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.,
     998 F.2d 1192 (3d Cir. 1993) .......................................................................34

Phillips v. County of Allegheny,
     515 F.3d 224 (3d Cir. 2008) .........................................................................32

Poulis v. State Farm Fire & Cas. Co.,
     747 F.2d 863 (3d Cir. 1984) .........................................................................44

Resorts Int'l Inc. v. Greate Bay Hotel and Casino, Inc.,
     830 F. Supp. 826 (D.N.J. 1992).....................................................................45

Rolle v. Brevard County, Florida,
     2007 WL 328682 (M.D. Fl., Jan. 31, 2007) .................................................36

**Page**

Rolo v. City Investing Liquidators Inc.,
        155 F.3d 644 (3d Cir 1988) ............................................................50

Sentinel Trust Co. v. Universal Bonding Ins. Co.,
        316 F.3d 213 (3d Cir. 2003) .........................................................44

Shane v. Fauver,
        213 F.3. 113 (3d Cir. 2000) ..........................................................46

Shore v. Housing Authority of Harrison,
        506 A.2d 16 (App. Div. 1986).......................................................40

Singletary v. Pennsylvania Department of Corrections,
        266 F.3d 180 (3d Cir. 2001) .....................................................53,54

State Trading Corp. v. Assuranceforeningen Skuld,
        921 F.2d 409 (2d Cir. 1990) ..........................................................55

Stegmeier v. St. Elizabeth Hospital,
        571 A.2d 1006 (App Div. 1990)....................................................51

Stoneking v. Bradford Avenue School District,
        882 F.2d 720 (3d Cir. 1989) ..........................................................36

Sutphen v. Benthian,
        397 A.2d 709 (App. Div. 1979).................................................39,40

Tatsch-Corbin v. Feathers,
         561 F. Supp. 2d 538 (W.D.Pa. 2008) .......................................23,35

Trafton v. City of Woodbury,
        799 F. Supp. 2d 417 (D.N.J. 2011)................................................39

Twohy v. First Nat'l Bank of Chicago,
        758 F.2d 1185 (7th Cir. 1985).......................................................55

United States v. U.S. Gypsum Co.,
        333 U.S. 364 (1948)......................................................................56

**Page**

<u>Varlack v. SWC Caribbean Inc.</u>,
    550 F.2d 171 (3d Cir. 1977) ..................................................................52,53

<u>Watterson v. Page</u>,
    987 F.2d 1 (1st Cir. 1993)......................................................................33,34

<u>Wilson v. City of Atlantic City</u>,
    142 F.R.D. 603 (D.N.J. 1992) ................................................................50,51

<u>Wilson v. Garcia</u>,
    471 U.S. 261 (1985)...................................................................................51

<u>Zenith Radio Corp. v. Hazeltime Research</u>,
    401 U.S. 321 (1971).................................................................................46

## <u>Statutes</u>

28 U.S.C. §636(b)(1)(A) ............................................................................56

28 U.S.C. §1291 .........................................................................................1

28 U.S.C. §1343(a)(3) .................................................................................1

28 U.S.C. §1343(a)(4) .................................................................................1

28 U.S.C. §1367 .........................................................................................1

29 U.S.C. §1331 .........................................................................................1

42 U.S.C. §1983 .....................................................................................1,38

N.J.C.R.A. 10:6-1 *et. seq* .......................................................................1,38

N.J.S.A. 59:2-3 ........................................................................................39

N.J.S.A. 59:3-1 ........................................................................................40

N.J.S.A. 59:3-2......................................................................................39,40

**Page**

N.J.S.A. 59:6-4 ............................................................................41

N.J.S.A. 59:6-5 .....................................................................23,39,40

N.J.S.A. 59:6-6 .....................................................................23.39,40

## Rules

F.R.C.P. 8(a)(2) ...........................................................................34

F.R.C.P. 9(b) ...............................................................................34

F.R.C.P. 12(b)(6) .....................................................................32,38

F.R.C.P. 12(c) .............................................................................32

F.R.C.P. 15(c)(1) .........................................................................51

F.R.C.P. 26 ...............................................................10,19,25,26,29

F.R.C.P. 72(a) .............................................................................56

N.J. Civ. R. 4:26-4 .......................................................................51

## I. SUBJECT MATTER JURISDICTION & APPELLATE JURISDICTION

On January 14, 2011, Plaintiff-Appellant ("Mullin," "Plaintiff" or "Plaintiff's decedent") filed her Complaint in the District of New Jersey against several parties alleged to have been the proximate cause of the death of her son who committed suicide at the state operated jail facility Central Reception & Assignment Facility ("CRAF"), alleging constitutional violations pursuant to 42 U.S.C. §1983 and the New Jersey Civil Rights Act ("NJCRA") along with pendent state claims. The Complaint named as defendants the State of New Jersey and several individual administrators of the jail facilities (the "State Defendants"), Trenton Psychiatric Hospital ("Trenton"), Kintock Group; Mercer County; Jane Byrd and John Does [A168]. The matter was later settled with Kintock Group, a halfway house, and Mercer County was voluntarily dismissed from the case [A195]. Jurisdiction in the federal court was predicated on federal question under 29 U.S.C. §1331, 28 U.S.C. §1343(a)(3) and 28 U.S.C. §1343(a)(4). Supplemental jurisdiction over pendant state claims existed under 28 U.S.C. §1367.

After four years of battling over the pleadings which are the subject of this appeal, the remaining defendant, Nurse Byrd, was dismissed on summary judgment by Order dated May 25, 2016 [A100], disposing of all claims.

Plaintiff timely filed her Notice of Appeal on June 22, 2016 [A1]. This Court has jurisdiction of this appeal pursuant to 28 U.S.C. §1291.

1

This appeal is limited to the dismissal of defendant Officer Nicholas Dimler ("Dimler"), responsible for the monitoring and oversight of plaintiff prior to his death and the failure to permit amendment of the complaint to again implead Dimler along with  officers Robert Russo ("Russo"), Chief Ralph Yansek, Lt. Dudich, Sgt. B. Stern, Sgt. Thomas Spence and Office Eric Large ("Large"), each one of whom was on duty during the pertinent time frame during which Mullin was calling out for psychological help and denied such help; failing to abide by specific protocols requiring constant observation, such failures being a direct and proximate cause of Mullin's death (see Facts, *infra*, p. 3).  Plaintiff does not appeal from the dismissals of  the other defendants or summary judgment granted to Nurse Byrd on May 25, 2016.

## II. <u>STATEMENT OF ISSUES</u>

1.   Was it contrary to law and improper for the District Court to dismiss the Second Amended Complaint as conclusory? [raised in opposition, A604, and on reconsideration, A657; Order, A3].

2.   Did the District Court abuse its discretion in failing, upon reconsideration, to reverse its decision dismissing the Second Amended Complaint? [raised A657; Order, A44].

3.    Did the District Court abuse its discretion in failing to permit plaintiff to

2

file and serve the Third Amended Complaint? [raised A788, A871, Orders A57, A85].

4.    Did the District Court abuse its discretion in failing to reverse the Order denying amendment on appeal from the Magistrate Judge to the District Judge? [raised A871, Order, A85].

<div align="center">

### III. <u>RELATED CASES AND PROCEEDINGS:  NONE</u>

### IV. <u>STATEMENT OF THE CASE</u>

</div>

### A.  <u>FACTS</u>

The 29 year old male plaintiff Mullin committed suicide on January 17, 2009 with a bedsheet while incarcerated at CRAF [Complaint, A173, ¶22; autopsy A667].   Mullin had been scheduled to be released from the defendant halfway house Kintock when he began to exhibit deterioration in mental status and became emotionally labile with aggressive behaviors.  After swallowing a handful of pills in front of a caseworker at Kintock, and found to be under the influence of illegal narcotics including cocaine and opiates, he was transferred first to South Woods State Prison and thereafter, on or about January 16, 2009, to CRAF [Second Amended Complaint, improperly designated the Fourth Amended Complaint "SAC," A415, ¶11-18,[1] A ; Kintock records, A914 ].

---

[1] There were  four (4) complaints filed in this action; the original [A168], an Amended Complaint [A223], a Second Amended Complaint [A262], another Second Amended Complaint that should have been designated a Third Amended

<div align="center">3</div>

Mullin was released to the jail facilities with a  Discharge and Continuity Plan from Kintock indicating that he required additional treatment and was a high risk for alcohol/drugs[SAC, ¶21, A420; Kintock records, A921].

Mullin also suffered from a known and continuing history of  suicide attempts and drug abuse.  His medical chart maintained at CRAF established that plaintiff suffered from a  mood disorder, had a family history of suicide and a history of being a suicide risk [SAC, ¶49, A424].  Mullin had a history of treatment for psychiatric problems [SAC ¶40, 41, 43-50, A423-424].

At the time of transfer to CRAF Mullin was designated a Special Needs Inmate, defined as an inmate suffering from a psychiatric condition who is "unable to meet the functional requirements of incarceration without mental health treatment."  This designation was noted as "active" on the transfer sheet sent from

---

Complaint [A297]  and the Fourth Amended Complaint which is the subject of this appeal [415].  Judge Cooper referenced  plaintiff's incorrect labeling of the Second Amended Complaint as a Fourth Amended Complaint (Order, footnote 1, A594). The confusion was brought on by the filing of different proposed amended complaints on the cross-motions to dismiss and in support of a third motion to amend.  Ultimately the Fourth Amended Complaint was filed. This is now identified as the Second Amended Complaint and was the complaint subject to dismissal on November 1, 2013, referred to herein as the SAC [A415].

The proposed Third Amended Complaint ("TAC")  is the complaint plaintiff sought to file after the SAC was dismissed [A1053, without highlights; A1167 with highlights to show source of discovery].

4

Southwoods to CRAF ["TAC" ¶30,31, A1167,1173 and Special Needs transfer sheet, A1012; policy A1015].

Policy required that Mullin be placed on a Special Needs Roster available to all monitoring, housing, supervisory and medical personnel (TAC, ¶35, A1174; policy A1016]. Mullin was placed on the Roster and transferred to a Close Custody Unit, Housing S3 [TAC, ¶35, A1174].

The Close Custody Unit is for inmates placed on either Administrative or Disciplinary Segregation, Protective Custody or Suicide Watch in accordance with Internal Management Procedures ("The Procedures"). There are two (2) levels of monitoring in the Close Custody Unit: Close Watch or Constant Observation. Pursuant to The Procedures, Close Watch requires "intermittent monitoring of an inmate either in person or by video monitoring at 15 minute intervals." Constant Observation requires "uninterrupted observance of one inmate who is on suicide watch that shall be conducted in person or by video monitor when the video monitor provides continuous unobstructed vigilance." (TAC ¶41-44, A1176; policy, A944].

Mullin was required by The Procedures to have been placed on Constant Observation at the time he was transferred to South 3. [TAC ¶49, A1176, 1177; policy A946].

Mullin was not monitored on either Close or Constant Watch as mandated by The Procedures [TAC, ¶44, 45, 103, A 1176, 1187].

Pursuant to The Procedures, if a mental health professional is not available due to the time of the transfer after business hours, then the person being transferred must be under Constant Watch until such time as an appropriate evaluation is made [TAC ¶49, A1167; policy A946].

Officer Dimler was the officer on the 3rd shift responsible for monitoring and supervision under the subject policies and procedures, and failed to monitor decedent either on Constant Watch or Close Watch. Officer Dimler was obligated by policy to know which inmates under his watch were designated Special Needs, and had direct knowledge that Mullin was a Special Needs inmate requiring special precautions and monitoring  [TAC ¶45,54,65, A1167].

Dimler had direct knowledge of Mullin's vulnerability to suicide, both from having the transfer records and electronic chart available to him, but also having direct knowledge that Mullin was a Special Needs Inmate on a floor requiring close or constant watch [SAC, ¶15,26,27,28,61,62, A415; TAC ¶35-37, 44, 52, 54 A1167].

Officer Russo was also an officer responsible for monitoring and supervision over the plaintiff on the Second Shift in the South Three Housing Unit [TAC ¶53,54, A1167; Internal Investigation, A982, 985-988].

6

Several inmates stated that Mullin requested to see a psychiatrist, and told Officer Russo that he wanted to kill himself, but was ignored and humiliated by Officer Russo.

The statements of the inmates include that when Mullin requested to see a "psych," Officer Russo refused access, stating that "he was beat" and to "go ahead and hang yourself," that "you have to wait until the holidays are over to see the psych because they won't be back until the holidays are over;" that Mullin was "clearly distressed" and was told by Officer Russo to "Shut up.  You might as well kill yourself," and that "there was no psych available" so "I guess you have to kill yourself" [TAC ¶57-65, A1167; investigation, A985-988].

One inmate stated that Officer Dimler, the third shift officer, failed to make any rounds at all during his entire shift  except once when he started the shift [TAC ¶57-65, A1167;  investigation, A986].

The Shift Commanders during the 2d and 3d shifts were Chief Ralph Yansek and Lt. Dudich, Sgts. B. Stern and Thomas Spence, along with Officer Russo's partner, Officer Eric Large [TAC ¶66,67, A1167; investigation, A985-990, 1004-1007].

Mullin was found dead after having committed suicide with a bedsheet on January 17, 2009 by Dimler [SAC ¶102, A 415; TAC ¶51, A1178].

1.  **Plaintiff's Knowledge of the Facts and Discovery**

From the outset of the claim plaintiff-appellant attempted to obtain information from the State regarding her son's death. She filed two (2) affidavits in connection with her motion to file a late notice of claim [A210, 212].

The only information in plaintiff's possession was the electronic medical chart and corrections file on Mullin which counsel had obtained by request and was used to develop and prepare the original complaint [SAC ¶40,42, A423].

Plaintiff raised the issue of the lack of discovery and need to identify the parties responsible for the supervision and care of Mullin in her cross-motion to amend the complaint in response to the State Defendants' first motion to dismiss (A208; brief to show presentation of issue, A252].

Paragraph 28 of the Proposed Amended Complaint stated that plaintiff had requested records but that none had been provided [A230].

Plaintiff again requested that the Court compel discovery including identification of individual defendants in her second cross-motion to amend the complaint in response to Trenton's motion to dismiss [A256]; in the brief [A287] and in the proposed Second Amended Complaint [¶28, A262].

The Magistrate Judge denied both impleader of Dimler and discovery, holding that "plaintiff's request for discovery is DENIED, without prejudice and the plaintiff may renew discovery requests after defendants have answered the

amended complaint or any renewed motions to dismiss have been resolved" [A295,296]. Reconsideration was granted but leave to implead Dimler denied [A386]. On the reconsideration motion the court wrote that "discovery may illuminate the circumstances surrounding Mullin's death," yet denied the discovery necessary to determine those circumstances prior to motions for dismissal [A399]. The appeal of reconsideration Order of June 19, 2012 was affirmed by the District Judge [A488, 493].

On February 10, 2012, in connection with the filing of an Affidavit of Merit on the medical malpractice count, plaintiff advised the Magistrate Judge that there was no discovery or exchange of records "due to the various 12(b) motions to dismiss and cross-motions to amend the complaint and that plaintiff had requested the records and was seeking "permission to file a motion to compel the records by court order as well as to file a late tort claim notice" [A357].

On February 21, 2012 plaintiff again wrote the court noting that documents needed to be provided [A362, 364]. At status conference on February 23, 2012 the discussion was on plaintiff's request to file a late notice of claim against Nurse Byrd [A368].

On July 2, 2012 plaintiff received documents from defendant Kintock which indicated known mental health issues leading to removal of Mullin from Kintock back to the jail facilities [A914]. Based on this information plaintiff was

finally permitted to amend the complaint to add Dimler as a defendant with an order entered September 14, 2012, resulting in the filing of the Fourth Amended Complaint (which should have been identified as a Second Amended Complaint) [A508, 415]. However, plaintiff still had no documents or information from the State Defendants as to the happening of the suicide and surrounding events.

The State Defendants refiled their motion to dismiss on November 25, 2012 without having provided any discovery [A518].

A Rule 16 conference was held on November 27, 2012 at which time a discovery plan was set [A520]. Defendants had yet to comply with their Rule 26 obligations to produce discovery, thus continuing to hamper plaintiff's ability to name proper defendants and permit a more detailed pleading.

Plaintiff briefed opposition to two (2) motions to dismiss [A526], two (2) cross motions to amend, reconsideration of denial of amendment and appeal, all without the benefit of any discovery. When the defendants raised new issues in their reply on the second filing for dismissal, plaintiff was granted permission to and briefed a Sur-Reply on March 9, 2013 [A529], again without benefit of discovery. The case was now 2.3 years old.

## 2. State Discovery and The "Missing Disc" Discovery

On April 19, 2013 the State Defendants served discovery consisting of two (2) discs of materials. The cover letter did not note that there were two (2) discs

and the Bates numbers used overlapping identical numbers with the designations "DOC Mullin" and "Confidential Mullin" [A887]. Although the office did receive both discs of materials, one had been misfiled and the material not printed out. Counsel requested that her staff print out the discovery for her review and received a package of documents that contained the medical chart and documents already in plaintiff's possession [March 4, 2014 letter, A719; Certification on Reply to Motion to Amend, A857, 858-859].

However, the Missing Disc contained a bombshell of data, including the investigation of the suicide involving statements of eleven (11) inmates that Mullin had called for psychological help while in his cell but his pleas were ignored as an Officer identified as Officer Russo told him to go kill himself  and that medical help was unavailable. Thereafter Mullin did kill himself. Further, an inmate noted that Officer Dimler had not conducted routine shifts and was nowhere to be seen during the course of his shift; it was during Dimler's 3rd shift that Mullin committed suicide. Nor were there any supervisors to be found [A719; internal investigation, A982; TAC, A1167].

The answers to interrogatories sent with the April 2013 discs and in May 2013 were not enlightening. The State Defendants avoided responsive answers by stating that the supervisory defendants answering discovery were "no longer employed" by the State and therefore could not answer the questions or access any

information. Further, Officer Dimler's answers to interrogatories failed to correlate his South 3 Housing Unit to the Close Custody Watch and failed to identify the Special Investigation Divisions' investigation containing the critical materials [see, Balicki answers to interrogatories, A1100; May 2, 2013 answers to interrogatories by defendant Marie Dunlap-Pryce; A1120; defendant Robert Patterson's Answers to Interrogatories, A1135; and the May 29, 2013 answers of Defendant Dimler A1150, specifically #5, requesting identification of documents; #7, identification of witnesses, #12, no witness statements and #14, 15 and 16 – describing "your version" of the events, which fails to note that Mullin was on a close custody unit or why, with no identification of supervisors or the extent of monitoring, as requested by plaintiff. In his answer to number 18, Dimler denied knowledge as to whether Mullin made any complaints of whatever nature.

In preparation for a status conference, on June 18, 2013, plaintiff emailed defense counsel asking for the records that had been provided in April 2103 [A689]. On June 27, 2013 plaintiff counsel again forwarded her discovery requests to defense counsel for review and discussion about what the state would produce, again indicating lack of knowledge of the April 2013 discovery [A690, 691].

On September 24, 2013 plaintiff wrote yet another email to defense counsel stating that counsel did not have any of the "logs and records maintained by the

correction staff/facility regarding monitoring and transfer of decedent and activities in his housing unit," and providing a list of missing documents [A710].

It was thus overwhelmingly clear that plaintiff counsel was unaware of the April 2013 discovery. It should have been apparent to all parties based on plaintiff's brief in opposition to dismissal, emails, discussions at status conferences and plaintiff's continued requests for the records that plaintiff either had not received, misplaced or otherwise was unaware of these materials.

Plaintiff counsel finally found out about the Missing Disc discovery on February 26, 2014 during a conversation with counsel from Kintock which revealed that plaintiff was unaware of the critical discovery. Plaintiff advised the Court of this problem by letter dated March 4, 2014 requesting that the Court reopen the pending motion for reconsideration of dismissal [A719], which was granted with refiling April 24, 2014 [A728].

## 3. **The July 2013 discovery**

The State also provided discovery on July 17, 2013 [A889]. This discovery consisted of general policies and procedures on suicide watch, close custody and screening procedures. This batch of documents did not identify Officer Dimler's responsibilities and did not identify Officer Russo or Large as having any involvement with Mullin [April 23, 2014 Certification in support of Motion for Reconsideration of the November 1, 2013 Order of dismissal, A 951a,, ¶6, 7, 9, 14,

ftn.1; TAC A1167, at ¶ 53,54 57-65], showing that plaintiff obtained the identity of Russo and Large, as well as their roles, from the Missing Disc discovery. The July 2013 discovery included a roster sheet which matched Dimler to the time of death, comporting with the pleadings [A959]  and provided 2 Observation Reports for the period <u>after</u> Mullin was found dead, which showed 15 minute observation as the policy for that unit [A970]. These policies and documents supported plaintiff's allegations in the Second Amended Complaint before the Court on dismissal. These policies indicated that inmates on Unit S3 required close or constant observation [A740, showing housing unit on "S3;" policy for S3, A939, 961]. Plaintiff had pled the allegations regarding failing to follow policy and procedure requiring close supervision as well as direct knowledge on the part of Dimler that Mullin was a suicide risk by way of the transfer records from Kintock and the chart on Mullin maintained in the jail.  Pleading standards do not require the level of specificity regarding recitation of actual policies in order to pass the "plausibility" test.   Therefore plaintiff did not present these general policies in opposition to the motion to dismiss; however, she did on reconsideration to show that the allegations were not "conclusory"  [Legal Argument, Point I, pp. 32, 36]. Certification, A1269; policies A 939, 961, 973, 1014, 1023, 1031, 1040].

14

Without the Missing Disc discovery plaintiff was still unable to connect the policies and procedures supplied in July 2013 with the identification of plaintiff as a Special Needs Inmate [see, TAC, A1167, 1173].

### 4.  **The October 23, 2013 Discovery Letter**

On October 23, 2013 the State Defendants served a response to plaintiff's email request of September 24, 2013 [A1219].   This was received on November 1, 2013, the date Judge Cooper filed her 40 page decision dismissing the Second Amended Complaint as to Dimler and other parties  [A1219, see date stamp; the word "Mullin" is handwritten by plaintiff counsel].  This letter did not include any documents, but referred to documents already provided.  The response was cryptic in that it failed to refer to the critical Missing Disc discovery in direct response to a question.  It was in response to Item #6 requesting "The Morbidity and Mortality Reviews for all suicide/attempted suicides within 5 years prior/1 year subsequent to January 17, 2011" that the defense referred to the "Special Investigations Division Report." Because plaintiff had the same day received the November 1, 2013 order dismissing the case on the pleadings, and was focused on evaluating that opinion and the need to move for Reconsideration, and because the request for suicide morbidity rates was not relevant to the immediate and urgent issues to be addressed, counsel failed to pick up any discrepancy or problem with discovery production on November 1, 2013.  Nor could plaintiff have possibly notified the

District Court of the discovery problem or efforts to locate the missing discovery in time to avoid the November 1, 2013 decision.

In her denial of the motion to amend based on the Missing Disc discovery, the Magistrate focused on the October 23, 2013 letter as proof of the "clues" that would have alerted plaintiff to the problem.  Even if it had, such knowledge would not have avoided the November 1, 2013 dismissal order; and plaintiff was able to reopen the reconsideration briefing schedule upon advising the Court of the problem on March 4, 2016 [A719, 725].

5. **The Allegations in the Second Amended Complaint and Proposed Third Amended Complaint**

The Court is referred to the following paragraphs in the Second Amended Complaint ("SAC") for the relevant allegations involving Dimler: [SAC, ¶7, 14-18, 21, 22, 24-29, 40, 49,50, 55, 61,62, 77 and 107, A415].

Despite alleging a factual basis for actual knowledge of Mullin's vulnerability to suicide by Dimler, and that he failed to adhere to ministerial duties in failing to abide by policy and procedure requiring one on one or close supervision, Judge Cooper found those allegations to be "conclusory;" noting that the wording of plaintiff counsel was not clear or cogent enough to provide sufficient factual basis to be deemed plausible for the claims asserted [A31-32].

Once the April 2013 disc was located and the July 2013 discovery was produced, plaintiff finally had the information available to establish more detailed

16

allegations to support the complaint. Now, for the first time the details and purpose of plaintiff's housing unit, the designation of plaintiff as a Special Needs inmate, and the policies and procedures applicable to the management and care of plaintiff were available. Plaintiff moved to amend the complaint [A788].

The motion to amend set forth the additional facts to be added to the Third Amended Complaint ("TAC"), highlighted to show which facts were from the April 2013 discovery (Mullin's classification as a Special Needs Inmate and the refusal to assist despite Mullin's pleas for help) as opposed to the July 2013 discovery (policies and procedures, Observation reports from <u>after </u>the death) [Certification on Motion to Amend, A793; TAC, A1167].

## B. PROCEDURAL HISTORY

Over the course of 4 years a battle over pleadings ensued. The State Defendants and Trenton Psychiatric brought two (2) motions to dismiss resulting in two (2) cross-motions to amend [A197, 199, 203, 256, 290] followed by a motion for reconsideration and then appeal as the requests to amend were denied as to Dimler [November 28, 2011 Order, A295], motion for reconsideration [A327]; Order granting reconsideration but denying leave to amend to implead Dimler [A386]; appeal [A403, 409]; refiling of appeal [A457, 463] and affirmance [A488-493]. The defense continued to argue that plaintiff should not obtain any discovery [A359].

A third attempt to amend as to Dimler followed which was granted based on limited discovery from defendant Kintock [A403, 453, 467, 508], followed by a refiling of two (2) motions to dismiss, by the State Defendants and Jane Byrd with plaintiff filing opposition [A518, 524, 526].  With the exception of the third refiling of the motions to dismiss, all of these motions were made and briefed without the benefit of discovery.

**There were thus seven (7) motions (not including the final dismissal motion) over the course of 2.3 years filed, briefed and determined while plaintiff kept demanding discovery necessary to identify proper parties and to obtain the State's investigation to no avail.**   Indeed, the Magistrate denied discovery  both on the initial  motion request and on reconsideration, as did the District Court [A295, 386, 488, 493]. Yet it was the plaintiff's clerical error in misfiling one of the April 19, 2013 discs of material, caught in time to request a reopening of plaintiff's motion for reconsideration of dismissal and to permit a motion to amend, an error brought to the court's attention within  **one week** of discovery, that appears to have been the straw that broke the camel's back, with a finding of "undue delay" by the Magistrate and denial of the final request to amend, a denial affirmed by the District Court  [A57, 80, 85].

On November 28, 2011, the Magistrate Judge entered an Order which denied the request to add Dimler and denied plaintiff's request for discovery [A295].

Thereafter Plaintiff filed a motion to reconsider the November 28, 2011 Order [A327]. Plaintiff submitted a clarification of all the docket entries and the complaint as ordered by the court [A370, 376].

Thereafter, after being advised in Rule 26 disclosures and in the Answer of defendant Jane Byrd, R.N. that said defendant was an employee of a previously unknown public entity, the University of Medicine and Dentistry ("UMDNJ"), plaintiff filed a motion to file a late notice of claim [A373]. That motion was granted by Order dated August 30, 2012 [A496].

By Order dated June 19, 2012, the Magistrate granted reconsideration of the November 28, 2011 Order, and upon reconsideration denied the amendment. The Order provided that plaintiff file a Fourth Amended Complaint in accordance with the Order [A386, 415].

On Monday, July 2, 2012, during the time that plaintiff was preparing to file an appeal, plaintiff received new information from defendant Kintock which presented new facts as to the reason for Mullin's transfer back into detention and the psychological problems associated with that transfer [A914].

Plaintiff filed a Motion to Appeal the June 19, 2012 Order along with a motion to further amend the complaint on July 3, 2012 [A403, 409], **filing the motion within one day of receipt of the discovery.** On July 9, 2012 The District

Court entered an Order stating that this practice was improper and granted plaintiff permission to refile the appeal and the motion to amend by July 17, 2012 [A453].

Plaintiff timely filed the appeal of the June 19, 2012 Order which was affirmed [A457, 463, 488, 493].

Plaintiff's third motion to amend was filed as ordered on July 16, 2012 [A467]. This time the motion was granted [A508]. The Fourth Amended Complaint (SAC) was filed on September 21, 2012 [A415].

The State Defendants and defendant Jane Byrd filed motions to dismiss the Fourth Amended Complaint (SAC) with completion of briefing on February 13, 2013 [A 518, 524, 526].  Upon service of the complaint on Dimler, the State Defendants sought to include him in the motions  resulting in an Order requiring resubmission of the motions [A559, 561, 586, 589, 591, 594].

Defendants refiled their motions to dismiss on May 20, 2013 and June 6, 2013 [A598, 600, 602] with a hearing date of July 1, 2013.  Plaintiff's brief in opposition was filed June 17, 2013 [A604].

On November 1, 2013 the District Court issued its order dismissing the Complaint against all defendants except Nurse Byrd on the constitutional violation claim and defendant Kintock [A3, A41.  Plaintiff sought reconsideration.

The motion for Reconsideration was first filed on November 13, 2013 in conjunction with a motion to amend the complaint with a proposed Third

Amended Complaint [A 607, 610].  By Order dated November 15, 2013 the Court ordered that plaintiff refile the motion separately and that a motion to amend would await the decision on the Motion to Reconsider [A654].  Thereafter plaintiff refiled the Motion to Reconsider on November 23, 2013 [A657, 660].

By letter dated March 4, 2014 [A719] plaintiff advised the Court of the Missing Disc discovery. The Court permitted plaintiff to refile the Motion for Reconsideration, which she did on April 24, 2014 [A725, 728, 731]. The Court now had before it all the materials available.

On July 25, 2014 the Court rendered its Memorandum Opinion and Order denying reconsideration [A44, 56].

The Court found that "this new evidence [provides] many missing details relating to Plaintiff's allegations relating to policy and procedure and Dimler's knowledge" [A52, 53].   The Court then stated "what Plaintiffs truly seek to do is to amend the Second Amended Complaint" [A44, at 10].  The Court went on to note that leave should be freely given absent undue delay, bad faith or dilatory motive, among other factors, citing Foman v. Davis, 371 U.S. 178 (1962)  [A53].

The Court granted leave for plaintiff to file a motion by August 22, 2014 to amend the complaint. That motion was timely filed [A788] and denied by Order of December 8, 2014 [A57].  Plaintiff appealed on December 22, 2014 [A871, 878] with an affirmance of the Magistrate's decision July 13, 2015 [A80, 85].

C.  **RULINGS PRESENTED FOR REVIEW**

   1.  **The November 1, 2013 Order Dismissing the Complaint**

The District Court dismissed the complaint against all parties with the exception of Nurse Byrd on the constitutional claim and defendant Kintock [A41, 42]. Before the Court was the SAC [A415].

It is clear that plaintiff counsel was unaware of the Missing Disc Discovery, as the gross depravity of the corrections officers in telling Mullin to kill himself and in failing to conduct any rounds of monitoring as mandated would obviously have been included by counsel in her brief and discussed. It was not.

The court commenced by citing the allegations, which included direct knowledge by Dimler of the propensity for self-harm by Mullin having had access to both the Kintock and electronic medical chart of Mullin [A9, 10, 30-31]. Further, that Dimler failed to abide by policies mandating direct and constant supervision and monitoring over the plaintiff [A9, 10, 30-31]. The court reviewed the six counts brought by plaintiff which included constitutional violations and negligence [A11].  The Court cited the relevant standard and looked to <u>Freedman v. City of Allentown</u>, 853 F. 2d 1111, 1114 (3d Cir. 1988) for support. <u>Freedman</u> stood for a heightened pleading standard for civil rights cases later rejected by the Third Circuit in <u>Leatherman v. Tarrant County Narcotics</u> 507 U.S. 163 (1993) (Legal Argument, Point I, p. 35).

The court found that the immunities of NJSA 59:6-5 and 6-6, immunizing the failure to diagnose a mental condition and for any decision to confine a person for mental illness applied to deny plaintiff any recovery for negligence.  In so doing, the Court failed to evaluate the simple claims arising out of the failure to supervise Mullin and abide by ministerial duties in applying protocols for observation periods, as a direct and proximate cause of death.

With respect to the constitutional claims, the court reviewed the standard for suicide cases under Colburn v. Upper Darby Twp., 838 F.2d 663, 667, 669 (3d Cir. 1988)("Colburn I"), and Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991)("Colburn II").  The plaintiff must establish  (1) that the inmate had a 'particular vulnerability to suicide;' (2) that the custodial officer knew or should have known of that vulnerability and (3) that officer 'acted with reckless indifference' to that vulnerability. Colburn II, 946 F.2d at 1023.[2]  The court discussed the need for actual knowledge of the vulnerability [A24] citing Colburn, Supra., Kulp v. Veruete, 267 Fed. Appx. 141, 144 (3d Cir. 2008) and Tatsch-Corbin v. Feathers, 561 F. Supp. 2d 538, 540-542 (W.D. Pa. 2008). Despite this discussion, the Court found the allegations that Dimler was on actual notice of Mullin's vulnerability to suicide, coupled with his failure to provide the one on one supervision required and mandated by policy and permitting Mullin to be in his

---

[2] Note that Colburn II involved the grant of summary judgment; Colburn I was a dispute over the pleadings decided in plaintiff's favor.

cell with materials that he could use to commit suicide in violation of protocol were conclusory and insufficient to meet pleading standards.[3]  The court wrongly concluded that plaintiff had not pled actual knowledge on the part of Dimler [A3].

### 2. The July 25, 2014 Order & Opinion Denying Reconsideration

Plaintiff moved for reconsideration of the November 1, 2013 order on November 25, 2013 [A657].

The court reviewed the new information from the April and July discovery which by any measure established a serious and viable claim both under Title 59 and for constitutional violations. The Court now had at its disposal discovery supporting the claims and that the Court's parsing of the factual allegations in the SAC "was an exceptionally harsh and restrictive view of the pleading standards which plaintiff contend[ed did] not comport with law" [A49]. The Court disagreed. The Court stated that 'conclusory' means that the words chosen by plaintiffs were insufficiently specific to provide the requisite notice to defendants [A50-51]. Plaintiff seriously disputes this position as the allegations were certainly clear enough to apprise the defendants of the nature of the case.

---

[3]  Plaintiff acknowledges alternative pleadings in that the SAC alleged that Dimler had actual knowledge from the records or in the alternative failed to review them. Alternative pleadings are permitted and are not fatal to the complaint. In re K-Dur Antitrust Litigation, 338 F. Supp. 2d 517, 543 (D.N.J. 2004).

Plaintiff again argued that the court overlooked relevant law on negligent supervision, and that the immunities cited did not apply to misfeasance in the handling of ministerial obligatory duties.  The court did not agree.

Reconsideration was denied [A56]. The District Court did not find defendants' derelictions in failing to comply with their Rule 26 obligations, failing to comply with discovery for 2.5 years, and failing to observe or identify the problem with the Missing Disc discovery that was so apparent from emails, status conferences and continued requests for the information as pertinent or as playing any part in the delay associated in handling of the case and numerous motions and cross motions engendered by these derelictions [*see,* A54, ftn. 2]. Yet defendants' failures in providing discovery and allowing the problem to fester were purposeful and contumacious; plaintiff's delay regarding the Missing Disc discovery was not. The July 2013 Discovery was not as probative on the issues and the pleadings as it solely contained policies and procedures relating to suicide watch and the type of supervision required without establishing their relationship to the plaintiff.

**3**.**The December 8, 2014 Order Denying Leave to Amend**

This decision placed the entire "lengthy and tortured" procedural posture of the case on plaintiff, excoriating plaintiff counsel for failing to pick up on "repeated clues" regarding the misplaced discovery, failing to include the July 2013 discovery in plaintiff's opposition to dismissal resulting in the November 1,

2013 Order, failing to decipher from the October 23, 2013 discovery letter (stamped received November 1, 2013) that there was missing discovery, failing to decipher from the state's unusual Bates numbered production which used overlapping numbers to identify documents that there was a problem; which conduct rose to such a level of dilatory and contumacious behavior that it warranted the grossly unjust Order denying amendment of the complaint in a clearly meritorious claim brought by a blameless litigant. In condemning plaintiff counsel for her office's unfortunate loss of a disc of discovery, the Court failed to consider the obfuscation of the State Defendants in failing to provide any relevant discovery for 2.5 years and then compounding the problem by allowing the unfolding travesty to continue despite obvious "clues" to the defense that plaintiff was not aware of the discovery.  These clues included (1) no mention of the critical discovery in the opposition brief on dismissal; (2) no effort to amend the complaint upon receipt of the discovery in April 2013 and (3) emails/discovery requests in June and September 2013 which kept requesting the information which had already been produced. The decision failed to note that seven (7) motions had been  filed including three (3) cross-motions to amend the complaint without any discovery from the state and in violation of Rule 26. The decision failed to distinguish between the July 2013 discovery, consisting of policies and procedures which, although very helpful, could not be the basis for substantive new factual allegations

without the Missing Disc discovery. Even accepting that plaintiff could have and should have done a better job of figuring out that she was missing discovery, and should have included the July 17, 2013 discovery on the initial briefing on the motion to dismiss instead of putting it all together on reconsideration, the balance of the equities, including multiple causes for "undue delay," the interests of justice, the overwhelming evidence of liability, and plaintiff counsel's overall compliance with the rules, with meeting all filing requirements and requests of the court, in comporting herself professionally and appropriately at all times (not only on this case but multiple cases before the same judges)[4] compelled a different result.  It was an abuse of discretion under all of the circumstances to deny the relief and throw the plaintiff out of court.

The Court noted status conference calls on June 18, 2013, September 24, 2013, November 18, 2013 and January 28, 2014 during which the court "urged counsel to proceed with discovery" [A61].  It certainly would have been helpful if during one of those calls defense counsel said "Your Honor, plaintiff seems to be missing discovery because we already provided it in April, why does she keep asking for it?"  It certainly would have been helpful if defense counsel conferred

---

[4] The anecdotal comment is appropriate to the extent that the Court is familiar with counsel, her filing of multiple civil rights cases and the handling of discovery in these cases without exhibiting dilatory conduct, without "losing" discovery, and without the procedural complications that arose in this case.  This is a factor to be considered when determining whether  an attorney exhibits dilatory , contumacious behavior and acts in bad faith in appearing in federal district court.

with plaintiff counsel, instead of responding to her September 24, 2013 email requesting the information supplied in April 2013 with the letter dated October 23, 2013 which failed to reference the critical discovery where requested and instead put it in an answer to a completely unrelated inquiry; a tangential inquiry not relevant to plaintiff's effort to get the pleadings under control.

As to the Bates numbers, the cover letters with the discovery did not note any discs or number of discs, and counsel asked her staff to print out the material which she assumed contained all the discovery produced [A857, 858-859].

Plaintiff contended there was no prejudice. Plaintiff contended that with respect to the new defendants they had not been identified despite knowledge by the State and that under a Shared Attorney theory relation back should apply.

In response the defense argued prejudice. They ironically presented to the Court that there were "resources spent both by the parties and the Court in addressing repeated motions to amend, dismiss and reconsider" [A69]. Considering that the defense was at least partially the cause of these problems and delays it is inexplicable how the court laid this at the plaintiff' feet. Despite the record, including the Magistrate's own denial of plaintiff's requests by motion to compel discovery in conjunction with her motions to amend, the Magistrate found that the Court's consideration of "four motions to dismiss, four motions for leave to amend (including two cross-motions), three motions for reconsideration, one

motion for leave to serve a late notice of tort claim and one appeal – not counting the additional motions that were re-filed at the court's instruction" and the "extensive briefing" involved was <u>plaintiff's fault</u> [A77]. Yet every single one of these motions was brought and considered without the State Defendants serving a scrap of discovery. The late tort claim motion was brought after Nurse Byrd's Answer and Rule 26 disclosures revealed she was an employee of the University of Medicine and Dentistry instead of the DOC, a fact plaintiff counsel could not possibly have known. Counsel timely made an appropriate request and filed the appropriate motion under <u>Lowe v. Zarghemi</u>, 731 A.2d 14 (1999).

The Court analyzed the difference between the April 2013 lost or missing discovery and the July 2013 discovery known to counsel. She noted the tactical decision not to include the July 2013 production [73-74]. "Tactical" was not a fair adjective; a good faith basis in law on the pleading standards for policy violation would have been a more accurate description. Plaintiff had specifically alleged that policy and procedure required one on one supervision and that Dimler had failed to abide by that policy. Plaintiff now had the actual policies to support that allegation. Plaintiff had no basis to discuss the "Special Needs Inmate" policies because plaintiff did not know that Mullin was classified as a Special Needs Inmate until she saw the April 2013 discovery.

The Court's discussion of the April 2013 missing discovery was brutal. She noted the Bates number issue and the October 2013 letter production, finding that "there were repeated opportunities, and repeated clues, that should have made a diligent attorney aware that something was missing," and that the delay was "undue."

With respect to the new defendants, the defense argued that the Attorney General does not represent the new defendants who need to "request" representation." The Court found that "plaintiff has failed to articulate a sufficient basis for these claims to relate back under Rule 15(c)." [A77]. It was an abuse of discretion to accept that sham argument, as the Attorney General was and remains the attorney for any DOC employee, regardless of any technical requirements to "request representation" [Legal Argument Point III D ].

What the decision ultimately reveals is the Court's frustration with the procedural posture of the case. The court found plaintiff responsible for "undue delay" and denied the motion to amend.

## 4.The July 13, 2015 Order Affirming the December 8, 2014 Order

The District Court affirmed the order denying amendment [A80, 85]. The Court confirmed the findings that plaintiff was soley responsible for any and all delays by citation to the Magistrate: "The delay caused by the repeated errors, oversights and strategy decisions here can only be described as undue.

30

Furthermore, allowing the amendment at this point of the litigation, after so much motion practice, would only cause further delay, to the prejudice of the parties" [A82].

### 6. **The May 25, 2016 Order on Summary Judgment of Nurse Byrd**

On May 25, 2016 the District Court granted summary judgment to Nurse Byrd, upon a complete record as to that remaining defendant [A86, 100]. This order concluded the case as to all defendants, triggering this appeal.

## V. **SUMMARY OF LEGAL ARGUMENT**

The pleadings were sufficiently pled in the SAC regarding actual notice of vulnerability to suicide and the failure to abide by ministerial duties in the supervision of decedent. In the face of overwhelming evidence of a meritorious claim based on new allegations brought forward in a proposed third amended complaint and a blameless litigant it was a gross miscarriage of justice to deny plaintiff the opportunity to amend based on the wrongful characterization of the procedural history as attributable to plaintiff's counsel; the finding of "undue delay" was an abuse of discretion and contrary to law.

## LEGAL ARGUMENT

## POINT I

## IT WAS CONTRARY TO LAW TO DISMISS THE SECOND AMENDED COMPLAINT AS TO DIMLER

### A. Standard of Review

The Third Circuit has plenary review over the District Court's grant of a motion to dismiss under 12(b)(6) or 12 (c) and reviews the decision *de novo.* Omnipoint Commc'ns Enters, L.P. v. Newtown Twp., 219 F.3d 240, 242 (3d Cir. 2000).

### B. The Second Amended Complaint was Factually Sufficient

The facts as pled were more than enough to raise plaintiff's right to relief "above the speculative level", the standard for review under F.R.C.P. 12(b)(6). Plaintiffs supplied predicate facts as opposed to pleading a formulaic or conclusory recitation of the elements of the causes of action. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007); M.G. v. Crisfield, 547 F. Supp. 2d 399 (D.N.J. 2008). Twombly enunciated the "plausibility" standard, which requires a complaint to allege sufficient factual matters to state a claim that is plausible on its face. Although the factual allegations need not be detailed, they must be enough to allow the court to draw a reasonable inference that there is a right to relief. Twombly, *Supra*, *See also*, Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009); Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008).

32

In accordance with prior law, the Court remains required under <u>Twombly</u> to accept as true all allegations in the complaint and view them in the light most favorable to the plaintiff. <u>Twombly</u>, *Supra*, <u>Iqbal</u>, *Supra*.; <u>Estate of Bailey by Oare v. County of York</u>, 768 F.2d 503, 506 (3d Cir. 1985) (citations omitted). The pleader is required to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist. <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 183 (3d Cir. 1993). The court may look only to the facts alleged in the complaint and its attachments. <u>Jordan v. Fox, Rothschild, O'Brien & Frankel,</u> 20 F.3d 1250, 1261 (3d Cir. 1994).

The Court should only dismiss a complaint where under no set of facts could plaintiff possibly prevail. <u>Morse v. Lower Merion School District,</u> 12 F.3d 902, 906 (3d Cir. 1997); <u>Moser v. Bascelli</u>, 865 F. Supp. 249 (E.D. Pa. 1994), citing <u>Markowitz v. Northeast Land Co</u>., 906 F.2d 100, 103 (3d Cir. 1990).

A court should not dismiss a complaint where there is a curable pleading in a civil rights action and should grant leave to amend prior to the dismissal. <u>Nealman v. Laughlin</u>, 2016 WL 4539203, *5 (M.D. Pa. 8/31/16), citing <u>Fletcher – Harlee Corp. v. Pote Concrete Contractors Inc.,</u> 482 F.3d 247, 251 (3d Cir. 2007); <u>Grayson v. Mayview State Hosp</u>., 293 F.3d 103, 108 (3d Cir. 2002). The Court may, in considering a motion to dismiss, review the allegations, exhibits attached, matters of public record, and "undisputedly authentic" documents. <u>Watterson v.</u>

Page, 987 F.2d 1 (1ˢᵗ Cir. 1993), at *5)(plaintiff introduced the documents to bolster their argument against defendants' motion to dismiss); Pension Benefit Guar. Corp. v.  White Consol. Indus. Inc., 998 F.2d 1192, 1196 (3d Cir. 1993), affirming that the court can review documents attached by defendants on motion to dismiss without converting the motion to summary judgment.

The District Court failed to abide by prevailing law in requiring a heightened standard of pleading, citing Freedman v City of Allentown, 853 F.2d 1111, 1114-15 (3d Cir. 1988) to support her ruling.

In Colburn I,  838 F.2d 663, 666 (3d Cir. 1988), decided the same year as Freedman, Id., the Third Circuit noted that it had imposed on Section 1983 claims the additional pleading requirement that the "complaint contain a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs" (citations omitted). This is the standard cited by Judge Cooper in her November 1, 2013 decision, citing Freedman, 853 F.3d 1114 [A12].  However, the United States Supreme Court has since Colburn I ruled that there is no heightened pleading standard for claims alleging violation of civil rights.  Leatherman, 507 U.S. at 168; Moser v. Bascelli, 865 F. Supp. 249 (E.D. Pa. 1994 (Freedman has been overruled by Leatherman, at p. 254-255).   Rule 8(a)(2) requires that a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Further, rule 9(b) does not include

civil rights actions among the actions requiring greater particularity in pleadings.

Leatherman, 507 U.S. at 168; *See also*, Erickson v. Pardus, 551 U.S. 89, 93 (2007)

(per curiam), quoting Twombly, 550 U.S. at 555, that the allegations need only

"'give the defendant fair notice of what the…claim is and the grounds upon which

it rests.'"

> A complaint complies with the Colburn I standard if plaintiff
>
> allege[s] the specific conduct violating the plaintiff's rights, the time and the place of that conduct, and the identity of the responsible officials, citing District Council 47, American Federation of State, County and Municipal Employees v. Bradley, 795 F.2d 310, 313, 314 (3d Cir. 1986), Frazier, 785 F.2d at 68-70, Hall v. Pennsylvania State Police, 570 F.2d 86, 89 (3d Cir. 1978).
>
> Colburn I, at 670.
>
> Colburn I and Colburn II, 946 F. 2d 1017 enunciated both the pleading

standards and the standard of proof in a jail suicide case, to which the court

referred [A24-26]. *See also*, Kulp v. Veruente, 267 Fed. Appx. 141, 143 (3d Cir.

(PA) 2008); Tatsch-Corbin v. Feathers, 561 F. Supp. 2d 538, (W.D.Pa. 2008)

(denying motion to dismiss, holding that a complaint can survive a motion to

dismiss if it suggests that the individual defendant should have known the prisoner

was a suicide risk, and failed to take the necessary and available precautions to

protect the prisoner).

In Colburn I the Third Circuit reversed the District Court's dismissal of the

complaint for the failure to allege the facts with sufficient specificity. *Id*., at 665.

Dimler had actual knowledge that Mullin required one on one constant supervision and that policy and procedure required that level of supervision. The Court must accept these allegations as true. *See,* <u>Rolle v. Brevard County, Florida</u>, 2007 WL 328682 (M.D. Fl., Jan. 31, 2007), citing <u>Nichols v. Maynard</u>, 2006 WL 3161488, *2 (11th Cir. 2006)(court finds allegations that officer had actual knowledge based on information contained in agency's records sufficient to infer actual notice of suicidal tendencies and that policies were not preventing suicides).

In violation of policy Dimler permitted Mullin to be in a cell with materials such as bedsheets, which were not permitted.

It is not required that plaintiff set forth the exact language or the exact policies violated; it is enough to have alleged that specific suicide risk policy was not abided by. *See*, <u>Bullock v. Beard,</u> 2010 WL 1507228, *5 (M.D. Pa. April 14, 2010). In <u>Mann v. Palmerton Avenue School District</u>, 33 F. Supp. 3d 530 (M.D. Pa. 2014) pleading that there were no policies regarding head injuries for football players and no policies for medical clearance and evaluation of students was sufficiently pled without having to set forth the exact language of the policy; in <u>Stoneking v. Bradford Avenue School District</u>, 882 F.2d 720 (3d Cir. 1989), policies pertaining to the failure to take action regarding complaints of sexual misconduct by teachers were similarly sufficient without having to recite the actual policy.

36

In <u>Freedman,</u> the Court found the facts insufficient to support a complaint alleging a jail suicide.  One officer failed to advise the supervising officer that plaintiff had previously attempted suicide. That allegation amounted at most to simple negligence.  <u>Freedman</u> is distinguishable from this case.

In <u>Kulp v. Veruete</u>, 167 Fed. Appx 911 (3d Cir. 2006) the Third Circuit reversed the dismissal of the complaint. Kulp was an 18 year old man incarcerated for a variety of charges relating to assault on college female students.  Plaintiff alleged that the supervising officer knew or should have known of the commitment documentation and the "Inmate Commitment Summary Report" showing alcohol addiction and mental illness. Another Officer had conducted a suicide screening which did not indicate any potential suicide threat. He was assigned to 48 hours of administrative segregation under "regular" supervision. at p. 913. The suicide screening was alleged to have been completed improperly.  Another employee performing a mental health assessment found that plaintiff was depressed, had problems with his family and suffered from drug and alcohol abuse, had been diagnosed with bipolar disorder but refused to take his medication and thought things "could not get worse.' He did not appear to pose a threat to himself at that time.  No officers removed from the inmate's possession items that could be used in a suicide attempt.  Officer Veruete, like officer Dimler, had the direct responsibility of observing plaintiff. Plaintiff alleged that Veruete "knew, or should

have known, on the basis of the contents of the aforementioned documentation, that Kulp had a particular vulnerability to suicide and should be kept under observation." Plaintiff alleged that the officer failed to appropriately observe him. *Id*. at 914. Kulp was later found hanging by a shoelace around his neck. *Id.* at 915. The Complaint alleged deliberate indifference and causation.

The District Court found these allegations to be conclusory. *Id*. at 916.

The Third Circuit disagreed, stating that the plaintiff, in her memorandum in opposition to defendant's motion to dismiss, buttressed her complaint with a number of facts which could be asserted in an amended complaint.  at p. 916, citing Colburn I at 670.  Plaintiff was therefore entitled to a reasonable amount of discovery to prove her case.  The Court held:

> The District Court here held the parents to a higher  standard of pleading than is required.  As we have stated: "….But a plaintiff need not plead facts. To withstand a 12(b)(6) motion, a plaintiff need only make out a claim upon which relief can be granted.  If more facts are necessary to resolve or clarify the disputed issues, the parties may avail themselves of the civil discovery mechanisms under the Federal Rules…The need for discovery before testing a complaint for factual sufficiency is particularly acute for civil rights plaintiffs, who often face informational disadvantages….citing Alston v. Parker, 153 F.3d 299, 233 n. 6 (3d Cir. 2004).

The analysis in Kulp is similar as that before this Court.

Insofar as violations under the New Jersey Civil Rights Act, N.J.S. 10:6-1 *et. seq*. are alleged in the Second Count of the Complaint, said statute is co-extensive and read in conjunction with 42 U.S.C. Sec. 1983; therefore the same arguments

and legal analysis apply.  <u>Trafton v. City of Woodbury</u>, 799 F. Supp. 2d  417, 443

(D.N.J. 2011).

### C. <u>The Immunities Under The Tort Claims Act Are Not Applicable.</u>

Plaintiff's negligence claim against Dimler is the failure to supervise

plaintiff's decedent.

Failure of supervision remains a viable cause of action under Title 59 of the

New Jersey statutes, and no immunity applies to this claim.  <u>Longo v. Santoro</u>, 480

A.2d 934 (App. Div. 1984); <u>Marcinczyk  v. State  of New Jersey</u>, 5 A.3d 785

(2010);  <u>Sutphen v. Benthian,</u> 397 A.2d 709 (App. Div. 1979); 59:2-3; 59:3-2.

Plaintiff alleges that the individual defendants failed to supervise plaintiff

adequately, resulting in the suicide.  This is a different claim than one brought for

the failure to diagnose mental illness or the conditions of confinement for mental

illness.

The District Court determined that all of the defendants  were shielded

from liability under the Tort Claims Act, N.J.S.A. 59:6-5 and 6-6, for "failing to

diagnose a mental condition and for any decision to confine a person for mental

illness" [A16-24].

The negligence alleged does not involve performing a mental health

assessment, failing to diagnose a mental condition, or any decision to confine a

person for mental illness.  The negligence alleged was that Dimler failed to follow

express policy requiring one on one supervision. Accordingly, neither 59:6-5 or 59:6-6 provides immunity for Officer Dimler.

Public employees are liable for their negligence to the same extent as private persons absent a specified immunity. N.J.S.A. 59:3-1. Regarding activities that are considered discretionary, "nothing in this section shall exonerate a public employee for negligence arising out of his acts or omissions in carrying out his ministerial functions. N.J.S.A. 59:3-2. <u>Longo v. Santoro</u>, *Supra.*; <u>Sutphin v. Benthian</u>, *Supra.*

Title 59 only immunizes high level judgment or policy decisions. <u>Kolitch v. Lindedahl</u>, 497 A.2d 183 (1985); <u>Costa v. Josey</u>, 388 A.2d 1019  (App. Div.), *aff'd.*  401 A.2d 526 (1979).  Liability for the failure to perform ministerial or operational duties is governed by a simple negligence standard. <u>Fitzgerald v. Palmer</u>, 219 A.2d 512, 514 (1966); <u>Shore v. Housing Authority of Harrison,</u> 506 A.2d 16 (App. Div. 1986).

The allegations against Officer Dimler do not involve any discretion or judgment, or determination "in the commitment process" [A18], citing <u>Ludlow v. City of Clifton</u>, 702 A.2d 506  (App. Div. 1997).  The allegations against Dimler do not involve any choices in the management and supervision of decedent; they involve direct violation of established policy. In contrast, *See*, <u>McNesby v. State of</u>

New Jersey, Department of Human Services, 555 A.2d 1186 (N.J. App. Div. 1989).

N.J.S.A. 59:6-4 specifically refers to the failure to perform an adequate public health examination and has no bearing on this case.

## POINT II

## THE ORDER DENYING RECONSIDERATION WAS CONTRARY TO LAW AND AN ABUSE OF DISCRETION

### A.  Standard Of Review

The Third Circuit reviews whether the District Court's denial of reconsideration constitutes an abuse of discretion.  Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010); Long v Atlantic City Police Dept., 670 F.3d 436 (3d Cir. 2012). Where the decision is based on a legal error the Court has plenary review. Adams v. Gould, 739 F. 2d 858, 863-864 (3d Cir. 2011).

### B.  Standard for Reconsideration

There are three grounds for granting a motion for reconsideration: (1) an intervening change in controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice. North River. Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194 (3d Cir. 1995).  Here, both the second and third factors provided the basis for reconsideration.

The District Court's failure to consider the new evidence, based on a clerical error rectified by plaintiff counsel relatively quickly, which avoided any further waste of judicial resources and failing to balance the court's pique at the error so as to completely ignore the massive amount of information supporting a meritorious action resulting in a ruling that was manifestly unjust.

### C. <u>Basis for Reconsideration</u>

#### 1. <u>Significant new evidence</u>

Reconsideration of the November 1, 2013 order was based on the new facts before the Court and unknown to plaintiff at the time the motions for dismissal were heard: the Missing Disc discovery of April 2013. Plaintiff also provided as extrinsic evidence the policies and procedures from the July 2013 discovery that supported the claims. The April 2013 discovery was not of marginal value or merely supportive; it consisted of overwhelming evidence of liability, both as to Dimler and new parties, particularly Officers Russo and Large who ignored Mullin's cries for help while stating he wanted to kill himself. The April 2013 discovery confirmed plaintiff's allegations that Dimler failed to follow policy required for monitoring Mullin  and that he was on actual notice that Mullin was a suicide risk as Mullin had been classified a Special Needs Inmate, was on the Special Needs Roster, and that the housing unit in which plaintiff was placed was a unit designated Close Custody Watch requiring 15 minute rounds. The April 2013

discovery identified the immediate supervisors who failed to see to it that the officers conducted their appropriate rounds and were responsible for the actions of Dimler, Russo and Large.

The July 2013 discovery did not reveal the identities of the new defendants, did not contain the statements from the witnesses (inmates) and did not contain the internal investigation conducted by internal affairs. **The July 2013 discovery did not contain the documents showing Mullin was actively classified as a Special Needs Inmate requiring immediate and continuing mental health treatment**. **The July 2013 discovery did not contain the documents showing that Mullin was pleading for help and stated that he was going to kill himself to the on duty corrections officer, Russo.** The July 2013 discovery provided all the jail policies and procedures for Close Custody and Constant Observation, their definitions and the policy for suicide watch and intake screening and identified the housing unit for S3 as a close custody unit; the July 2013 discovery identified that Mullin was put on that unit due to Disciplinary Charges, as opposed to being on a mental health Special Needs Roster.

All of these facts were presented on the Motion for Reconsideration of dismissal as a proposed Third Amended Complaint which was timely filed within 14 days.

The litigant is blameless.  Dismissal is a drastic sanction that should be reserved for those cases where there is a clear record of delay caused by contumacious conduct where counsel shows a "callous disregard" of [counsel's] responsibilities. National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639 (1976); See, Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863 (3d Cir. 1984)("Poulis II); Donnelly v. Johns Manville Salzo Corp, 677 F.3d 339, 334 (3d Cir. 1982).

## 2.    Use of extrinsic evidence was appropriate

See, *infra.*, p, 35.  *See also,*  Mele v. Federal Reserve Bank of New York, 359 F.3d 251 (3d Cir. 2004); Sentinel Trust Co. v. Universal Bonding Ins. Co., 316 F.3d 213 (3d Cir. 2003).

## 3. The Court overlooked the law regarding pleading standards in a jail suicide case & Title 59 immunities

It was an abuse of discretion and not in accordance with law not to have reconsidered the pleadings in light of the new evidence and proposed amended factual allegations. The allegations of actual knowledge could no longer reasonably be found to be conclusory. Plaintiff met the Colburn I and Colburn II pleading standards.

There is no standard requiring that the Officer "witness" actions by an inmate. Knowledge can come from many sources, including documents, charts,

and transfer records.  That was the basis for knowledge pled in the SAC, and it was an abuse of discretion to ignore those pled facts.

The law on Title 59 immunity has been addressed, *infra*., p.39.

### D.  Manifest Injustice Resulted From the Dismissal

Prevention of a manifest injustice is of critical importance, such that a court may even consider an argument raised for the first time in a post-judgment motion if doing so can avoid a manifest injustice.  Max's Seafood Café v. Quinteros, 176 F.3d 669 (3d Cir. 1999).  In Max's, the Third Circuit found that the trial court had refused to consider certain evidence post-judgment, which resulted in a clear error of law, and its later refusal to reconsider the order was not consistent with the sound exercise of discretion.  *See also,* Carroscosa v. McGuire, 2007 WL 1456205, (D.N.J. May 15, 2007) (reconsideration is appropriate where the court made a clear error of law or fact which necessitates entering a different ruling in order to prevent a manifest injustice.").  To the contrary is Resorts Int'l Inc. v. Greate Bay Hotel and Casino, Inc., 830 F. Supp. 826 (D.N.J. 1992), promoting a more limiting approach to reconsideration, which does not comport with the Third Circuit's decision in Max's.

## POINT III

## IT WAS AN ABUSE OF DISCRETION TO DENY AMENDMENT OF THE COMPLAINT

### A. Standard Of Review

The standard for appellate review of the trial court's denial of amendment is abuse of discretion. <u>Lorenz v. CSX Corp</u>., 1 F. 3d 1406, 1413 (3d Cir. 1993), citing <u>Bechtel v. Robinson,</u> 886 F. 2d 644, 652 (3d Cir. 1989).

### B. Standard for Motion to Amend

Failure to provide a reasonable opportunity to cure a defect in a Section 1983 complaint by permitting amendment is an abuse of discretion. <u>Shane v. Fauver</u>, 213 F.3. 113, 116. (3d Cir. 2000). The only exception to this is where there is a true showing of prejudice, futility, dilatory conduct, or "undue delay." <u>Zenith Radio Corp. v. Hazeltime Research</u>, 401 U.S. 321 (1971) (unexplainable and unjustified delay); <u>Foman</u>, 371 U.S. at 182; <u>In Re Burlington Coat Factory Securities Litigation</u>, 114 F.3d 1410 (3d Cir. 1977) (dilatory tactics); The liberal rules regarding amendments are designed to permit cases to be resolved on their merits. <u>Arthur v. Maersk, Inc.,</u> 434 F.3d 196 (3d Cir. 2006), citing <u>Foman,</u> at 182.

Because plaintiff's conduct in this case does not rise to that level, because there is no prejudice, because the litigant is blameless and other remedies could

have been fashioned to avoid the excessively harsh and unjust result of this Order (sanctions on counsel),[5] this court should reverse the decision.

In her Certification in support of the Motion to Amend, plaintiff provided additional documents in support of the motion, and referred the Court to all the documents produced in connection with the Motion for Reconsideration [A793].

The presentation of the Third Amended Complaint identified which allegations were new, which allegations came from the April 2013 discovery and which from the July 2013 discovery [TAC, A1167].

In balancing the factors involving the delay in the proceedings it was improper and an abuse of discretion for the Magistrate to place the entire blame for delay on plaintiff, and prohibit the filing, finally, of an amendment that would clearly set forth sufficient facts to provide a plausible basis for relief that could not possibly be considered or interpreted as "conclusory."  It was a gross abuse of discretion and manifestly unjust, in the face of an overwhelmingly meritorious claim, to deny the amendment.

Delay alone does not provide a basis for denial of a motion to amend. It is only when the delay will prejudice the non-moving party that a motion can be denied.  Prejudice is the touchstone of denial. <u>Harrison Beverage Co. v. Dribeck Importers, Inc.</u>, 133 F.R.D. 463, 468 (D.N.J. 1990), citing <u>Cornell & Co., Inc. v.</u>

---

[5] This is not to suggest that sanctions would be appropriate either under the circumstances.

Ocean Safety & Health Review Commission, 573 F. 2d 820, 823 (3d Cir. 1978); Cureton v. NCAA, 252 F.3d 267, 273 (3d Cir. 2001); Bechtel v. Robinson, 886 F.2d at 652.    Undue delay is shown where the opposing party is unfairly disadvantaged in preparing their case.    Harrison, *Id*., citing Heyl v. Patterson International Inc. v. F.P. Rich Housing of the Virgin Islands, Inc, 663 F.2d 419, 425 (3d Cir. 1981), *cert. den. sub.nom*. 455 U.S. 1018 (1982).

The Magistrate cited burden on the court and judicial economy as factors to be considered on the issue of whether the amendment should be denied.    In re Human Tissue Products Liability Litigation, 2009 WL 737048 at *6 (D.N.J. March 18, 2009). She referred to the continuation of motions and the need to put "a stop to what seems like an endless cycle" [A72, 76].    It is the defense who created the "endless cycle," not the plaintiff,  by failing to immediately provide the internal investigation and policies, instead filing motion after motion to dismiss the complaint, causing the countless reconsideration motions, cross-motions to amend and appeals.

Plaintiff did not take the  "inconvenience" to the Court in writing a 40 page opinion lightly, as suggested by both the Magistrate and the District Court.  That is baseless.  The moment plaintiff became aware of discovery or legal issues she wrote letters and filed motions, within a day [A403] within a week [A719], and within 45 days [368, 369, 373]  of knowledge.

As stated by the Third Circuit:

The liberality of Rule 15(a) counsels in favor of amendment even when a party has been less than perfect in the preparation and presentation of a case, citing <u>Foman, Supra.,</u> <u>Boileau v. Bethlehem Steel Corp</u>., 730 F.2d 929, 938 (3d Cir. 1984). It allows for misunderstandings and good-faith lapses in judgment, so long as the party thereafter acts reasonably and diligently, citing <u>Adams</u>, *Supra*.; *see also,* 6 Wright et al.section 1488 (stating that leave should be granted  if delay was due to 'oversight or excusable neglect'). <u>Maersk</u>, *Supra*., at p. 206.

As stated by the United States Supreme Court in <u>Foman,</u> *Supra*.:

"[t]he  Federal Rules reject the approach that pleading is a game of skill in which one misstep…may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.  At 182-183.

Plaintiff counsel's conduct throughout the litigation was not dilatory and did not evidence bad faith.  She filed motions, briefs, reconsideration and appeals as well as motions to amend timely and in accordance with the Rules.  All requests by the Court were complied with. The only delay in this case caused by plaintiff was the misfiling of the disc containing the April 2013 discovery. The "failure" to include the July 2013 discovery in opposition to the motion to dismiss was based on a good faith interpretation and evaluation of the law that the July 2013 policies supported the claims already pled in the complaint, and that exploration of those documents would await discovery.

C.**There was No Prejudice to the Defendants**.

There was no legitimate claim of prejudice. Dimler  had been on notice

of the claims for years. The theories against him had not changed in the proposed TAC. No depositions other than Mullins' mother had been taken, nor had paper discovery been completed in this case [A746].[6]

The new defendants were not identified by the State until April 1, 2013.

The fact that defendants may choose to make another motion to dismiss does not impute prejudice on the merits. In Harrison,133 F.R.D. 463, cited by the Court, an amendment was requested on the eve of trial. Discovery had been completed. The defense sought to add six (6) new affirmative defenses, which would have required the reopening of discovery after a trial date was set. That case is an example of true prejudice. *See also*, Jang Boston Sci Scimed, Inc., 729 F.2d 357, 368 (3d Cir. 2013), where plaintiff failed to make timely motions to amend the complaint at any time prior to dismissal, as opposed to this case; Bjorgung v. Whitetail Resort LP, 550 F.3d 263 (3d Cir. 2008), Rolo v. City Investing Liquidators Inc., 155 F.3d 644 (3d Cir 1988).

## D. **The Amendment Relates Back to the Filing of The Complaint**

### 1.    **The state's fictitious defendant rules apply**

The federal courts in New Jersey apply the state substantive law relative to the applicable statute of limitations. Wilson v. City of Atlantic City, 142 F.R.D. 603 (D.N.J. 1992). New Jersey permits fictitious defendant pleadings under the

---

[6] There is no record to cite to on the issue of depositions. Counsel hereby certifies that the statement is true.

name of an unidentified defendant, such as "John Doe."  Plaintiff is permitted to substitute a true party in interest, unknown or unidentified prior to expiration of the statute of limitations, assuming that due diligence is shown. N.J. Civ. R. 4:26-4, Wilson, *Supra*., Derienzo v. Harvard Industries, Inc., 357 F.3d 348 (3d Cir. 2004), citing Farrell v. Votator Div. of Chemetron Corp., 299 A.2d 394 (1973).

Due diligence has already been discussed.  Immediately upon ascertaining the existence of the new defendants, plaintiff advised the Court and sought to amend.

### 2. The amendment relates back.

Pursuant to F.R.C.P. 15(c)(1) the amended pleading relates back to the date of the original pleading, thus obviating any issue regarding expiration of the statute of limitations. Wilson v. Garcia, 471 U.S. 261 (1985), Derienzo, *Supra.*, Wilson, *Supra.* It is only under the most egregious circumstances that courts have failed to permit such an amendment. See Mears v. Sandoz Pharmaceuticals, 693 A.2d 558 (App. Div. 1997); Stegmeier v. St. Elizabeth Hospital, 571 A.2d 1006  (App Div. 1990). Federal Rule 15(c) provides that an amendment naming a new party will relate back to the date of the original complaint if:  (1) the claim arises out of the "conduct, transaction, or occurrence" set forth in the initial pleading, (2) within 120 days of the institution of the action, the party to be brought in by amendment must have received notice so that the party will  not be prejudiced in maintaining a

defense on the merits, and (3) within 120 days of institution of the action, the party to be brought in by amendment must know or should have known that "but for a mistake concerning the identity of the proper party," the action would have been brought against that party. Maersk, 434 F.3d, at 208-209.

Clearly the claims here arise out of the same conduct, transaction and occurrence initially pled. The issue before the Court is notice to the new defendants.

Relation back of an amendment naming new parties is dependent upon what the potential defendants knew or should have known, and is not based on what the party seeking to amend knew during the initial 120 day period under F.R.C.P. 4 (m)[7] or the party's timeliness in seeking to amend. Krupski v. Costa Crocieres, 560 U.S. 538 (2010). Knowledge of the plaintiff regarding the identity of the defendant is important on the issue of "mistake" in the failure to move to amend. Krupski, Id., at 548-550. "Mistake" includes a lack of knowledge, and the Court is to view the definition of "mistake" broadly in determining whether to permit the impleader of a new party. Maersk, Supra., p. 209; Varlack v. SWC Caribbean Inc., 550 F.2d 171 (3d Cir. 1977).

Notice to new defendants can be imputed under a "shared attorney" method. Notice can also be informal, and includes knowledge of a complaint or litigation.

---

[7] Amended to 90 days on December 1, 2015.

Singletary v. Pennsylvania Department of Corrections, 266 F.3d 180 (3d Cir. 2001); Varlack, *Supra.*

Where the originally named parties and the party sought to be added are represented by the same attorney, the attorney most likely would have communicated with the new party or have a relationship with the new party sufficient to permit joinder. The question is whether the same attorney's involvement gives rise to the inference that the attorney, within the 120 day period, had some communication or relationship with the newly identified parties. Singletary, *Supra.*

Of significance is whether plaintiff pled John Doe fictitious defendants sufficient to advise counsel that he/she was representing defendants which, but for lack of knowledge or mistake on the part of plaintiff counsel, would include the potential parties with whom counsel had a relationship. Singletary, 266 F.3d at 196, 197. Under such circumstances, there is an inference that an investigation regarding the allegations in the complaint would have been made alerting the potential new parties of the matter. Singletary, at 197 and footnote 5. Plaintiff did plead John Doe defendants.

Even the most cursory investigation into the litigation would have required interviews or notification to the prospective defendants, all of whom gave statements in connection with the investigation into the suicide and were intimately

involved in the circumstances that led to the suicide. John Doe defendants were identified as persons who were responsible for the custodial care, supervision, management and control of Mullin [SAC ¶10, 18, 77, A415]. The Attorney General has represented all the state employees since the inception of the litigation.

The new parties knew or should have known but for plaintiff's lack of knowledge, or "mistake," that they would have been named in the lawsuit. *See*, Maersk, 434 F.3d at 208.

Plaintiff moved immediately upon notice of these new defendants. In discussing other Circuit holdings, the Third Circuit in Singletary noted:

> It is certainly not uncommon for victims of civil rights violations (e.g. an assault by police officers or prison guards) to be unaware of the identity of the person or persons who violated those rights. This information is in the possession of the defendants, and many plaintiffs cannot obtain this information until they have had a chance to undergo extensive discovery following institution of a civil action. If such plaintiffs are not allowed to relate back their amended "John Doe' complaints, then the statute of limitations period for these plaintiffs is effectively substantially shorter than it is for other plaintiffs who bring the exact same claim but who know the names of their assailants;… Singletary, footnote 5.

The Magistrate ruled that Relation Back did not apply. This constitutes an abuse of discretion. It is specious for the State to take the position that the Attorney General is not counsel for their employees despite that they are the only counsel who can possibly undertake such representation. The fact that there is a procedure for "requesting" representation, with its concommitent bureaucracy, does not obviate the simple fact that the Attorney General does and will be

representing these new parties, and that the Attorney Genera has been in charge of this litigation from its inception.

## E. Dismissal Does not Operate to Preclude Amendment

A Complaint may be amended even after a dismissal or judgment on the pleadings. Amendment of the complaint is an appropriate response to a judgment dismissing the complaint for the failure to state a cause of action where there is a meritorious claim.  Foman v. Davis, 83 S. Ct. 227 (1962).  The Court must engage in a further evaluation to determine if permitting the amendment comports with standards of justice, fairness and prejudice, and determine the facts and reasons for the amendment.  *See,* State Trading Corp. v. Assuranceforeningen Skuld, 921 F.2d 409, 417-418 (2d Cir. 1990); Cooper v. Shumway, 780 F.2d 27, 29 (10th Cir. 1985); Twohy v. First Nat'l Bank of Chicago, 758 F.2d 1185, 1196 (7th Cir. 1985).

In the Third Circuit it was an abuse of discretion to deny reopening of a judgment and permitting an amended complaint where the amendment was meritorious and there was no prejudice.  A dismissal which did not adjudicate the merits did not bar the amendment.  Adams v. Gould, Inc., 739 F.2d 858 (3d Cir. 2011).

## POINT IV

## IT WAS AN ABUSE OF DISCRETION FOR THE DISTRICT COURT TO AFFIRM THE MAGISTRATE'S DECISION DENYING AMENDMENT

### A. Standard of Review

Where the District Court refuses to allow plaintiff to amend her complaint, the decision may be reversed only upon a finding that the District Court abused its discretion. The Court has plenary review over any matters of law.  Adams, 739 F.2d at 863-864.

### B.  Standard of Review for the District Court

The Magistrate Judge may hear and determine any non-dispositive  pretrial matter. The District Court will reverse a Magistrate's decision only if it is "clearly erroneous or contrary to law." 28 U.S.C. Sec. 636(b)(1)(A); F.R.C.P. 72 (a). Cataldo v. Moses, 361 F. Supp. 2d 420 (D.N.J. 2004); Gabapentin Patent Litigation, 312 F. Supp. 2d 653 (D.N.J. 2004). Under this standard, a finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564 (1985), citing United States v. U.S. Gypsum Co., 333 U.S. 364 (1948).   A disagreement with the Magistrate is not enough to warrant reversal.  Andrews v. Goodyear Tire & Rubber Co., Inc., 191 F.R.D. 59 (D.N.J. 2000).

To preserve appeal from a Magistrate's ruling, the ruling must be appealed to the District Court. <u>Continental Cas. Co. v. Dominick D'Andrea, Inc</u>. 41, F.R.S. 3d 19 (3d Cir. 1998).

## C.  <u>The Magistrate's Decision Should have been Reversed</u>

Plaintiff presented the record to the District Court.

The District Court's failure to stop the manifest injustice to plaintiff by affirming the denial constituted an abuse of discretion. The affirmance failed to balance the equities, failed to consider the blameless litigant, failed to take into account any derelictions of the defense, failed to consider the lack of prejudice, failed to consider that the Magistrate herself had denied plaintiff's requests for discovery on the first two (2) cross-motions to amend and failed to consider counsel's diligence in filing timely motions and opposition and hewing to all directives during the course of the litigation. The Court also overlooked the law on the definition of "undue delay."

The court's discretion to deny leave to amend is limited to proof that the delay is undue, motivated by bad faith, or prejudicial to the opposing party. <u>Adams</u>, 739 F.2d at 864, citing <u>Foman</u>, 371 U.S. 178 (1962); <u>Dussouy v. Gulf Coast Investment</u> Corp., 660 F.2d 594, 597-98 (5th Cir. 1981).

In <u>Cureton v. National Collegiate Athletic Association</u>, 252 F.3d 267 (3d Cir. 2001) the court noted that the mere passage of time does not require denial of

a motion to amend. at 272-273.  Delay may become undue when a movant fails to amend a complaint which could have been made previously. In <u>Cureton</u>, unlike our case, the factual information on which the proposed amendment relief was known almost two and a half years before plaintiffs sought leave to amend. at 273-274; further there was no reasonable explanation for the delay.

Prejudice is not defined by the length of litigation, or  motion practice requiring reconsideration and appeals. The Magistrate's focus on "endless" litigation and "prolonged" motion practice was in error, as the reasons for the protracted litigation were caused by many factors. There was no prejudice to reinstating the case against Officer Dimler and impleading the new defendants, all of whom were able to properly prepare for trial and present theirs defense on the merits.

A careful reading of both the Magistrate's November 28, 2014 decision and the District Court's opinion affirming the decision shows a fatigue, a pique, and a frustration with the proceedings, presented as "undue delay."  The decisions were punitive and not in accordance with law.

## D.  Relation Back Applied

The Magistrate's failure to consider the defendants' failure to identify the new defendants for 2.3 years despite knowledge of same as of the day the complaint was filed, coupled with the fact that they are all state employees with

one attorney representing all employees and agencies as a basis to apply Relation Back was contrary to law and an abuse of discretion.

The Attorney General entered an appearance on February 16, 2011, within a month of the filing of plaintiff's complaint [A101, docket entry 4]. A notice of tort claim was filed in February 2010, putting the entity on notice of a potential claim. Fuller v. Rutgers, The State University, 381 A.2d 811 (App. Div.), *certif. den.*, 384 A.2d 840 (1978)[A672].

Under the identity of interest doctrine, constructive notice can be presumed if the parties are closely related in business operations or other actions so that filing suit against one is sufficient to provide notice to the other of the litigation. Supervisory police officials are considered to have an identity of interest with their employers. Garvin v. City of Philadelphia,  354 F.3d 215, 227 (3d Cir. 2003).  The State as well as the correctional facility and chief executive operating the facility where the defendants worked, were all served within the 120 day period and entered an appearance [A101, docket entry no. 4]. They are deemed to have constructive notice of the suit.

## E. **Amendment on Post Judgment Pleadings was to be Allowed**.

It was an abuse of discretion to deny reopening of a judgment and permitting an amended complaint where the amendment was meritorious and there was no

prejudice. <u>Adams v. Gould, Inc</u>., at 858 (3d Cir. 2011); <u>In Re. Burlington Coat Factory Security Litigation</u>, 114 F.3d 1410, 1434 (3d Cir. 1977)

## <u>CONCLUSION</u>

For all of the above reasons, the rulings should be reversed and this matter remanded back to the District Court.

Respectfully submitted,

<u>/s/ Shelley L. Stangler, Esq.</u>
Shelley L. Stangler, Esq.
Shelley L. Stangler, P.C.
Bar ID 023191987
Attorney for the Appellant/Plaintiff Joan Mullin as Administratrix of the Estate of Robert Mullin, Jr. and Joan Mullin individually

Dated:  January 23, 2017

## CERTIFICATION OF ADMISSION TO BAR

I, Shelley L. Stangler, Esq., certify as follows:

1.      I am a member in good standing of the bar of the United States Court of

Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the

foregoing is true and correct.


/s/ Shelley L. Stangler, Esq.
Shelley L. Stangler, Esq.

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the Court's Order, Filed January 10, 2017 Granting Appellant's Motion to file a brief not exceeding 14,000 words because this brief contains 13,737 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated:        January 23, 2017

/s/ Shelley L. Stangler, Esq.
Shelley L. Stangler, Esq.

<u>CERTIFICATE OF FILING AND SERVICE</u>

I, Elissa Matias, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

January 23, 2017, the foregoing Brief and Appendix on behalf of Appellant Joan

Mullin Volume I was filed through the CM/ECF system and served electronically.


<u>/s/ Elissa Matias</u>
   Elissa Matias

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

SHELLEY L. STANGLER, ESQ.
155 MORRIS AVENUE 2nd Floor
SPRINGFIELD, NEW JERSEY 07081
TELEPHONE: (973) 379-2500
FAX: (973) 379-0031
Attorneys for Plaintiffs
Attorney ID No. 023261988

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased and JOAN MULLIN, individually,<br><br>Plaintiffs,<br><br>v.<br><br>ADMINISTRATOR KAREN BALICKI, et als.<br><br>Defendants. | CIVIL ACTION<br><br>Civ. No. 3:11-cv-00247<br><br>NOTICE OF APPEAL TO UNITED STATES COURT OF APPEAL FOR THE THIRD CIRCUIT |

Notice is hereby given that Joan Mullin, plaintiff in the above named case, hereby appeals to the United States Court of Appeals for the Third Circuit from the following orders and companion opinions:

1.     The November 1, 2013 Order of the Hon. Mary C. Cooper granting defendants' motion to dismiss the complaint as to Officer Dimler only (docket entry 154);

**A1**

2.    The July 25, 2014 Order of the Hon. Mary C. Cooper, U.S.D.J. denying reconsideration of the November 1, 2013 Order dismissing plaintiff's complaint as to Officer Dimler only (docket entry 204);

3.    The December 8, 2014 Order of the Hon. Lois H. Goodman, U.S.M.J. denying plaintiff's motion to amend the complaint to allege new facts against Officer Dimler and to implead newly identified corrections officers as defendants (docket entry 220);

4.    The   July 13, 2015 Order of the Hon. Mary C. Cooper, U.S.D.J. affirming the  December 8, 2014 Order denying amendment (docket entry 230); and

5.    The May 25, 2016 Order of the Hon. Mary C. Cooper, U.S.D.J. terminating the case and dismissal of the entire complaint upon granting summary judgment to the remaining defendant (docket entry 252).

LAW OFFICES OF SHELLEY L. STANGLER, P.C.

BY: _____

**SHELLEY L. STANGLER, ESQ.**
**155 MORRIS AVENUE 2nd Floor**
**SPRINGFIELD, NEW JERSEY 07081**
**TELEPHONE: (973) 379-2500**
**FAX: (973) 379-0031**
**Attorney for Plaintiffs**

Dated: June 22, 2016

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually, | CIVIL ACTION NO. 11-247 (MLC) |
| Plaintiffs, | **MEMORANDUM OPINION** |
| v. | |
| ADMINISTRATOR KAREN BALICKI, et al., | |
| Defendants. | |

**COOPER, District Judge**

The Plaintiffs, Joan Mullin, individually and as administratrix of the estate of Robert Mullin, her son, (hereinafter "Plaintiffs") bring this action against the following individual defendants in their "personal, individual and professional capacities" who represent the Department of Corrections of the State of New Jersey, South Woods State Prison, and Central Reception & Assignment Facility: Administrator Karen Balicki (hereinafter "Balicki"); Director Robert Patterson (hereinafter "Patterson"); and Director Marie Dunlap-Pryce (hereinafter "Dunlap-Pryce").  (See dkt. entry no. 102, 2nd Am. Compl. (hereinafter "Compl.").)[1]  Plaintiffs

---

[1] Before the Court is Plaintiffs' Second Amended Complaint. (See dkt. entry no. 129, 3-8-13 Order at 1; dkt. entry no. 143, 5-14-13 Order at 1 n.1.)  References to "Complaint" hereinafter refer to this Second Amended Complaint.

further bring this action against the following individuals in their "personal, individual and professional capacities": Jane Byrd, L.P.N. (hereinafter "Byrd"); Erin Marusky, R.N. (hereinafter "Marusky"); Officer Dimler (hereinafter "Dimler"); and Beatrice Teel, R.N. (hereinafter "Teel"). (See id.) Plaintiffs also name as defendants Kintock Group and Mercer County. (See id.)

Mercer County was dismissed from the action by stipulation of the parties on March 22, 2011. (See dkt. entry no. 15, Stip. of Dismissal as to Mercer County.) Plaintiffs also agreed to the dismissal of the claims against Marusky by order of the Court on May 2, 2013. (See dkt. entry no. 139, 5-2-13 Order.)

Before the Court are the separate motions by Byrd to dismiss the claims asserted against her and by Balicki, Patterson, Dunlap-Pryce, Dimler, and Teel (hereinafter "DOC Defendants") to dismiss the claims asserted against them for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c). (See dkt. entry no. 144, Byrd's Mot. to Dismiss; dkt. entry no.

2

**A4**

145, DOC Defs.' Mot. to Dismiss.)[2]  For the reasons that follow,

the Court will deny the part of the motion to dismiss concerning

the individual-capacity, constitutional claims against Byrd, and

the Court will grant the remainder of the separate motions to

dismiss in their entirety.

## I.    ALLEGATIONS IN THE COMPLAINT

Plaintiffs' claims are based on the suicide of Robert Mullin

(hereinafter "the decedent") while incarcerated in the State of New

Jersey.  Specifically, Plaintiffs allege that the decedent was

incarcerated for about six to eight years through January 17, 2009,

---

[2] Byrd and Dimler filed answers on October 24, 2012 and April
9, 2013 respectively.  (See dkt. entry no. 108, Byrd Answer; dkt.
entry no. 134, Dimler Answer.)   Both preserved the grounds for
dismissal at issue before the Court by raising failure to state a
claim as an affirmative defense in their answers.  With respect to
these two defendants, the motions pending are Rule 12(c) motions
for judgment on the pleadings for failure to state a claim since
these defendants have filed responsive pleadings.  See Turbe v.
Gov't of V.I., 938 F.2d 427, 428 (3d Cir. 1991) (stating that
Rule 12(b)(6) motions must be filed before a responsive
pleading, but that "[a] Rule 12(c) motion for judgment on the
pleadings may be filed after the pleadings are closed. . . .
Rule 12(h)(2) provides that a defense of failure to state a
claim upon which relief can be granted may also be made by a
motion for judgment on the pleadings."); Fed.R.Civ.P. 12(h)(2).
As to the remaining defendants who have not filed responsive
pleadings, the pending requests for relief are pursuant to Rule
12(b)(6) for failure to state a claim upon which relief may be
granted.  Counsel for Dimler described the nature of the request
for all the DOC Defendants as being pursuant to Rule 12(b)(6).
This was in error, as the filing of Dimler's answer renders that
request to be pursuant to Rule 12(c).  See Turbe, 938 F.2d at 428.
Byrd's motion was properly labeled as a Rule 12(c) motion.  Because
the standard for a Rule 12(b)(6) motion applies to both the Rule
12(c) and the Rule 12(b)(6) motions pending, see id., the Court
will hereinafter address them by reference to Rule 12(b)(6).

the date of his death.  (Compl. at ¶ 11.)  In May of 2008, he was

transferred from prison to a halfway house operated and managed by

The Kintock Group (hereinafter "Kintock").  (Id. at ¶ 12.)  The

decedent was to be released from Kintock around April to June of

2009 following his completion of the therapy, work studies, and

rehabilitative services.  (Id. at ¶ 13.)  However, while residing

at Kintock, the decedent had been fired from his job.  (Id. at ¶

23.)

     On January 15, 2009, while at Kintock, the decedent exhibited

a deterioration in his mental status and became aggressive.  (Id.

at ¶ 14.)  Illegal substances, including cocaine and opiates, were

found in his possession.  (Id. at ¶ 15.)  Also, in the presence of

a Kintock caseworker, the decedent swallowed a handful of pills

that he identified as medication for depression.  (Id. at ¶ 16.)

     The decedent was subsequently transferred to South Woods State

Prison, where he was medically evaluated, and he tested positive

for opiates and cocaine.  (Id. at ¶¶ 17–18.)   On January 16, 2009,

he was transferred to the Central Reception & Assignment Facility

(hereinafter "CRAF"), "under the custodial care, supervision,

management and control" of Balicki, Patterson, and Dunlap-Pryce

(hereinafter "Supervisory Defendants").  (Id. at ¶ 18.)  Plaintiffs

further allege that between January 15 and 17, 2009, the decedent

"also was treated by and was under the custodial care, supervision,

4

**A6**

management, and control of the Trenton Psychiatric Hospital," and its employees and staff.  (Id. at ¶ 19.)

Plaintiffs allege that Kintock's file on the decedent indicated that he had an extensive drug history and a high risk of abusing drugs and alcohol.  (Id. at ¶¶ 21-22.)  Also, Plaintiffs allege that the decedent had a history of mental illness and suicide attempts.  (Id. at ¶¶ 24, 40.)  At various points from 2005 until the time of his death, the decedent had been hospitalized for mental illness, had used medication for his psychiatric conditions, and had considered or attempted suicide.  (Id. at ¶¶ 40-41, 43-49.) The Complaint alleges that this was reflected in various medical records and intake forms; however, with the exception of the records from Kintock, the Complaint does not allege that the defendants had actual knowledge of these records or the information contained therein in January of 2009.  (See, e.g., id. at ¶¶ 40-41, 43-48.)

On January 14, 2009, three days before his death, the decedent's medical records reflect that he "was seen at South Woods State Prison, following a transfer from Kintock to Detention/ECU, and the diagnosis of 'mood disorder,' a family history of suicide, and a history of being a suicide risk."  (Id. at ¶ 49.)  The Complaint does not indicate whether the particular defendants in

this matter were aware of the January 14, 2009 records or their
content.

        According to the Complaint, Byrd and Teel, as agents of the
Supervisory Defendants, examined and evaluated the decedent on
January 16, 2009.  (Id. at ¶ 39.)  Byrd performed a nursing intake
on this date, and the decedent allegedly responded in the
affirmative to the following questions: (1) "have you ever been
hospitalized or treated for psychiatric illness"; and (2) "have you
ever considered or attempted suicide."  (Id. at ¶ 50.)  The
decedent's medical records from this same date included a
"diagnosis of 'mood disorder,' a family history of suicide, and a
history of being a suicide risk."  (Id.)  On January 16, 2009 at
CRAF or South Woods State Prison, Byrd cleared the decedent
medically for placement in the general prison population.  (Id. at
¶¶ 51, 56.)

        At approximately 4:23 AM on January 17, 2009, Dimler, who was
allegedly the corrections officer responsible for caring for and
treating the decedent, found the decedent unresponsive after the
decedent had hung himself with what limited records indicate was a
self-made noose from a bed sheet.  (Id. at ¶¶ 25-26.)  After this
discovery, Teel was summoned, an unnamed officer or medical
provider performed CPR, and the decedent was pronounced dead at
4:49 AM.  (Id. at ¶¶ 30-31, 57.)

The Complaint asserts that Kintock failed to advise or notify
Byrd, Teel, and Dimler about the decedent's mental-health and
substance-abuse issues. (Id. at ¶ 56.) The Complaint further
alleges that Dimler and Teel "knew or should have known" of the
decedent's history of attempted suicide, mental illness, and
substance abuse from the transfer records from Kintock. (Id. at ¶¶
27, 33.) The Complaint alleges that they failed to "review,
evaluate, or follow" transfer records from Kintock in determining
what level of care to provide to the decedent, including treatment
for his intoxication and one-on-one supervision. (Id. at ¶ 36.)
The Complaint asserts that Byrd and Teel failed to evaluate the
decedent for intoxication, as was required by policy and procedure.
(Id. at ¶ 53.) According to the Complaint, had these defendants
properly evaluated the decedent and reviewed his medical records,
the decedent "would have been transferred to the infirmary and/or
been placed under constant supervision without the ability to harm
himself." (Id. at ¶ 54.) Moreover, Dimler and Teel purportedly
"knew that policy and procedure required direct and constant
supervision and monitoring, and yet failed to abide by said policy
and procedure, evidencing a gross indifference" to the decedent's
welfare. (Id. at ¶¶ 28, 34.) Specifically, both permitted the
decedent to be in a cell with materials including bed sheets that
could be used to inflict self-harm. (Id. at ¶¶ 29, 36.)

7

**A9**

According to the Complaint, the decedent's history of suicide attempts, mental-health issues, and recent drug abuse were known or should have been known to Dimler, Teel, Byrd, Kintock, and the Supervisory Defendants. (Id. at ¶¶ 60-64.) However, the individual defendants, including Teel and Dimler, failed to provide adequate supervision to the decedent. (Id. at ¶¶ 60-61.) The Complaint alleges that the failures of these individual defendants "were the direct and proximate cause of the self-harm and suicide by" the decedent. (Id. at ¶ 55.)

The Complaint also asserts that the Supervisory Defendants failed to follow their own policy and procedure requiring them to familiarize themselves with an inmate's transfer records and failed to ensure that the decedent was properly treated and supervised for drug addiction and suicide risk. (Id. at ¶¶ 64-65.) The Complaint also claims that these Supervisory Defendants failed to enact and enforce procedures and policies that required their staff to review transfer records or that provided for the treatment of intoxication, and these failures foreseeably led to the decedent's suicide. (Id. at ¶ 66.)

Plaintiffs initially brought this action on January 14, 2011; however, the complaint at issue before the Court is the Second Amended Complaint, which was filed September 21, 2012. The Complaint asserts six counts pursuant to 42 U.S.C. § 1983

(hereinafter "section 1983") and the New Jersey Civil Rights Act

(hereinafter "NJCRA"), N.J.S.A. 10:6-1 et seq.:

(1)   deprivation of the decedent's constitutional rights
under the Fourteenth, First, Fourth, Fifth, and Sixth
Amendments of the United States Constitution (id. at ¶¶ 73-
94);

(2)   deprivation of the decedent's constitutional rights
under the New Jersey Constitution, Article 12, the right to
be free from cruel and unusual punishment, and Article 1,
the right to due process (id. at ¶¶ 95-104);

(3)   negligent hiring, training and supervision of employees
and agents (id. at ¶¶ 105-18);

(4)   intentional and negligent infliction of emotional
distress (id. at ¶¶ 119-34);

(5)   abuse of process by Supervisory Defendants and Kintock
(id. at ¶¶ 135-44); and

(6)   medical malpractice by, inter alia, Byrd and Teel (id.
at ¶¶ 145-62).

Plaintiff seeks compensatory and punitive damages, funeral

expenses, interest, attorneys' fees, and litigation costs.

## II.   GOVERNING STANDARD

When considering a motion to dismiss for failure to state a

claim, the court must accept the facts pleaded in the complaint as

true and draw all inferences in favor of the plaintiff. Phillips

v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). "[O]nly a

complaint that states a plausible claim for relief survives a

motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

"A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. This plausibility standard is not a "probability requirement." The standard merely requires "more than a sheer possibility that the defendant has acted unlawfully." Id.; see also Phillips, 515 F.3d at 234.

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Legal conclusions "must be supported by factual allegations." Id. at 679.

A civil-rights complaint must "'contain a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs.'" Freedman v. City of Allentown, 853 F.2d 1111, 1114 (3d Cir. 1988) (quoting Ross v. Meagan, 638 F.2d 646, 650 (3d Cir. 1981)).[3] The court must look past any conclusory allegations regarding the willfulness of the defendants' conduct or the defendants' reckless disregard of the

---

[3] Plaintiffs assert civil-rights claims under section 1983 and under the NJCRA, the state counterpart of section 1983 for violation of rights secured under New Jersey's Constitution. See Green v. Corzine, No. 09-1600, 2011 WL 735719, at *7 (D.N.J. Feb. 22, 2011). The "NJCRA is generally interpreted to be coextensive with its federal counterpart." Id. Unless otherwise stated, the analysis and determinations with respect to the section 1983 claims apply equally to claims under the NJCRA.

rights of the victim; the court will focus on "the factual scenario itself to examine whether the conduct alleged, viewed most favorably to plaintiffs, is reasonably susceptible to falling within the conclusions alleged." Id. at 1115.

In situations in which more specific allegations may demonstrate that the conduct at issue falls within section 1983's ambit, district courts are required to permit amendment to the complaint. Id. at 1114. "Furthermore, when the lack of factual specificity is fairly attributable to defendants' control of required information, we have permitted the action to proceed to a reasonable amount of discovery to help [plaintiff] make the necessary showing to prove her case." Id. (internal quotation marks and citation omitted).

### III. ANALYSIS

### A.    Official-Capacity Claims[4]

Balicki, Patterson, Dunlap-Pryce, Dimler, Teel, and Byrd (hereinafter "Movants") seek dismissal of the official-capacity claims (both state and federal) asserted against them based on state-sovereign immunity under the Eleventh Amendment. The Eleventh Amendment states, "The judicial power of the United States

---

[4] Plaintiffs have named several of the individual defendants in their "personal, individual, and professional capacities." Based on the nomenclature in our federal jurisprudence, the Court construes this to mean that the individuals are sued in their individual and official capacities.

11

**A13**

shall not be construed to extend to any suit in law or equity,
commenced or prosecuted against one of the United States by
citizens of another state, or by citizens or subjects of any
foreign state." U.S. Const. amend. XI. With a few exceptions, the
Eleventh Amendment prevents a state entity from being a defendant
in a lawsuit. This state-sovereign immunity extends to state
officials who are sued for money damages in their official
capacities. See, e.g., Kentucky v. Graham, 473 U.S. 159, 169-70
(1985). However, Congress can abrogate state-sovereign immunity
through an unequivocal expression, or a state can waive its own
immunity to suit. Coll. Sav. Bank v. Fla. Prepaid Postsecondary
Educ. Expense Bd., 527 U.S. 666, 670 (1999).

The parties do not dispute that Movants are state officials,
and thus, when sued in their official capacities, the Eleventh
Amendment issues arise. In this case, the Complaint seeks monetary
damages as opposed to prospective relief against these state
officials sued in their official capacities. Congress did not
abrogate state-sovereign immunity in section 1983. Graham, 473
U.S. at 169 n.17. And the State of New Jersey has not waived its
sovereign immunity in federal courts. Thus, none of the exceptions
to the Eleventh Amendment's bar on monetary relief against state
officials in their official capacity are present in this case.

In addition to these immunity issues, there are other deficiencies with respect to Plaintiffs' official-capacity claims pursuant to section 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. But states, and state officials in their official capacities, are not "persons" for section 1983 purposes. Will v. Mich. Dep't of State Police, 491 U.S. 58, 64-65 (1989).

Because Movants in their official capacities are immune from suit and because they are not "persons" under section 1983, the Court will dismiss the portions of the Complaint seeking relief against these state officials in their official capacities. In fact, having realized their mistake of law, Plaintiffs have stated that they are willing to stipulate that there is no official-capacity liability in this matter. (See dkt. entry no. 147, Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 11-13; dkt. entry no. 148, Pls.' Opp'n to Byrd's Mot. to Dismiss at 9.) Any references in the Complaint to official-capacity liability will no longer be viable.

**B.    Individual-Capacity Claims**

The Eleventh Amendment does not bar the individual-capacity claims, and state officials in their individual capacities are "persons" for the purposes of a section 1983 suit.  Hafer v. Melo, 502 U.S. 21, 30-31 (1991).

**1.    State Common-Law Claims**

With respect to the common-law claims against the Movants in their individual capacities, New Jersey state law pursuant to New Jersey's Tort Claims Act (hereinafter the "TCA") limits the circumstances in which state officials and state entities can be held liable for negligence under state law.  N.J.S.A. 59:1-1 to 12-3.  Because the TCA applies only to state-law claims and "provides no immunity" from constitutional claims brought under section 1983, Tice v. Cramer, 627 A.2d 1090, 1105 (N.J. 1993), the Court will analyze the remaining individual-capacity state common-law claims separately from the constitutional claims.

Movants have asserted that the alleged conduct at issue is shielded from liability under state law by the TCA.  Specifically, Movants argue that, pursuant to N.J.S.A. 59:6-5 and 6-6, public entities and employees are immune for "failing to diagnose a mental condition, and for any decision to confine a person for mental illness."  (DOC Defs.' Mot. to Dismiss at 14; see also Byrd's Mot. to Dismiss at 8, 11.)  Those sections provide:

14

**A16**

> a.   Neither a public entity nor a public employee is
> liable for injury resulting from diagnosing or failing
> to diagnose that a person is afflicted with mental
> illness or is a drug dependent person or from failing to
> prescribe for mental illness or drug dependence;
> provided, however, that nothing in this subsection
> exonerates a public entity or a public employee who has
> undertaken to prescribe for mental illness or drug
> dependence from liability for injury proximately caused
> by his negligence or by his wrongful act in so
> prescribing.
> b.   Nothing in subsection a. exonerates a public entity
> or a public employee from liability for injury
> proximately caused by a negligent or wrongful act
> or omission in administering any treatment prescribed
> for mental illness or drug dependence.

N.J.S.A. 59-6-5.

> Neither a public entity nor a public employee is liable
> for any injury resulting from determining in accordance
> with any applicable enactment: (1) whether to confine a
> person for mental illness or drug dependence; (2) the
> terms and conditions of confinement for mental illness
> or drug dependence; (3) whether to parole, grant a leave
> of absence to, or release a person from confinement for
> mental illness or drug dependence.

N.J.S.A. 59:6-6.

Courts interpret these provisions broadly, and close calls in

application are resolved in favor of immunity, not liability. See,

e.g., Charpentier v. Godsil, 937 F.2d 859, 865 (3d Cir. 1991);

Greenway Dev. Co. v. Bor. of Paramus, 750 A.2d 764, 767 (N.J.

2000); Ludlow v. City of Clifton, 702 A.2d 506, 508 (N.J. App. Div.

1997); Perona v. Twp. of Mullica, 636 A.2d 535, 539 (N.J. App. Div.

1994).   These provisions reflect and advance New Jersey's public

policy in favor of providing immunity to public employees for their
discretionary decision making.  Perona, 636 A.2d at 539, 541.

The New Jersey Appellate Division stated that the immunity
conferred by N.J.S.A. 59:6-6 is not limited only to confinement
within a "mental institution" and that the linchpin for such
immunity "is a discretionary decision whether to confine a person
for the care and treatment of mental illness rather than the
particular type of facility in which a person may be confined."
Ludlow, 702 A.2d at 508.  Immunity is also not limited to
physicians and can apply to any public employee, including police
officers.  Perona, 636 A.2d at 539.  Additionally, immunity is not
limited to final decisions on whether to confine a person for
mental illness; it applies to all determinations in the commitment
process.  Ludlow, 702 A.2d at 508.

The broad construction of these immunities has led courts to
apply them in a wide range of circumstances.  For example, the
Appellate Division in Perona v. Township of Mullica found that
police officers were immune from suit in circumstances similar to
those presented by this case.  636 A.2d 535.  The police officers
had responded to a domestic violence complaint and learned that Mr.
Perona was attempting to prevent Mrs. Perona from taking a walk by
herself because she had written him what he interpreted to be a
suicide note.  Id. at 537.  Mrs. Perona denied having suicidal

16

**A18**

intent, indicating that the note merely reflected her wishes if she
were to fail to return home -- if she decided to hitchhike for
example.  Id.  The officers were satisfied with her explanation and
left the Peronas' home.  Shortly thereafter, Mrs. Perona attempted
suicide by walking in front of traffic on a nearby highway.  Id.
The Appellate Division concluded that the officers' decision not to
take Mrs. Perona into custody or confinement was immune from
liability under N.J.S.A. 59:6-6.  Id. at 541.

In Predoti v. Bergen Pines County Hospital, the Appellate
Division determined that a hospital was immune under N.J.S.A. 59:6-
6.  463 A.2d 400 (N.J. App. Div. 1983).  The plaintiff, who was
diagnosed as suffering from "schizophrenia chronic undifferentiated
suicidal," was assigned to the closed ward of the hospital where he
was placed in restraints.  Four days later, he was transferred to a
less-restricted open ward after responding well to treatment.  Id.
at 401.  Two days later, while on an escorted walk for open-ward
patients, the plaintiff detached from the group and was injured by
an automobile when he attempted to cross a highway.  Id. at 402.
The court concluded that the hospital was not liable for the
plaintiff's injuries under N.J.S.A. 59:6-6 and stated, "Decisions
affecting confinement of the mentally ill are usually highly
predictive and though reasonable can lead to a demonstrably bad
result. . . . By immunizing these difficult decisions the

Legislature allows them to be made in an appropriate atmosphere free from the fear of suit." Id. at 402-03.

In McNesby v. State of New Jersey, Department of Human Services, the Appellate Division again ruled in favor of immunity. 555 A.2d 1186 (N.J. App. Div. 1989). The plaintiff's decedent, who had a history of psychiatric illness and suicidal tendencies, was involuntarily committed to a psychiatric hospital, and upon his admittance, the hospital took suicide precautions, which involved keeping him within the sight of a staff member at all times. However, after several days, hospital staff determined that these precautions were no longer necessary, and he was transferred into a "step-up" ward, where he was allowed intervals of unsupervised access to the hospital grounds. Id. at 1187-88. The plaintiff's decedent subsequently set himself on fire, resulting in his death, and the plaintiff brought suit against the State. The plaintiff alleged that, unlike Predoti, she was not claiming negligence based on the decision to transfer the decedent to a less restrictive ward, but rather based on the failure to properly supervise the decedent following the transfer. Id. at 1189. On those facts, the Appellate Division ruled that the State was immune from liability under N.J.S.A. 59:6-6 because the State did not simply fail to properly supervise but instead made a deliberate choice to provide the decedent with unsupervised time, which was an integral part of

18

**A20**

the treatment plan to prepare him for his release to the community.
Id.

With respect to immunity under N.J.S.A. 59:6-6 in this case,
Movants argue that the gravamen of the Complaint is that the
defendants, who knew or should have known of the decedent's history
of mental illness, substance abuse, and suicidal tendencies,
cleared the decedent to be released into the general prison
population rather than isolating him or providing him with constant
supervision. (See, e.g., Byrd's Mot. to Dismiss at 8, 12.)  Thus,
Movants contend that they are immune from suit because the claims
relate to their alleged failure to properly confine the decedent
based on his mental illness and substance abuse under N.J.S.A.
59:6-6.

Plaintiffs argue that such immunity is inapplicable here and
N.J.S.A. 59:6-6 immunity relates to "whether to commit a person for
mental illness, as well as the terms and conditions of confinement
**'for mental illness or drug dependence**.'"  (Pls.' Opp'n to DOC
Defs.' Mot. to Dismiss at 23; Pls.' Opp'n to Byrd's Mot. to Dismiss
at 11-12.)  Plaintiffs contend that the Complaint alleges that
decedent was incarcerated, not that he was confined for mental-
health treatment.  (Pls.' Opp'n to Byrd's Mot. to Dismiss at 11-12;
Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 23.)  According to
Plaintiffs, the immunity at issue applies only to confinement in

facilities that render treatment for mental health. (Pls.' Opp'n to Byrd's Mot. to Dismiss at 12-13.) With respect to Byrd, Plaintiffs further argue that part of their claims rests on her alleged failure to review the decedent's transfer records and follow prison protocol, and these actions are outside of the purview of the immunity conferred by N.J.S.A. 59:6-6. (Id. at 13-14.)

Defendant Byrd responds that, in this case, the confinement that results in immunity under N.J.S.A. 59:6-6 "is not the confinement arising from criminal conduct, but rather the choice not to confine for mental illness." (Dkt. entry no. 150, Byrd's Reply Br. in Support of Mot. to Dismiss at 6.)[5] Byrd analogizes her decision to release the decedent into the general prison population to the decision of an emergency room doctor discharging a patient from a general hospital rather than placing the patient on suicide watch. (Id.) Byrd asserts that the case law contradicts Plaintiffs' contention that the confinement for the purposes of this immunity must be in a mental institution. (Id. at 6-9.) Byrd further argues that N.J.S.A. 59:6-6 applies even if Plaintiffs cast their claims as those for negligent supervision because "[t]he statutory immunity of N.J.S.A. 59:6-6 applies to all actions and inactions by the defendant which related to the

---

[5] The DOC Defendants did not reply to the Plaintiffs' Opposition to their motion to dismiss.

determination of whether to confine the decedent for mental illness." (Id. at 10-12.)

The Court agrees with Movants and concludes that they are immune from liability for Plaintiffs' state common-law claims based on N.J.S.A. 59:6-6.  The case law demonstrates wide-ranging applicability of this type of immunity.  It applies to police officers confining (or failing to confine) individuals for mental-health reasons.  See Perona, 636 A.2d at 541.  It applies even where the potential confinement would not be in a mental institution, but rather would be in police custody or in another ward of a hospital not specific to mental health.  See id.; Predoti, 463 A.2d at 402-03.  The Court therefore rejects Plaintiffs' arguments that the potential confinement under this provision must be in a mental institution.

The Court is not persuaded by Plaintiffs' attempts to remove this case from the realm of the provision's immunity based on the fact that the decedent was already confined because he was incarcerated.  The decision before Movants was whether to further confine the decedent from the general prison population as a result of potential mental-health issues.  Movants decided against such confinement, and therefore, their decision is one considering "whether to confine a person for mental illness or drug dependence."  N.J.S.A. 59:6-6.

21

**A23**

claims, the Court declines to consider Byrd's argument that she is
not a "person" for the purposes of the NJCRA. (See Byrd's Mot. to
Dismiss at 16-17.)  And lastly, the Court need not address the DOC
Defendants' argument that Plaintiffs improperly filed a late Notice
of Claim, in violation of the TCA, N.J.S.A. 59:8-8 and 8-9, which
is a procedural bar to recovery. (See DOC Defs.' Mot. to Dismiss
at 14-16.)

### 2.   Constitutional Claims

The immunities established in the TCA do not provide immunity
for the constitutional claims presented under section 1983. Tice,
627 A.2d at 1105.  The Court will analyze the individual-capacity
constitutional claims for the adequacy of the pleadings and not for
immunity-type issues.

The Court of Appeals for the Third Circuit has had occasion to
consider under which circumstances liability can be imposed under
section 1983 for prison suicides. See Colburn v. Upper Darby Twp.,
838 F.2d 663, 667, 669 (3d Cir. 1988) (hereinafter "Colburn I");
Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991)
(hereinafter "Colburn II").  A plaintiff bringing a section 1983
claim based on a prison suicide "has the burden of establishing
three elements: (1) the detainee had a 'particular vulnerability to
suicide,' (2) the custodial officer or officers knew or should have
known of that vulnerability, and (3) those officers 'acted with

23

**A24**

reckless indifference' to the detainee's particular vulnerability."
Colburn II, 946 F.2d at 1023.  This standard balances two competing
principles.  First, "a section 1983 claim arising from a prisoner's
suicide is not per se precluded merely because the injury resulted
from the prisoner's own self-destructive behavior."  Freedman, 853
F.2d at 1115.  And second, "a prison custodian is not a guarantor
of a prisoner's safety."  Id.

     The Court of Appeals for the Third Circuit has declined to
define "reckless indifference" in this standard but stated that it
implies that there was "a strong likelihood," not just a mere
possibility, of self-harm, and this standard requires that the
custodial officials "'knew or should have known' of that strong
likelihood."  Colburn II, 946 F.2d at 1024.  Relying on the
jurisprudence of sister circuits, the Court of Appeals for the
Third Circuit stated, "Custodians have been found to 'know' of a
particular vulnerability to suicide when they have had actual
knowledge of an obviously serious suicide threat, a history of
suicide attempts, or a psychiatric diagnosis identifying suicidal
propensities."  Id. at 1025 n.1.  With respect to the phrase
"should have known," the court explained that its meaning is
distinct from its usual meaning for tort-law purposes:

     [The phrase] does not refer to a failure to note a risk
     that would be perceived with the use of ordinary
     prudence.  It connotes something more than a negligent
     failure to appreciate the risk of suicide presented by

24

**A25**

the particular detainee, though something less than a
subjective appreciation of that risk.  The "strong
likelihood" of suicide must be "so obvious that a lay
person would easily recognize the necessity for"
preventative action; the risk of self-inflicted injury
must not only be great, but also sufficiently apparent
that a lay custodian's failure to appreciate it
evidences an absence of any concern for the welfare of
his or her charges.

Id. at 1025 (internal citation omitted).

The Court of Appeals for the Third Circuit in Colburn I and

Colburn II had the opportunity to analyze the standard for a

section 1983 claim based on a prison suicide both at the motion-to-

dismiss stage and the summary-judgment stage.  In that case,

Melinda Lee Stierheim, who was visibly intoxicated, was taken into

custody by the Upper Darby police.  Colburn I, 838 F.2d at 664.

Diane Miller, a custodial official with the Upper Darby police

department, searched her, but did not find a handgun.  Id. at 665.

About four hours later, Stierheim shot herself in her cell with a

handgun.  Id.  Stierheim's mother, Sue Ann Colburn, as the

administratrix of Stierheim's estate sued the town, the police

department, Miller, and several other individuals under section

1983 for deprivation of Stierheim's constitutional rights.  Id.

The court, in the decision on the motion to dismiss, detailed

the allegations of the complaint to determine whether they were

insufficient as a matter of law to assert section 1983 claims based

on a prison suicide against custodial officials in their individual

25

**A26**

attempt but rather an effort to escape from her boyfriend.  Id. at
1026.  She accepted help from police officers in getting down when
they arrived.  Id.

     With respect to the other allegations regarding what Miller
knew on the night in question, the court explained that while a
trier of fact may infer that scars on Stierheim's arms were the
result of a suicide attempt, the record demonstrated that no one
noticed these scars on the evening of her suicide.  Id.  Nothing in
the record developed through discovery indicated "that Stierheim
had ever been diagnosed as suffering from a mental illness
characterized by a high risk of self-inflicted harm" or that there
was any other indication that Stierheim was vulnerable to suicide.
Id.  While the plaintiff had relied on Stierheim's intoxication as
an indicator of vulnerability to suicide, the court noted its
agreement with the majority of other circuits, "which have refused
to recognize intoxication as a factor sufficient to trigger the
duty to guard against self-inflicted injury."  Id.  The court
further reasoned that Stierheim's possession of a bullet -- that
was discovered by Miller during the search -- without more, was not
an indicator of suicidal tendencies.  Id. at 1027.  Finally, the
court concluded that, while consumption of a large quantity of
drugs could manifest suicidal intent, the three pills that Miller

believed that Stierheim had tried to swallow were insufficient to "make it apparent that a detainee is on the verge of suicide." Id.

The court was convinced, following the development of the record through discovery, "that no fair-minded jury could conclude . . . that Stierheim had a particular vulnerability to suicide of which Miller should have been aware." Id. Thus, the court affirmed the district court's grant of summary judgment in favor of Miller. Id.

Following Colburn I and Colburn II, the Court of Appeals for the Third Circuit has had several opportunities to apply the standard for section 1983 claims based on prison suicides. In Freedman v. City of Allentown, the court found that the plaintiffs' allegations that the decedent prisoner had prominent scars on his wrists, when viewed in the light most favorable to the plaintiffs, amounted merely to negligence and did not state a viable section 1983 claim. 853 F.2d at 1116. While there were allegations that the decedent prisoner had suicidal tendencies and had previously attempted suicide, the allegations did not suggest that this was known to the individual police officers but rather that the probation officer knew about the decedent's suicidal past and failed to mention it to the officers. Id. at 1115. For these reasons, the court affirmed the dismissal of the complaint against the police officers. See id. at 1116.

Similarly, in Kulp v. Veruete, following discovery, the court
affirmed the district court's grant of summary judgment where the
defendants had recognized that the decedent had some emotional
issues and potentially "passive suicidal thoughts," but two
counselors, after extended evaluations, did not think it was
necessary to place the decedent on suicide watch.   267 Fed.Appx.
141, 144 (3d Cir. 2008).

Where the allegations in the complaint demonstrate concrete,
direct knowledge on the part of the defendant officials of the
decedent's suicidal tendencies and an inexplicable disregard of the
warning signs, a motion to dismiss should be denied.   For example,
in Tatsch-Corbin v. Feathers, the complaint averred that the
decedent was released into the general prison population as opposed
to being placed on suicide watch even though: the defendant
officials had specific, direct knowledge of the decedent's history
of mental-health issues and suicide attempts; the decedent
indicated he was considering killing himself to an intake officer;
and the decedent made additional suicide threats to prison
officials as he was escorted to and from a hearing the day before
his suicide.   561 F.Supp.2d 538, 540-542 (W.D. Pa. 2008).   The
United States District Court for the Western District of
Pennsylvania concluded on these facts that a jury could find that

officials acted with deliberate indifference to the decedent's condition and, thus, denied the motion to dismiss.  Id. at 544.

Plaintiffs in this case argue that the standard for section 1983 liability in prison suicide cases is established by the facts. Plaintiffs assert that Defendants' "failure to follow protocol despite specific knowledge that it could lead to self-inflicted harm, including the failure to properly monitor and supervise the inmate in his cell and/or allow bedsheets in the cell among other failures can amount to deliberate indifference sufficient to impose individual liability."  (Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 19.)

The Court will consider this standard with respect to the allegations against the defendants individually.  According to the Complaint, Dimler was responsible for supervising the decedent once he had been released into the general prison population through the time of his suicide.  (Compl. at ¶ 26.)  Teel was the medical provider responsible for the decedent's care and supervision from the time he was placed in the general prison population until his death.  (Id. at ¶ 32.)  Dimler and Teel "knew or should have known of the history of suicide and psychiatric illness suffered by" the decedent and that the decedent was an addict at a high risk for suicide.  (Id. at ¶¶ 27, 33, 62.)  According to the Complaint, both disregarded the decedent's risk of suicide and violated policy and

procedure, by failing to adequately monitor the decedent, allowing
him to be in his cell with materials that could harm him, and
failing to intervene to prevent the suicide.  (Id. at ¶¶ 28-29, 34-
35, 60, 61.)  The Complaint also asserts that Dimler and Teel
failed to review the transfer records from Kintock in order to
determine what level of supervision was required.  (Id. at ¶ 36,
62.)  Dimler and Teel also purportedly failed to evaluate the
decedent for intoxication as was required by prison policy and
procedure.  (Id. at ¶ 53.)

The Court finds that the conclusory allegations with respect
to Dimler and Teel are insufficient as a matter of law and fail to
demonstrate -- even when viewed with all inferences in Plaintiffs'
favor -- that they would have had any reason to be concerned about
the decedent's risk of suicide.  See Freedman, 853 F.2d at 1114
(stating that court must look past conclusory allegations).  With
respect to the allegations that Dimler and Teel failed to review
the transfer records or evaluate the decedent for intoxication, the
Court finds that these conclusory allegations, even if taken as
true, would merely establish negligence and would fall short of the
reckless indifference required by Colburn II.  946 F.2d at 1023.
Plaintiffs have not pled -- beyond conclusory statements that
merely restate the legal standard -- actual knowledge on the part
of Dimler or Teel.  Id. at 1025 n.1.  Nor have Plaintiffs pled that

31

**A31**

they "should have known" of the decedent's vulnerability to suicide, as the Complaint fails to point to any actions of the decedent that would have alerted Dimler or Teel to the fact that he was a suicide risk.  Plaintiffs have not alleged how Teel and Dimler, in the course of their duties, would have been aware of the decedent's particular vulnerability.  This "should have known" standard requires "something more than a negligent failure to appreciate the risk of suicide," and the Complaint, viewed in the light most favorable to Plaintiffs, does not provide allegations capable of satisfying this standard.  Id. at 1025.  Therefore, the Complaint will be dismissed in its entirety as to Dimler and Teel.

In contrast, the Court finds that the Complaint, when viewed in the light most favorable to Plaintiffs with all inferences drawn in their favor, states a claim against Byrd in her individual capacity under section 1983 for a prison suicide.  The Complaint alleges that Byrd performed a nursing intake on January 16, 2009 and noted that the decedent had answered in the affirmative to questions regarding whether he had a history of suicidal tendencies and whether he had been hospitalized or treated for psychiatric illness.  (Compl. at ¶ 50.)  Despite this, Byrd purportedly cleared the decedent to be placed into the general prison population.  (Id. at ¶ 59.)  The Court finds that these specific allegations of Byrd's basis for knowledge of the decedent's vulnerability to

suicide are sufficient to overcome a motion to dismiss.  Colburn II
-- in reliance of the jurisprudence of other circuits --
specifically states that actual knowledge may be based on a history
of suicidal tendencies.  946 F.2d at 1025 n.1.  Plaintiffs have
adequately pled a section 1983 individual-capacity claim against
Byrd following a prison suicide based on her actual knowledge of
the decedent's particular vulnerability.

Plaintiffs request that, if the Court deems any of the claims
insufficient (for example the individual-capacity claims against
Dimler and Teel), the Court permit additional discovery to assist
in the development of the claims in the Complaint.  (Pls.' Opp'n to
Byrd's Mot. to Dismiss at 15-16; Pls.' Opp'n to DOC Defs.' Mot. to
Dismiss at 24.)  The Court concludes that the lack of specificity
is not "fairly attributable to the defendants' control of required
information."  See Freedman, 853 F.2d at 1114.  The Court finds
that these allegations seek to impose liability against these
defendants on a negligence standard, which is not permitted for
prison suicide cases.  Therefore, the Court declines to permit
discovery to allow development of the claims against Dimler and
Teel.

## C.  **Supervisory Liability**

With regard to the liability of the Supervisory Defendants,
Plaintiffs refer to federal jurisprudence on section 1983 municipal

liability under <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978). (<u>See</u> Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 14-16.) In contrast to state government defendants, the Eleventh Amendment does not bar damage awards against municipalities and municipal officials in their official capacity. <u>Monell</u>, 436 U.S. at 690 n.54, 55. Likewise, municipal officers named in their official capacities are "persons" for section 1983 purposes. <u>Id.</u> at 690 n.55.

The one municipal defendant here -- Mercer County -- was dismissed from the action by stipulation of the parties on March 22, 2011. (<u>See</u> Stip. of Dismissal as to Mercer County.) Plaintiffs and Movants consistently treat all the individual defendants as state officials, not municipal officials. As discussed, these officials enjoy immunity under the Eleventh Amendment when sued in their official capacity. Thus, Plaintiffs' citations to municipal liability under <u>Monell</u> and its progeny are irrelevant. (<u>See</u> Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 14-16.)

Notwithstanding <u>Monell</u>'s inapplicability, supervisory liability under section 1983 is possible. However, such liability must be premised on the supervisory defendant's personal involvement in the wrongs; "it cannot be predicated solely on the operation of respondeat superior." <u>Rode v. Dellarciprete</u>, 845 F.2d

34

**A34**

1195, 1207 (3d Cir. 1988); see also Polk Cnty. v. Dodson, 454 U.S.
312, 325 (1991).

There are two theories under which supervisory liability may
be premised for section 1983 purposes. A.M. v. Luzerne Cnty. Juv.
Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004). First, "[i]ndividual
defendants who are policymakers may be liable under § 1983 if it is
shown that such defendants, with deliberate indifference to the
consequences, established and maintained a policy, practice or
custom which directly caused [the] constitutional harm." Id.
(internal quotations and citation omitted). Second, "a supervisor
may be personally liable under § 1983 if he or she participated in
violating the plaintiff's rights, directed others to violate them,
or, as the person in charge, had knowledge of and acquiesced in his
subordinates' violations." Id.; see also Rode, 845 F.2d at 1207.
This second theory essentially requires that the acts or omissions
of the supervisor were the "moving force" behind the harm. Sample
v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989); Jackson v. Taylor,
No. 05-823, 2006 WL 2347429, at *2 (D. Del. May 12, 2006).
"Allegations of participation or actual knowledge and acquiescence,
however, must be made with appropriate particularity." Rode, 845
F.2d at 1207.

The DOC Defendants argue that, based on the foregoing, the
Complaint is deficient with respect to the Supervisory Defendants –

35

- Balicki, Patterson, and Dunlap-Pryce.  Specifically, the DOC

Defendants argue that the Complaint lacks specific facts regarding:

(1) the conduct of the Supervisory Defendants; and (2) which policy

or procedure they failed to follow or implement.  (DOC Defs.' Mot.

to Dismiss at 12-14.)  Plaintiffs counter that the alleged facts

demonstrate "both the direct knowledge and participation of the

Supervisory Defendants in obtaining and reviewing transfer records

of inmates in their facilities" and that the Supervisory Defendants

failed "to enact, implement and enforce policies and procedures"

for: (1) the review of transfer records; and (2) the treatment of

individuals with addiction/intoxication issues or who pose a risk

of self-harm/suicide.  (Pls.' Opp'n to DOC Defs.' Mot. to Dismiss

at 18.)  Plaintiffs claim that this "foreseeably led to the suicide

of Mullin and which evidenced a gross indifference and reckless

disregard for the rights of" the decedent.  (Id.)  Plaintiffs argue

that it is unreasonable to expect them to be able to identify the

exact policy at issue, as, without discovery, Plaintiffs do not

have access to internal department policies and procedures.  (Id.

at 19.)

     The Court of Appeals for the Third Circuit has addressed

claims against supervisory defendants in the prison suicide context

under similar facts.  In Colburn I, despite allowing the claims to

proceed over a motion to dismiss against the custodial official who

36

**A36**

was personally involved in alleged wrongdoing, the court dismissed

the claims against the supervisory defendants -- the police

commissioner of Upper Darby Township and the mayor of Upper Darby -

- in their individual capacities because the complaint lacked

allegations that these supervisory defendants were personally

involved in any of the activities related to the decedent's

suicide.  Colburn I, 838 F.2d at 673.

The Court finds the Complaint in this case to be similarly

deficient with respect to the Supervisory Defendants.  The

Complaint identifies Balicki, Patterson, and Dunlap-Pryce as

"supervisory official[s]."  (Compl. at ¶¶ 2-4.)  The Complaint

alleges that the decedent was in the custodial care of the

Supervisory Defendants and that agents of the Supervisory

Defendants examined the decedent.  (Id. at ¶¶ 37, 39.)  The

Complaint alleges that the Supervisory Defendants "knew or should

have known based on daily intake records at their disposal that"

the decedent was being transferred to their care and that he had a

history of suicide attempts, psychiatric problems, and drug abuse.

(Id. at ¶ 63.)  Under policy and procedure, Plaintiffs aver that

the Supervisory Defendants were required to know the status of

inmates brought into their facilities and to review the transfer

records.  (Id. at ¶ 64.)  Plaintiffs allege that the Supervisory

Defendants failed to review these records and to ensure that the

37

decedent was properly treated as a suicide risk.  (Id. at ¶ 65.)
Finally, Plaintiffs assert that the Supervisory Defendants failed
to enact and enforce policies and procedures requiring the review
of transfer records and the proper treatment of those who had
addiction problems or who were a suicide risk.  (Id. at ¶ 66.)

        The Court finds that, as in Colburn I, these allegations are
insufficient to survive a motion to dismiss.  The Complaint lacks
any allegations that these Supervisory Defendants were personally
involved in the actions at issue.  See Colburn I, 838 F.2d at 673.
Plaintiffs do not allege that these Supervisory Defendants
participated, directed, or acquiesced in the violation of the
decedent's rights.  See A.M., 372 F.3d at 586.

        While Plaintiffs also seek to hold the Supervisory Defendants
liable under the policy or practice theory of supervisory
liability, see id., the Court finds that the Complaint is far too
conclusory with respect to any deficiencies in any policy or
practice.  And while Plaintiffs have argued that it is unreasonable
to expect them to identify the policy or procedure without
discovery, the Court will not allow a fishing expedition into the
operations of the state department of corrections absent any
indication by Plaintiffs that such discovery will be fruitful.  For
these reasons, the Court will dismiss the claims asserted against
the Supervisory Defendants in their entirety.

**D.    Punitive Damages**

Plaintiffs have requested punitive damages against the individual defendants.  Punitive damages are available for section 1983 claims when the conduct of the defendant "involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983).  This is true even when the underlying liability standard for compensatory damages is that of recklessness.  Id.  Where the facts allege reckless conduct, and the allegations of the complaint with respect to that conduct are found to be sufficient to withstand a motion to dismiss, a court may decline to dismiss punitive-damage claims at the motion-to-dismiss stage.  See, e.g., Tatsch-Corbin, 561 F.Supp.2d at 545.

The claims asserted against the majority of the defendants will be dismissed, thereby resulting in the dismissal of the punitive-damage claims against these defendants as well.  However, with respect to Byrd, the Court has found that the Complaint adequately pleads a claim for relief.  Therefore, the Court declines to dismiss Plaintiffs' request for punitive damages asserted against Byrd at his juncture.

**IV.    CONCLUSION**

The Court for the reasons stated above, will (1) grant the motion to dismiss by Balicki, Patterson, Dunlap-Pryce, Dimler and Teel, (2) deny the motion for judgment on the pleadings by Byrd

insofar as it concerns individual-capacity, constitutional claims asserted against her, and (3) otherwise grant Byrd's motion. Remaining before the Court in this matter are Plaintiffs' claims against Kintock (which did not move to dismiss any claims) and the constitutional claims against Byrd in her individual capacity.  The Court will issue an appropriate Order.

                                    s/ Mary L. Cooper
                                **MARY L. COOPER**
                                United States District Judge

Date:      November 1, 2013

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOAN MULLIN, ADMINISTRATRIX OF THE          CIVIL ACTION NO. 11-247 (MLC)
ESTATE OF ROBERT MULLIN, deceased,
and JOAN MULLIN, individually,                        **O R D E R**

          Plaintiffs,

          v.

ADMINISTRATOR KAREN BALICKI, et
al.,

          Defendants.

For the reasons stated in the Court's Memorandum Opinion

dated November 1, 2013, **IT IS** on this  1st  day of November,

2013, **ORDERED** that the motion to dismiss by Defendants

Administrator Karen Balicki, Director Robert Patterson, Director

Marie Dunlap-Pryce, Officer Dimler, and Beatrice Teel, R.N.,

(dkt. entry no. 145) is **GRANTED**; and it is further

     **ORDERED** that the motion for judgment on the pleadings by

Defendant Jane Byrd, L.P.N., (dkt. entry no. 144) is **GRANTED IN

PART** and **DENIED IN PART** as follows:

          **GRANTED** as to the claims against Jane Byrd, L.P.N., in

her official capacity; and

          **GRANTED** as to the state common-law claims against Jane

Byrd, L.P.N.; and

**A41**

**DENIED** as to the constitutional claims under 42 U.S.C. § 1983 and N.J.S.A. 10:6-1 et seq. against Jane Byrd, L.P.N., in her individual or personal capacity; and it is further

**ORDERED** that all claims against Defendants Administrator Karen Balicki, Director Robert Patterson, Director Marie Dunlap-Pryce, Officer Dimler, and Beatrice Teel, R.N., are **DISMISSED**; and it is further

**ORDERED** that the Clerk of the Court will designate the action insofar as it is brought against Defendants Administrator Karen Balicki, Director Robert Patterson, Director Marie Dunlap-Pryce, Officer Dimler, and Beatrice Teel, R.N., as **TERMINATED**; and it is further

**ORDERED** that the claims asserted against Defendant Jane Byrd, L.P.N., in her official capacity, and the state common-law claims asserted against her, are **DISMISSED**; and it is further

**NOTED** that Defendants Jane Byrd, L.P.N., and Kintock Group are the only viable defendants remaining in the action, and that the Clerk of the Court should designate the action insofar as it is brought against all other defendants as **TERMINATED**; and it is further

**ORDERED** that the motion filed on the docket under docket
entry number 146 is **ADMINISTRATIVELY TERMINATED** as unnecessary.

s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually,<br><br>Plaintiffs,<br><br>v.<br><br>ADMINISTRATOR KAREN BALICKI, et al.,<br><br>Defendants. | CIVIL ACTION NO. 11-247 (MLC)<br><br>**MEMORANDUM OPINION** |

**COOPER, District Judge**

Joan Mullin, individually and as administratrix of the estate of Robert Mullin, her son,

("Plaintiffs") seeks reconsideration of this Court's Order dated November 1, 2013 (dkt. entry

no. 185, Notice of Mot. for Reconsideration) in which the Court granted in part and denied in

part the defendants' motion to dismiss and motion for judgment on the pleadings (collectively

"motions to dismiss"). (See dkt. entry no. 154, 11-1-13 Order.) For the reasons that follow,

that motion for reconsideration is denied.

## I.    BACKGROUND

The Court, for the purposes of judicial economy, will not repeat the facts, procedural

history, and reasoning of the Court's November 1, 2013 Opinion ("Opinion") and Order

("Order") and instead incorporates them by reference. (See dkt. entry no. 153, 11-1-13 Op.;

11-1-13 Order.) Following the Opinion and Order, on November 13, 2013, Plaintiffs filed a

motion for reconsideration and to amend the Second Amended Complaint. (See dkt. entry no. 155, 11-13-13 Notice of Mot.) Because the motion for leave to amend should have been "pursued in a separate motion before the Magistrate Judge," this Court denied the motion without prejudice on November 15, 2013. (Dkt. entry no. 158, 11-15-13 Order at 2.) This Court granted Plaintiffs leave to refile the motion for reconsideration before this Court and to file a separate motion for leave to amend before the Magistrate Judge **"AFTER THE**

**SEPARATELY-FILED MOTION FOR RECONSIDERATION HAS BEEN**

**RESOLVED."** (Id. at 3.) Plaintiffs then filed a motion for reconsideration of the Opinion and Order on November 25, 2013. (See dkt. entry no. 160, 11-25-13 Notice of Mot.) On March 4, 2014, after briefing on the motion for reconsideration was complete, Plaintiffs' counsel filed a letter to this Court seeking to reopen the motion on the basis of "additional evidence" that Plaintiffs' counsel had in her possession since before the Court issued its Opinion and Order but that she had misplaced. (Dkt. entry no. 182, 3-4-14 Pls.' Counsel Letter at 2.) On March 31, 2014, this Court denied the motion for reconsideration without prejudice and permitted Plaintiffs to refile the motion presenting the new evidence. (Dkt. entry no. 184, 3-31-14.) On April 24, 2014, Plaintiffs filed the instant motion for reconsideration. (See Not. of Mot. for Reconsideration.)

Plaintiffs seek reconsideration as to two aspects of the Opinion and Order: (1) the dismissal of all of the claims against Officer Dimler ("Dimler"); and (2) the dismissal of the claims under the New Jersey Tort Claims Act against Nurse Byrd ("Byrd"). (See dkt. entry no. 186, Pls.' Br. in Supp. of Mot. ("Pls.' Br.") at 1.) The purported basis of the motion is

2
**A45**

"new facts which were not before the Court and unknown to plaintiff at the time the motions were filed and opposition briefed." (Id.) There appear to be two sets of information that came to Plaintiffs' attention following the briefing of the motions to dismiss. According to Plaintiffs' counsel, "[o]n July 17, 2013 the State Defendants supplied the policies and procedures, among other documents, which finally established that Dimler and Byrd were in violation of various policies and failed to properly perform their ministerial functions." (Id. at 8.) Additionally, Plaintiffs' counsel claims that she had received discs of discovery information from the defendants in April 2013, but that she "misplaced and misfiled" one of the discs. (Id.) The information on this disc apparently related to "the investigation into the suicide," and the misplaced disc was not discovered until after February 26, 2014. (See id.; 3-4-14 Pls.' Counsel Letter at 2.) On the basis of this new information, Plaintiffs intend to seek to amend the Second Amended Complaint and add new allegations in a Third Amended Complaint, which Plaintiffs submitted as an exhibit to this motion. (See Pls.' Br. at 2; dkt. entry no. 187, Proposed Third Am. Compl.)

The new allegations that arise from these new sources of information relate to specific policies of the Department of Corrections that impose various obligations on Byrd and Dimler that they allegedly failed to follow. (See Pls.' Br. at 2-3.) According to Plaintiffs, Byrd was required to, inter alia, ensure that Robert Mullin ("Mullin"), the decedent, was "seen by a mental health professional prior to his placement in detention and that he be placed on Close or Constant Watch" based on the fact that Byrd "obtain[ed] a positive response to a mental health item in that [Mullin] answered in the affirmative when asked if he had ever tried to

3

**A46**

commit suicide and whether he had ever been treated for a psychiatric disorder." (Id. at 3.)
Byrd also allegedly "failed to utilize the proper assessment mechanisms in place by policy,
failed to see to it that decedent was evaluated by a psychologist or psychiatrist upon transfer,
failed to document the type of watch necessary, all a direct and proximate cause of decedent's
death." (Id. at 5.) With respect to Dimler, Plaintiffs allege that Mullin was transferred to a
Close Custody Unit, which was "for inmates placed on either Administrative or Disciplinary
Segregation, Protective Custody or Suicide watch," and that internal procedures require that
inmates in Close Custody be monitored either every fifteen minutes ("Close Watch") or
continuously ("Constant Observation") depending on the inmate. (See id. at 3-4.) Plaintiffs
claim that the internal procedures required that Mullin be placed on Constant Observation.
(Id. at 4.) Dimler purportedly failed to monitor Mullin "either on Constant Watch or Close
Watch." (Id. at 5.) Essentially, Plaintiffs' contention is that Dimler was on notice regarding
Mullin's vulnerability to suicide by virtue of his placement in the Close Custody Unit and that
because of this placement, Dimler was required by internal policy and procedure to monitor
Mullin more frequently than was done. (See id. at 5-6.)

Plaintiffs also wish to assert claims against new defendants. (Id. at 1.) Seemingly, this
would include "Officer Russo." Plaintiffs allege, based on the statements of other inmates,
that "Mullin requested to see a psychiatrist, and told Officer Russo that he wanted to kill
himself, but was ignored and humiliated by Officer Russo." (Id. at 5.) Officer Russo
purportedly refused Mullin's requests and said "Shut up. You might as well kill yourself."

4

**A47**

(Id. at 5-6.)  Plaintiffs do not identify the source of this information or why that was not available earlier, but the Court assumes that this information came from the misplaced disc.

## II.   STANDARD OF REVIEW

Plaintiffs have moved for reconsideration pursuant to Local Civil Rule 7.1 ("Rule 7.1").  Reconsideration is considered "an extraordinary remedy" that should granted "sparingly."  Daminao v. Sony Music Entm't, Inc., 975 F.Supp. 623, 634 (D.N.J. 1997) (quoting N.L. Indus., Inc. v. Commercial Union Ins. Co., 935 F.Supp. 513, 516 (D.N.J. 1996)).  Pursuant to Rule 7.1(i), "a motion for reconsideration shall be served and filed within 14 days after the entry of the order or judgment on the original motion," and "[a] brief setting forth concisely the matter or controlling decisions which the party believes the Judge or Magistrate Judge has overlooked shall be filed with the Notice of Motion."  "The word 'overlooked' is the operative term in the Rule."  Bowers v. Nat'l Collegiate Athletic Ass'n, 130 F.Supp.2d 610, 613 (D.N.J. 2001).  To succeed on such a motion, Plaintiffs "must show more than a disagreement with the court's decision."  Daminao, 975 F.Supp. at 634 (quoting Panna v. Firstrust Sav. Bank, 760 F.Supp. 432, 435 (D.N.J. 1991)).  And, in general, Rule 7.1 "does not contemplate a Court looking to matters which were not originally presented."  Id. (quoting Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F.Supp. 159, 162 (D.N.J. 1988)).

"Reconsideration motions . . . may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."  N.L. Indus., Inc., 935 F.Supp. at 516.  Reconsideration motions should only be granted

"where (1) an intervening change in the law has occurred, (2) new evidence not previously available has emerged, or (3) the need to correct a clear error of law or prevent manifest injustice arises." Id. (citing N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995)).

Plaintiffs here rely upon the second ground for reconsideration, "new evidence." Notably, "[n]ew evidence is not the equivalent of evidence that a party simply obtains after an adverse ruling." Physicians Healthsource, Inc. v. Janssen Pharm., Inc., No. 12-2132, 2013 WL 2460345, at *3 (D.N.J. June 6, 2013) (citing Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 252 (3d Cir. 2010)). Motions for reconsideration are not a means to expand the record before the court. Bowers, 130 F.Supp.2d at 613. Generally speaking, "courts should reject new evidence not presented when the court made its original decision." Physicians Healthsource, Inc., 2013 WL 2460345, at *3. Following a decision on a motion to dismiss, courts in this district have denied motions for reconsideration where new allegations are offered under the guise of "new evidence." See, e.g., id.

## III.   DISCUSSION AND ANALYSIS

Plaintiffs argue that this Court, in rendering the Opinion and Order, improperly parsed "the factual allegations in determining whether plaintiff could prove the lack of supervision or the failure to abide by policy and procedure in the supervision and management of [Mullin]" and that this "was an exceptionally harsh and restrictive view of the pleading standards which plaintiff contends does not comport with the law." (Dkt. entry no. 201, Pls.' Reply Br. at 18-

19.) The Court disagrees with this assessment, particularly given the nature of Plaintiffs'

claims and the potential immunities at play. In the Opinion, the Court explained:

> A civil-rights complaint must "'contain a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs.'" Freedman v. City of Allentown, 853 F.2d 1111, 1114 (3d Cir. 1988) (quoting Ross v. Meagan, 638 F.2d 646, 650 (3d Cir. 1981)). The court must look past any conclusory allegations regarding the willfulness of the defendants' conduct or the defendants' reckless disregard of the rights of the victim; the court will focus on "the factual scenario itself to examine whether the conduct alleged, viewed most favorably to plaintiffs, is reasonably susceptible to falling within the conclusions alleged." Id. at 1115.

(11-1-13 Op. at 10-11.) And, with respect to the state-law immunities under New Jersey's

Tort Claims Act, the Court stated, "Courts interpret these provisions broadly, and close calls

in application are resolved in favor of immunity, not liability." (Id. at 15.) Given the type of

claims at issue and the highly conclusory language used in the Second Amended Complaint,

the Court does not agree with Plaintiffs' charge that the Opinion was "exceptionally harsh" or

"restrictive."

Plaintiffs further contend that the Second Amended Complaint is not "conclusory."

Specifically, they assert that their "newly discovered evidence . . . supports the already pled

allegations before the Court and would tend to show that the Court did overlook the

allegations" relating to Dimler and Byrd. (Pls.' Reply Br. at 10.) According to Plaintiffs,

"discovery has established that in fact these allegations were not conclusory." (Id. at 26.) The

Court believes that Plaintiffs are confused by the nature and significance of a determination

that the pleadings were "conclusory." The Court's characterization of the pleadings as

"conclusory" means that the words chosen by Plaintiffs were insufficiently specific to provide

7

the requisite notice to the defendants. Whether discovery could ultimately prove or even support the allegations does not alter their conclusory nature in the first instance, and it is the words chosen, and not the potentially available proof, that the Court considers on a motion to dismiss. Therefore, the "new evidence" submitted by Plaintiffs does not change the Court's determination that some of the language used by Plaintiffs in the Second Amended Complaint was "conclusory."

The purported new evidence before the Court is (1) the policies and procedures that Dimler and Byrd allegedly failed to follow and (2) information relating to the knowledge of Dimler and other yet-unnamed defendants regarding Mullin's vulnerability to suicide. Plaintiffs first argue that the Court erred in concluding that Dimler and Byrd were entitled to immunity on the state-law claims pursuant to N.J.S.A. 59:6-6, which confers immunity on public employees for injuries resulting from their determination "whether to confine a person for mental illness or drug dependence [or] the terms and conditions of confinement for mental illness or drug dependence." (Pls.' Br. at 11.) Plaintiffs contend that this immunity is reserved for "high level judgment or policy decisions" and does not apply to Dimler or Byrd in the handling of their ministerial duties. (See id. at 12-13 (citing N.J.S.A. 59:3-2; Kolitch v. Lindedahl, 100 N.J. 485 (1985); Longo v. Santoro, 195 N.J. Super. 507 (N.J. App. Div. 1984)); see also Pls.' Reply Br. at 24.) Additionally, Plaintiffs argue that the dismissal of the constitutional claims against Dimler should be vacated because "new evidence and proposed amended factual allegations" demonstrate Dimler's actual knowledge of Mullin's vulnerability to suicide. (Pls.' Br. at 15.) The gist of Plaintiffs' new evidence of this

8

**A51**

knowledge is that Mullin was transferred to a Close Custody Unit, and policy required

supervision of inmates in this unit at a minimum of fifteen minute intervals. The fact that

Mullin was in this unit, and Dimler was aware of his existence in this unit, indicates —

according to Plaintiffs — that Dimler was on notice that Mullin required close supervision.

(Id. at 16-17.)

The defendants respond that reconsideration is not warranted and is improper because

Plaintiffs' motion is based not upon the "legal sufficiency" of the Second Amended

Complaint but rather upon "allegations as set forth in an entirely new and unfiled Complaint."

(Dkt. entry no. 189, Byrd's Opp'n at 14; see also dkt. entry no. 196, Attorney General's

Opp'n at 10 ("The court's Order and Opinion addressed solely whether certain claims in the

Second Amended Complaint should be dismissed for failure to state a claim, and these new

documents in no way did or would possibly have touched on that analysis.").)

The Court concludes that this "new evidence" does not warrant reconsideration of the

Court's Opinion and Order. The Second Amended Complaint, as written, remains conclusory

and insufficiently specific with respect both to Dimler's knowledge and to the alleged policies

and procedures that conveyed "ministerial" duties on Byrd and Dimler, which they allegedly

failed to follow. (See dkt. entry no. 102, 2d Am. Compl.) This new evidence, which

provides many missing details relating to Plaintiffs' allegations relating to policy and

procedure and Dimler's knowledge, is external to the Second Amended Complaint. In

evaluating a motion to dismiss, the Court typically does not look outside of the complaint.

See Borough of Moosic v. Darwin Nat'l Assur. Co., 556 Fed.Appx. 92, 95 (3d Cir. 2014)

9

**A52**

("Generally, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."); A.D. Bedell Wholesale Co. v. Phillip Morris Inc., 263 F.3d 239, 266 (3d Cir. 2001) ("It is black-letter law that [a] motion to dismiss for failure to state a claim . . . is to be evaluated only on the pleadings." (internal quotation marks and citation omitted)). Thus, the Court properly relied upon the allegations in the Second Amended Complaint. Plaintiffs have merely come forward with new allegations and have not demonstrated that the Court "overlooked" anything in the first instance. See Physicians Healthsource, Inc., 2013 WL 2460345, at *3 ("Plaintiff is seeking to assert new allegations . . . . In that regard, under the standard, Plaintiff has not raised any basis for which I would reconsider my prior rulings."). For this reason, reconsideration is not warranted.

What Plaintiffs truly seek to do is to amend the Second Amended Complaint. At this stage in the litigation, Plaintiffs must move for leave before the Magistrate Judge and may not amend as of right pursuant to Federal Rule of Civil Procedure 15(a). The decision whether to grant leave to amend is discretionary. See Lorenz v. CSX Corp., 1 F.3d 1406, 1413 (3d Cir. 1993). Leave to amend should be "freely given" unless there is a justification for denying such leave, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Id. at 1413-14 (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

The Court does not purport to opine on whether the Magistrate Judge should exercise the discretion to grant leave to amend in these circumstances other than to make note of a few

considerations.[1] With respect to the "new evidence" relating to policies and procedures, the parties do not dispute that this information was in fact at Plaintiffs' counsel's "disposal" as of July 17, 2013, after the briefing on the motions to dismiss was completed but before the Court rendered a decision. (See Pls.' Br. at 8.) The Court issued its Opinion and Order on November 1, 2013. Plaintiffs have offered absolutely no explanation why they did not bring this information to the Court's attention or attempt to amend the Second Amended Complaint prior to that date, over four months after Plaintiffs' counsel was aware of the information, which counsel describes as "critical." (Pls.' Reply Br. at 8.)[2] With respect to the new evidence relating to the investigation into Mullin's suicide, Plaintiffs' counsel misplaced or misfiled the disc containing this information but located it after February 26, 2014 — nearly four months after the Court rendered its decision. Plaintiffs' counsel promptly notified the Court about this discovery on March 4, 2014. (See 3-4-14 Pls.' Counsel Letter.)

The foregoing demonstrates that two sets of new information came to the Court's attention through very different circumstances. As a result, the new allegations that Plaintiffs

---

1 Despite the substantial briefing on the futility or sufficiency of the requested amendments or the significance of the external documents, the Court declines to consider such arguments on this motion for reconsideration of its dismissal of most of the claims in the Second Amended Complaint. (See Attorney General's Opp'n at 11-15; Byrd's Opp'n at 11-14.) These arguments may or may not be appropriate considerations for the Magistrate Judge, depending on the manner in which these arguments are presented.

2 Plaintiffs argue that "Defendants have been dilatory in their discovery obligations in this case, and should not be heard to complain of the plaintiffs' clerical error or moving faster to advise the Court to reopen the Motion for Dismissal based on the July 2013 evidence." (Pls.' Reply Br. at 8.) The Court is unimpressed by Plaintiffs' comparison of the parties' obligations vis-à-vis one another to the parties' obligations to the Court. Moreover, the Court invested considerable time evaluating the motions to dismiss, and Plaintiffs' counsel's disregard for the waste of judicial resources is disconcerting.

seek to add in a Third Amended Complaint may require different treatment depending on when that information became available to Plaintiffs' counsel. The Magistrate Judge, in applying the Foman factors, which include "undue delay," may exercise the discretion to draw a distinction between the information Plaintiffs' counsel learned of in July of 2013 as opposed to the information discovered in February or March of 2014. The Court does not intend to guide the Magistrate Judge's discretion but rather seeks to aid the Magistrate Judge by providing some direction to the parties in advance. To assist the Magistrate Judge, Plaintiffs would be wise to indicate, for each new allegation in the proposed Third Amended Complaint, where the information underlying that allegation came from and when Plaintiffs' counsel became aware of it. It is entirely unclear from the briefing which new allegations are based on the July 2013 discovery and which are based on the misplaced discovery found in February or March of 2014. The Magistrate Judge may view such distinctions as relevant, and therefore, the Court suggests that Plaintiffs clarify this on any subsequent motion for leave to amend the pleadings.

## IV.  CONCLUSION

For these reasons, Plaintiffs' motion for reconsideration (dkt. entry no. 185) is denied. The Court will issue an appropriate Order.

s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

Date:        July 25, 2014

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually,<br><br>Plaintiffs,<br><br>v.<br><br>ADMINISTRATOR KAREN BALICKI, et al.,<br><br>Defendants. | CIVIL ACTION NO. 11-247 (MLC)<br><br>**O R D E R** |

For the reasons stated in the Court's Memorandum Opinion dated July 25, 2014,

**IT IS** on this 25th day of July, 2014, **ORDERED** that the motion for reconsideration of

the Court's November 1, 2013 Order (dkt. entry no. 185) is **DENIED**; and it is further

**ORDERED** that the plaintiffs are **GRANTED LEAVE** to file a separate notice of

motion concerning leave to amend the complaint and assert new claims, as well as

separate briefs and exhibits in support thereof, before the Magistrate Judge **BY AUGUST**

**22, 2014** in accordance with the Federal Rules of Civil Procedure and the Local Civil

Rules.

_s/ Mary L. Cooper_____
**MARY L. COOPER**
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOAN MULLIN, Administratrix of the
Estate of Robert Mullin, deceased, and
individually,                                          Civil Action No. 11-247 (MLC)

                    Plaintiff,

            v.

STATE OF NEW JERSEY, et al.,                    ORDER DENYING MOTION FOR
                                                LEAVE TO AMEND COMPLAINT

                    Defendants.

Presently before the Court is a Motion to Amend (the "Motion"), filed by Plaintiff, Joan

Mullin ("Plaintiff"), individually and as Administratrix of the Estate of Robert Mullin, deceased

("Decedent"). [Docket Entry No. 206]. By way of the Motion, Plaintiff seeks leave to file the

proposed Third Amended Complaint (the "Third Amended Complaint" or "TAC"), adding new

causes of action, facts, and additional parties based on what she alleges is newly discovered

evidence. Defendants Balicki, Paterson, Dunlap-Pryce, and Dimler (the "DOC Defendants")

have opposed the Motion [Docket Entry No. 211], as has Defendant Jane Byrd ("Nurse Byrd")

[Docket Entry No. 210]. The Court has considered the Motion on the papers submitted, without

oral argument, pursuant to Rule 78. For the reasons set forth below, the Court denies Plaintiff's

Motion for leave to file the Third Amended Complaint.

## I.    BACKGROUND AND PROCEDURAL HISTORY[1]

On January 17, 2009, Decedent committed suicide while incarcerated in a facility

---

[1] The Court assumes the parties' familiarity with the facts of this case and therefore addresses only those facts
pertinent to an understanding of the issues raised by the Motion.

1

operated by the New Jersey Department of Corrections ("DOC"). On January 14, 2011,

Plaintiff filed suit against various defendants, alleging violations of Decedent's civil rights,

pursuant to 28 U.S.C. §§ 1983 and 1985 and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1, *et*

*seq.*, and asserting state law claims of negligence, emotional distress, abuse of process, and

medical negligence stemming from Decedent's death. [Docket Entry No. 1].

The procedural history of this case is lengthy and tortured. From the outset, this case has

had repeated and prolonged motion practice. Defendant Mercer County filed a motion to

dismiss on March 9, 2011 [Docket Entry No. 7], and was dismissed without prejudice by

stipulation filed on March 22, 2011. [Docket Entry No. 15].

Defendants State of New Jersey, New Jersey Department of Corrections, South Woods

State Prison, Central Reception and Assignment Facility, Balicki, and Byrd moved to dismiss the

Complaint on or about April 19, 2011. [Docket Entry 25]. Defendant Trenton Psychiatric

Hospital filed a separate motion to dismiss on May 19, 2011. [Docket Entry No. 27]. In

response, Plaintiff filed opposition, as well as her first and second applications for leave to

amend the complaint, by way of two separate cross-motions seeking to add newly discovered

facts and additional defendants. [Docket Entry Nos. 31, 34, 35]. The cross-motions were

referred to the undersigned to be decided [Docket Entry No. 40], and were granted by order

dated November 28, 2011, insofar as they sought to supplement the facts but denied as to new

parties for failure to provide sufficient facts to state a plausible claim (the "November 28

Order"). [Docket Entry No. 43]. The First Amended Complaint was filed on December 1,

2011. [Docket Entry No. 45].

Plaintiff then moved for reconsideration of that portion of the November 28 Order that

2

denied leave to add Dimler and Teel as defendants. [Docket Entry No. 46]. On December 16, 2011, Defendants Balicki, Dunlap-Pryce and Paterson filed another motion to dismiss. [Docket Entry No. 51]. That motion was denied without prejudice in light of the pending motion for reconsideration. [Docket Entry No. 57]. The undersigned granted reconsideration but affirmed the prior ruling on June 19, 2012. [Docket Entry No. 80]. Plaintiff appealed that decision, citing newly discovered evidence. [Docket Entry No. 85]. The appeal was denied without prejudice on July 9, 2012, as procedurally improper for relying on evidence not presented in support of the motion; Plaintiff was granted leave to re-file the appeal and a separate motion for leave to amend. [Docket Entry No. 89].

As a result, Plaintiff filed another motion for leave to amend the complaint on July 16, 2012 [Docket Entry No. 91], and a new appeal. [Docket Entry No. 92]. The June 19 Order was affirmed on August 2, 2012. [Docket Entry Nos. 94-95].

In the interim, Plaintiff filed a motion for leave to serve a late notice of tort claim on Nurse Byrd. [Docket Entry No. 69]. Nurse Byrd opposed and filed a cross-motion to dismiss. [Docket Entry No 74]. The cross-motion was denied without prejudice on April 5, 2012 [Docket Entry No. 77], and the motion for late tort notice was granted on August 30, 2012. [Docket Entry No. 99]. By order dated September 14, 2012, the Court also granted Plaintiff's July 16 motion to amend the complaint [Docket Entry No. 101], and Plaintiff filed her newest amended complaint, designated as the Fourth Amended Complaint, on September 21, 2012.[2]

---

[2] When Plaintiff filed the two separate cross-motions to amend in response to the various Defendants' motions to dismiss, she filed two different proposed amended complaints as exhibits to the cross-motions, designated as the proposed Second and Third Amended Complaints, leading to confusion as to the proper name of the current proposed pleading. The Court corrected the record in the March 8, 2013 Order, so that the currently operative pleading is the Second Amended Complaint, rather than the Fourth. [Docket Entry No. 129].

3

[Docket Entry No. 102].

Defendants Balicki, Dunlap-Pryce, and Paterson filed yet another motion to dismiss on November 25, 2012. [Docket Entry No. 111]. Nurse Byrd filed her own motion to dismiss on November 29, 2012. [Docket Entry No. 114]. By Order dated May 14, 2013, those motions were denied without prejudice, and leave was given to re-file [Docket Entry No. 143]; Nurse Byrd re-filed the motion to dismiss on May 20, 2013. [Docket Entry No. 144]. Defendants Balicki, Paterson, Dunlap-Pryce re-filed their own motion to dismiss on June 6, 2013, which was joined by Defendants Dimler and Teel (collectively, the DOC Defendants' and Nurse Byrd's motions are referred to as the "Motions to Dismiss"). [Docket Entry No. 145].

Throughout this entire period, the undersigned was engaged in case management. On February 23, 2012, the Court conducted a status conference call with counsel with regard to Plaintiff's request for emergent discovery necessary for her affidavit of merit. The Court also addressed the then-pending first motion for reconsideration.

An Initial Conference was conducted on November 26, 2012, at which the Court set a schedule for fact and expert discovery, as well as dispositive motions and amendments to pleadings. According to that schedule, any motions to amend the pleadings or add new parties was to be filed by no later than January 25, 2013, and all fact discovery was to be completed by May 17, 2013. *See* Order entered November 27, 2012 [Docket Entry No. 113]. The deadline for fact discovery was extended to July 31, 2013 during a status conference call on March 28, 2013, but the Court expressly denied leave to extend the time to amend because there had already been a number of amendments to the pleadings, noting that any further amendments must be on a showing that the request was based on information that Plaintiff did not know, and

4

**A60**

could not have known, prior to the January 25, 2013 deadline. *See* Orders dated January 28, 2013 [Docket Entry No. 119] and April 5, 2013 [Docket Entry No. 133].

During calls conducted on June 18, 2013, September 24, 2013, November 18, 2013, and January 28, 2014, the undersigned urged counsel to proceed with discovery. As is clear from the record on the present Motion, the DOC produced documents, including documents on discs, on or about April 13, 2013. Counsel's Certification in Support of Notice of Motion to Amend the Complaint ("Stangler Cert.") ¶ 6 [Docket Entry No. 206-2]; Certification in Support of Plaintiff's Reply on the Motion to Amend the Complaint ("Stangler Reply Cert.") ¶ 4 [Docket Entry No. 212-1]. The DOC made a further production on or about July 17, 2013 (the "July 2013 Production"). Stangler Cert. ¶ 6. A supplemental production was then made on or about October 23, 2013. *See* Exhibit 2 to the Declaration of Daniel Vannella ("Vannella Decl.") [Docket Entry No. 211-1 at 10]. Apparently Plaintiff had some concern about having received the October 23 production because she asked that it be produced again, which was done on or about January 6, 2014. Exhibit 3 to the Vannella Decl. [Docket Entry No. 211-1 at 13].

On November 1, 2013, the Court issued a 40-page decision granting in large part the Motions to Dismiss. [Docket Entry No. 153]. The claims against Balicki, Paterson, Dunlap-Pryce, Dimler, and Teel were dismissed. The state law claims against Nurse Byrd and the claims against her in her official capacity were dismissed, leaving only the §1983 claims as to Nurse Byrd. [Docket Entry No. 154]. Thus, as of November 1, 2013, "Defendants Jane Byrd, L.P.N., and Kintock Group [were] the only viable defendants remaining in the action." [Docket Entry No. 154].

On November 13, 2013, Plaintiff moved for reconsideration, citing for the first time the

5

information obtained by way of the July 2013 Production. [Docket Entry No. 155]. In addition, and by the same motion, Plaintiff sought leave to amend the complaint yet again. By Order dated November 15, 2013, the Court instructed Plaintiff to re-file the motion for reconsideration as a separate motion, with the motion to amend awaiting a determination of the reconsideration. [Docket Entry No. 158].

Accordingly, Plaintiff re-filed the motion for reconsideration on November 23, 2013. [Docket Entry No. 160]. That motion was fully briefed on January 2, 2014 [Docket Entry Nos. 174-175]; by letter dated March 4, 2014, however, Plaintiff sought leave to supplement the record to include evidence from a newly discovered disc that had previously been misfiled. [Docket Entry No. 182]. Plaintiff was given leave to re-file the motion for reconsideration, and did so on April 24, 2014. [Docket Entry Nos. 184, 185]. By Order and Opinion issued on July 25, 2014, the Court denied reconsideration but gave Plaintiff leave to file a motion to amend the complaint. [Docket Entry No. 203]. The present Motion followed.

By her current Motion, Plaintiff seeks to file the proposed Third Amended Complaint, a copy of which is attached to the Motion as Exhibit B. [Docket Entry No. 207-5]. Plaintiff seeks to add new facts to support her claims. She also seeks to add back in certain claims, such as the state law claims that were dismissed as to Nurse Byrd. In addition, she proposes to re-join certain defendants that have been dismissed, including defendants Balicki, Paterson, Dunlap-Pryce, Marusky, and Dimler. The proposed Third Amended Complaint would also add six new defendants that were not previously named and have never been served, including Officer Robert Russo, Chief Ralph Yansek, Lt. Dudich, Sgt. B. Stern, Sgt. Thomas Spence, and Officer Eric Large. Finally, the proposed new pleading would add a new count asserting a

6

**A62**

claim of Civil Conspiracy against the proposed new defendants, incorrectly designated as a second Count Six.

## II.   ARGUMENTS OF THE PARTIES

### A. Plaintiff's Arguments

Plaintiff point to various documents in support of her motion to amend:  Plaintiff's Brief in Support of Motion to Amend the Complaint ("Plaintiff's Brief") [Docket Entry No. 207]; the Stangler Cert. [Docket Entry No. 206-2]; the TAC [Docket Entry No. 207-5]; Letter Reply is support [Docket Entry No. 212]; and the Stangler Reply Cert. [Docket Entry No. 212-1].   In addition, Plaintiff has referred to the record submitted on the motion for reconsideration.   The following is a brief synopsis of the arguments made by Plaintiff, as culled from those various documents.

Plaintiff's Motion is premised on the fact that she became aware of or was provided with critical discovery after the Motions to Dismiss were fully briefed.   According to Plaintiff, that discovery would have led Judge Cooper to make a different decision on those motions because it provides additional facts and evidence as to the various failures committed by Defendants in the time leading up to the suicide of Decedent.   Plaintiff quotes language from the decision on the motion for reconsideration, and interprets that language as Judge Cooper's tacit approval of the sufficiency of the claims in light of the new evidence.   Plaintiff's Brief at 11-12 ("[T]he District Court concedes that the July 2013 materials indicate a claim on the merits") and at 19 ("Judge Cooper implied that a meritorious claim exists.").

As a threshold matter, Plaintiff argues that this Motion must be liberally granted to allow for a resolution of the dispute on the merits, rather than based on procedural technicalities.

7

Plaintiff contends that this is so particularly when the amendment is necessary because of an oversight rather than any bad faith. Plaintiff contends that under Rule 15, there is a strong presumption in favor of allowing amendments. Plaintiff's Brief at 17-18. She rejects the notion, put forward by Nurse Byrd, that there is a higher burden after judgment has been entered. Reply at 3.

As set forth in the moving papers, Plaintiff received a production of documents from the DOC on or about April 13, 2013. Stangler Cert. ¶ 6. That production included two discs containing DOC documents responsive to Plaintiff's requests. Stangler Reply Cert. ¶ 4. Plaintiff indicates that the contents of one disc was printed and reviewed; the other disc was misfiled and never reviewed (the "Misplaced Disc"). Stangler Cert. ¶ 6. The Misplaced Disc was not located until February 2014, after Plaintiff's counsel realized from a phone call with defense counsel that she was missing something. Plaintiff's Brief at 10.

Additional material information was produced by the DOC on or about July 17, 2013. Stangler Cert. ¶ 6. At the time of this supplemental production, the Motions to Dismiss had already been filed and were returnable.

Plaintiff's counsel recognized that the information contained in the July 2013 Production was pertinent to the issues raised on the Motions to Dismiss. She argues that the decision not to bring the new information to the attention of the Court as part of the Motions to Dismiss was "not contumacious or done in bad faith." Plaintiff's Brief at 11. Rather, she made the decision not to raise the new discovery while the motions were pending for a number of reasons. Plaintiff's Brief at 12. First, she believed the record was closed and any request to re-open it would be rejected. Plaintiff's Brief at 12, 19. Second, her assessment was that the pleadings as

8

submitted on the motions were sufficient to withstand dismissal. Plaintiff's Brief at 12, 19. In addition, she felt that other facts that were relevant were still missing from the July 2013 Production. Plaintiff's Brief at 12. Plaintiff's counsel also states that she believed that "the July 2013 policies did not support the claims in the complaint, and believed that exploration of those documents would await discovery." Plaintiff's Brief at 19. While counsel recognizes this strategy may have been mistaken, she argues it does not give rise to undue delay sufficient to deny the Motion, nor should the inconvenience to the Court from preparing a 40-page decision that Plaintiff now seeks to render moot serve as the basis for denial. Plaintiff's Brief at 12; Reply at 4.

Plaintiff further argues that there could be no prejudice to Defendants from allowing the amendment. Discovery has not been completed. Defendants, including those to be added for the first time, have been on notice of the claims and the possibility that they would be named, for quite some time. Plaintiff's Brief at 20. As to Nurse Byrd, there can be no surprise, since Plaintiff only seeks to amend to add support for the dismissed state law claims so that they can be reinstated. Reply at 2.

Finally, Plaintiff takes the position that the amendments should relate back to the date of the filing of the original complaint. Plaintiff's Brief at 23-26. She posits that this situation falls squarely within Rule 15(c): the amendments relate to the same transactions and conduct; the new defendants were on notice in light of the investigation the DOC must have conducted or notice should be imputed given that they have the same counsel as the existing defendants; and they should have known they would have been named but for a mistake, *i.e.*, Plaintiff's inability to identify them earlier. Plaintiff's Brief at 25-27.

9

**A65**

## B. Defendants' Arguments[3]

Defendants take issue with the proposed amendment for a number of reasons. They argue that the delay in bringing the Motion is undue, and the explanation given makes no sense. They also point to the prejudice they will suffer if the amendment is allow to proceed. Nurse Byrd further argues that the proposed amendment is futile as to her.

The DOC Defendants contend that the proposed new defendants have had no notice that they might be sued. Letter Brief on behalf of the DOC Defendants in Opposition to the Motion to Amend ("DOC Opposition") at 1 [Docket Entry No. 211]. The Attorney General does not represent those individuals and has apprised Plaintiff's counsel of that fact. DOC Opposition at 1. Indeed, the DOC Defendants argue that the Attorney General cannot be deemed to act on behalf of proposed defendants simply because they are or were state actors. DOC Opposition at 2. There is a process by which representation must be requested, that request must be evaluated, and if proper, granted. None of this has been done with regard to the proposed new defendants.

In their submission, the DOC Defendants also ask the Court to disregard what Plaintiff has described a mere oversight, going in great detail through the timeline of production of the discs, as well as the related correspondence and contemporaneous briefing. *See* DOC Opposition at 3-5. While the DOC Defendants take pains to say they do not intend to attack counsel personally, they point to the various interactions and say it is simply not reasonable for Plaintiff not to have known that the April 2013 production included the documents that Plaintiff now asserts are critical to the litigation.

---

[3] The DOC Defendants and Nurse Byrd filed separate opposition but make a number of the same arguments; their submissions will therefore be addressed together in this section.

10

In particular, the DOC Defendants point to the cover letter, dated April 19, 2013, detailing by Bates number the documents that were being produced. *See* DOC Opposition at 4; Docket Entry No. 175 at 2. According to the DOC Defendants, Plaintiff acknowledged that she had received the discovery by email dated September 24, 2013. DOC Opposition at 3. Defendants ask how Plaintiff did not notice that the documents she had reviewed began with Bates number 0306, and why she did not ask where the first 305 pages were. DOC Opposition at 11.

They also point to the fact that the Special Investigation Division report, which Plaintiff says was misplaced and is critical to her claims, was specifically referenced by the DOC Defendants in their production in response to Plaintiff's supplemental document requests on October 23, 2013 (the "October 23 Production"). DOC Opposition at 3-4; *see also* Exhibit 2 to the Vannella Decl. [Docket Entry No. 211-1 at 10] (identifying the SID report, previously produced, as responsive to Request 6, and giving the Bates numbers for the report). Counsel for Plaintiff received a second copy of the relevant portion of the October 23 Production attached to the DOC Defendants' December 2013 submission to the Court, and yet another copy at the request of Plaintiff's counsel in January 2014. DOC Opposition at 11; Vannella Decl. Exhibit 3 [Docket Entry No. 211-1 at 13]. Thus, the DOC Defendants argue that it is difficult to understand how Plaintiff was not aware of the production of the SID report, at least sufficiently to make further inquiry. Ultimately, they ask "what more did plaintiff need to figure it out?" DOC Opposition at 13.

Nurse Byrd takes this a step further, noting that the Misplaced Disc has no bearing on the claims as to her, and the only new information Plaintiff relies on in support of reasserting the

11

dismissed claims is contained in the July 2013 Production, which Plaintiff admits she had at least 3 ½ months prior to the Court's ruling on the Motions to Dismiss. Defendant Jane Byrd's Brief in Opposition to Plaintiff's Motion to Amend the Complaint ("Byrd Opposition") at 5.

Defendants also take issue with the fact that Plaintiff waited until the Motions to Dismiss were decided before raising the Misplaced Disc or the July 2013 Production and the need to incorporate them into the pleadings. DOC Opposition at 8; Byrd Opposition at 3. They take a different view of Judge Cooper's decision on reconsideration, in particular with regard to the failure to bring this information to the Court's attention while the motion was pending. DOC Opposition at 9 n.5. Nurse Byrd points to the Court's 40-page opinion on the Motion to Dismiss, and notes that the Court's efforts would be in vain if the amendment were allowed. Byrd Opposition at 4. Nurse Byrd would almost certainly file another motion to dismiss the state law claims based on immunity.

Nurse Byrd also points out that while the Motions to Dismiss were pending, the undersigned conducted status conferences on June 18 and September 24, 2013. At no point during those conferences did Plaintiff indicate that there was outstanding discovery that could impact the motions or ask for the Court's assistance in getting these critical documents. Byrd Opposition at 5-6.

According to Nurse Byrd, there is a heightened standard the Court should apply when considering a motion for leave to amend after judgment has been entered on the pleadings. In such cases, Nurse Byrd contends that the presumption for liberality disappears. Byrd Opposition at 6. Otherwise, Defendants argue, Plaintiff would be allowed to engage in seriatim theories, adjusting and amending based upon the briefing and decisions. Byrd Opposition at 7

12

Although the DOC Defendants advise that they do not oppose the amendment based on futility, Nurse Byrd does. She argues that the state law tort claims asserted against her have been dismissed based on a finding of immunity, and nothing in the July 2013 Production changes that, especially at this late date. Byrd Opposition at 7-8, 13-14.

Defendants disagree with Plaintiff's assertion that there would be no prejudice if the amendment were allowed. They point to the resources spent both by the parties and the Court in addressing repeated motions to amend, dismiss, and reconsider. DOC Opposition at 14-16; Byrd Opposition at 7-9. Allowing Plaintiff to add new defendants and claims, and to reassert claims that have been dismissed, would necessitate significant expansion of discovery, particularly with regard to the proposed new defendants. This would further delay resolution and increase costs, with resulting prejudice. DOC Opposition at 14-18. It would also put Nurse Byrd in the position of having to litigate the issue of immunity yet again. Byrd Opposition at 8-9.

Ultimately, Defendants contend that Plaintiff's own lack of diligence in reviewing the discovery that was produced, in making inquiry if something was missing, and in notifying the Court if there was a changed circumstance, require denial of the motion. Byrd Opposition at 9-10.

## III.    STANDARD OF REVIEW

Whether to grant a motion for leave to amend is within the sound discretion of the court. *See, e.g., Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1994). Pursuant to Rule 15, a party may amend once as a matter of course within a specified period of time. Fed. R. Civ. P. 15(a)(1). Once the allotted time has passed, a party may amend only with

13

**A69**

written consent of the adverse party or with leave of court. Fed. R. Civ. P. 15(a)(2). Requests for leave under Rule 15 are denied only where the court finds "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *See Foman v. Daivs*, 371 U.S. 178, 182 (1962).

Delay alone is not sufficient to deny a request for leave to amend, *Cureton v. NCAA*, 252 F.3d 267, 273 (3d Cir. 2001); "[h]owever, at some point the delay will become undue, placing an unwarranted burden on the court, or will become prejudicial, placing an unfair burden on the opposing party." *Id.* (internal citations omitted). The burden is on the moving party to "demonstrate that its delay in seeking to amend is satisfactorily explained." *Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 468 (D.N.J. 1990) (internal quotes omitted).

For prejudice to become "undue," it must rise to such a level that the non-moving party would be "unfairly disadvantaged or deprived of the opportunity to present facts or evidence." *Harrison*, 113 F.R.D. at 468 (internal quotations omitted). In evaluating the extent of any alleged prejudice, the court looks to the hardship on the non-moving party if the amendment were granted. *Cureton v. NCAA*, 252 F.3d 267, 273 (3d Cir. 2001). "Specifically, [courts] have considered whether allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or theories." *Id; see also Fourte v. Countrywide Home Loans, Inc.*, 2009 WL 2998110 (D.N.J. Sept. 15, 2009) ("In gauging prejudice, the Court should consider whether an amendment would require the opponent to expend significant additional resource to conduct discovery and prepare for trial or significantly delay the resolution of the dispute.") (internal citations omitted).

14

**A70**

Pursuant to Rule 15(c)(1)(B), an amendment to a pleading relates back to the filing date

of the original pleading when "the amendment asserts a claim or defense that arose out of the

conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading."

In addition, an amendment may relate back when:

> the amendment changes the party or the naming of the party against whom a claim
> is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by
> Rule 4(m) for serving the summons and complaint, the party to be brought in by
> amendment:
>> (i) received such notice of the action that it will not be prejudiced in
>> defending on the merits; and
>> (ii) knew or should have known that the action would have been brought
>> against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)((1)(C)(i)-(ii).   The relation back mechanism is designed to facilitate

resolution of a claim on the merits by allowing a plaintiff to sidestep a statute of limitation that

would otherwise prevent the addition of new claims or parties.   *See Glover v. FDIC*, 698 F.3d

139, 145 (3d Cir. 2012).   Although a critical aspect of relation back is a common core of

operative facts, "the touchstone for relation back is fair notice, because Rule 15(c) is premised on

the theory that a party who has been notified of litigation concerning a particular occurrence has

been given all the notice that statutes of limitations were intended to provide."   *Glover*, 698 F,3d

at 146 (internal citations omitted).

## IV.   ANALYSIS

The general rule is that leave to file amendments is to be liberally granted, in the absence

of certain factors, such as undue delay, prejudice, bad faith or futility.   *See, e.g., Prince v.
Aiellos*, Civ. No. 09-5429, 2012 WL 1883812, at *6 (D.N.J. May 22, 2012).   Defendant Nurse

Byrd argues that the liberal standard evaporates once judgment on the pleadings has been

15

**A71**

entered.  Byrd Opposition at 6-7.  Plaintiff disagrees, pointing out that Nurse Byrd relies on

cases outside of the Third Circuit for this proposition.  Reply at 3.

While the Third Circuit has not expressly ruled that the liberality standard disappears

after judgment has been entered, a number of cases within this Circuit make clear that as a case

progresses, a heightened standard may apply.  Although courts typically grant these requests

liberally, this standard becomes less flexible as the case proceeds and dispositive motions are

decided in a defendant's favor.  *See, e.g., In re Human Tissue Products Liability Litigation*,

2009 WL 737048 (D.N.J. Mar. 18, 2009) (relying on *Werner v. Werner*, 267 F.3d 288 (3d Cir.

2001)); *see also Reginella Construction Co., LTD., v. Travelers Casualty and Surety Co. of

America*, 971 F.Supp.2d 470, 479 (W.D. Pa. Sept. 5, 2013) *aff'd* 568 Fed. Appx. 174 (3d Cir.

2014).  At that point, the burden on a party seeking to amend becomes heavier as "the interests

in judicial economy and finality of litigation may become particularly compelling."  *Cureton v.

NCAA*, 252 F.3d 267, 273 (3d Cir. 2001); *In re Human Tissue Products Liability Litigation*, 2009

WL 737048 at *6 (D.N.J. Mar. 18, 2009).  In this instance, however, the Court finds that the

distinction is immaterial because the amendment at issue should not be allowed under either a

liberal standard or a heightened one.

Nurse Byrd has also argued that the proposed amendment is futile.  The issues that are at

the heart of the Motion, however, relate to delay and prejudice, and the Court therefore turns to

those issues first.

That there has been delay is beyond dispute.  Plaintiff received the productions at issue

in April and July 2013 but did not raise the relevance of the new information to the Court while

the Motions to Dismiss were pending, nor did she seek leave to amend.  Instead, she only did so

16

**A72**

after those motions had been granted in large part. When she finally alerted the Court to the fact that there was allegedly new evidence that would impact the ruling on the Motions to Dismiss, it was by way of a motion for reconsideration. At the time, Judge Cooper noted that Plaintiff did so without offering any explanation whatsoever for having waited so long. The question, therefore, is whether Plaintiff has now sufficiently explained the reasons for that delay such that the amendment should be allowed to proceed.

At the outset, the Court notes that there really are two elements of delay at issue:    that which relates to the information contained in the July 2013 Production, which Plaintiff now contends had a direct bearing on the issues to be decided by the Motions to Dismiss then pending before Judge Cooper, and Plaintiff's delay with regard to the information contained on the Misplaced Disc, of which counsel says she was unaware until February 2014.

The Court begins its analysis with the July 2013 Production and Plaintiff's failure to advise Judge Cooper that the documents produced were relevant to the issues raised in the pending Motions to Dismiss. Plaintiff offers several belated explanations for this failure. She indicates first that the Motions to Dismiss were already fully briefed and she did not believe she could re-open the record. Second, she states that she believed that her position on the Motions to Dismiss was strong and sufficient, without any need to bring the information contained in the July 2013 Production to the Court's attention. Finally, she says that she believed that "exploration of those documents would await discovery." Plaintiff's Brief at 19.

It is difficult to understand the first reason. Plaintiff has not refrained from seeking leave from the Court for various reasons, including to re-open the record on a motion. In fact, she did so on the motion for reconsideration after the record was complete, when she sought

17

**A73**

leave to add information found on the Misplaced Disc. *See* Plaintiff's March 4, 2014 letter to the Court [Docket Entry No. 182].

The second reason is more revealing. Plaintiff's counsel made a tactical decision not to bring the information contained in the July 2013 Production to the Court's attention because she deemed it unnecessary. In her brief and on Reply, Plaintiff says several times that she believed her position was sufficiently strong and the additional information was not needed. Plaintiff's Brief at 12, 19; Reply at 4. It was only after she was unsuccessful and much of the complaint was dismissed that she decided to introduce the new information from the July 2013 Production, by way her motion for reconsideration.

Plaintiff offers no explanation as to what she means when she says she believed that exploration of the July 2013 Production would "await further discovery," and the Court draws no conclusion from it. Instead, the Court looks to what actions Plaintiff actually took.

When Plaintiff received the July 2013 Production, she had several options. She could have alerted the Court to the fact that it impacted the pending Motions to Dismiss. She could have asked Judge Cooper for leave to supplement the record on the Motions to Dismiss or to cross-move to amend. She could have notified the undersigned that she wanted to seek leave to amend. She did none of these things, instead waiting until the Motions to Dismiss were largely granted, and then asking for a "do-over." Not only was this delay but it was clearly undue.

Next, the undersigned turns to the question of the Misplaced Disc. There is no dispute that this information was produced to Plaintiff in April 2013. Plaintiff suggests that the relevant inquiry is not when she received the production but rather, when she became aware of it. She contends that when the production was made, the disc at issue was placed into the wrong file and

18

never reviewed. Counsel has stated in the March 4, 2014 letter to the Court that she did not discover the error until February 26, 2014, and that she acted promptly thereafter to bring the issue to the attention of the Court. [Docket Entry No. 182].

Defendants ask the Court to look not at when counsel actually became aware of the Misplaced Disc but instead, to consider the many opportunities Plaintiff had to realize that the disc was missing and to follow up or at least make inquiry. Despite the many opportunities, no inquiry was made until counsel for defendants made Plaintiff's counsel aware of the oversight during a conversation in February 2014.

Defendants give a detailed chronology of the many clues that should have alerted Plaintiff's counsel to the fact that something was missing. First, there was the cover letter that accompanied the April 2013 production. The letter specifically indicated that the production included bates numbered documents in the range of 0001-0392, including 0001-305, which were being produced as confidential under the Consent Protective Order. [Docket Entry No. 175 at 2]. In this regard, Defendants ask how it could not have occurred to anyone that they had documents in the Bates range of 0306-0918 but not from 0001-0305. DOC Opposition at 12. They also point to the supplemental production made in October 2013. In that production, Defendants refer to and rely on the SID report, which Plaintiff now claims is so critical to her case that she should be allowed to amend again. The document is referred to by name and by bates number; if Plaintiff did not have a copy of the SID report or of documents in that bates range, she should have realized as much when she reviewed the October production. Defendants also point out that the October production was provided to Plaintiff two additional times, first with the DOC Defendants' December 30, 2013 submission to the Court, and then

19

**A75**

again, in January 2014, when Plaintiff's counsel asked for another copy.  At no point did
Plaintiff ask any follow up questions or make any inquiry as to the contents of the Misplaced
Disc.  Thus, Defendants argue that it is Plaintiff's own lack of diligence that caused the delay,
and this should not be excused.  The undersigned agrees.  There were repeated opportunities,
and repeated clues, that should have made a diligent attorney aware that something was missing.
That there was no inquiry made, and no follow-up, leads to the inescapable conclusion that the
delay with regard to the Misplaced Disc was in fact undue.

This does not end the inquiry, however.  The Court next looks to whether there would be
prejudice if the amendment were allowed.  Defendants point to the many motions that they have
had to litigate in this case, and indeed, there have been many.  All defendants, including Mercer
County, which was ultimately dismissed by stipulation, filed motions to dismiss; the DOC
Defendants and Nurse Byrd have filed multiple motions to dismiss.  They have also opposed
numerous motions to amend, filed by Plaintiff separately or as cross-motions, and have had to
brief opposition to several motions for reconsideration and an appeal.  At this point, they ask the
Court to intercede by denying the Motion and putting a stop to what seems like an endless cycle.

The DOC Defendants further object to Plaintiff's adding completely new defendants at
this late stage of the litigation.  They vigorously reject the notion, put forward by Plaintiff, that
the Office of the Attorney General represents these new individual defendants.  The DOC
Defendants' counsel points to the process in place for the Attorney General's office to represent
state actors when they are sued, and say that this process has not been invoked and cannot be
unless and until those individuals are actually served.  They also object to the idea that the
claims in the complaint can relate back as to these individuals.

20

**A76**

Nurse Byrd is particularly cogent in this regard, noting that all of the state law claims against her have been dismissed as a result of the prolonged motion practice. She has prevailed on her immunity claims, which were dismissed by the November 1, 2013 Order. The Motion seeks to revive all of those claims, and would lead to another round of motions to dismiss, all to the detriment of Nurse Byrd.

The undersigned finds that there would in fact be prejudice to the defending parties if the amendment would allowed to proceed. The current defendants, as well as those who have already been dismissed, have spent significant resources on this litigation, and they would essentially be forced back to square one.

Furthermore, there is nothing beyond speculation to support the notion that the proposed new defendants are on notice of the action or the claims against them, or that there would not be prejudice to them in defending on the merits. Plaintiff has failed to articulate a sufficient basis for these claims to relate back under Rule 15(c).

Finally, the Court considers the impact any amendment would have on the case itself and on the judicial economy of the Court. The Complaint was originally filed on January 14, 2011. In the almost four years since the filing, the undersigned has conducted at least eight conferences. During that time, the Court has considered at least four motions to dismiss, four motions for leave to amend (including two cross-motions), three motions for reconsideration, one motion for leave to serve late notice of a tort claim, and one appeal – not counting the additional motions that were re-filed at the Court's instruction to address procedural issues. Each time, the parties engaged in extensive briefing, and the Court had to spend time considering the issues and delivering a decision. While Plaintiff makes light of any prejudice to the Court resulting from

21

**A77**

her delay in notification of new evidence, twice referring to it as no more than an

"inconvenience," the undersigned is not as dismissive of the time that was spent in preparing a

40-page opinion, which would be rendered moot if the amendment were allowed to proceed.

*See also* July 25, 2014 Memorandum Opinion at 11 n.2 ("[t]he Court invested considerable time

evaluating the motions to dismiss, and Plaintiffs' counsel's disregard for the waste of judicial

resources is disconcerting.") [Docket Entry No. 203].

While the Court is not insensitive to the possibility of human error in any document

production, the delay caused by the repeated errors, oversights, and strategy decisions here can

only be described as undue.  Furthermore, allowing the amendment at this point of the litigation,

after so much motion practice, would only cause further delay, to the prejudice of the parties.

Accordingly, the Motion is denied.[4]

---

[4] Because the Court has found that the amendment should not go forward based on undue delay and substantial
prejudice, the Court does not reach futility in terms of the immunity arguments raised by Nurse Byrd.  The
undersigned does note, however, that although Plaintiff asserts that "the District Court concedes that the July 2013
materials indicate a claim on the merits," that statement is without citation.  Plaintiff's Brief at 12.  Indeed, Judge
Cooper, in the July 25 Opinion, seemed to take great care not to express any view on the merits of a motion to
amend.

## V.  CONCLUSION

For the foregoing reasons, and for good cause shown,

**IT IS** on the **8th** day of **December, 2014,**

**ORDERED** that the Motion to Amend the Complaint [Docket Entry No. 206] is

DENIED.

**LOIS H. GOODMAN**
**United States Magistrate Judge**

23

**A79**

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOAN MULLIN, administratrix of the ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually,<br><br>      Plaintiff,<br><br>  v.<br><br>ADMINISTRATOR KAREN BALICKI, et al.,<br><br>      Defendants. | CIVIL ACTION NO. 11-247 (MLC)<br><br>**MEMORANDUM OPINION** |

**PLAINTIFF,** Joan Mullin, administratrix of the estate of her son, Robert Mullin, earlier moved before the Magistrate Judge for leave to amend the second amended complaint to add new causes of action, facts, and additional parties ("Motion to Amend"). (Dkt. 207 at 1, 9–15 (sealed).)  Plaintiff asked the Magistrate Judge to permit amendment, because she had located a misfiled disc ("Misfiled Disc") produced in discovery on April 13, 2013. (Id. at 17.)  Plaintiff did not realize this error, however, until February of 2014. (Id. at 25.)

**PLAINTIFF** also received supplemental discovery documents concerning "policies and procedures covering a variety of issues" ("Supplemental Discovery") on July 17, 2013. (Id.)  During the time that Plaintiff received and located the Misfiled Disc and Supplemental Discovery, motions to dismiss were pending before this Court.  (See,

**A80**

e.g., dkt. 154.) Both the Misfiled Disc and the Supplemental Discovery were relevant, in

Plaintiff's view, to the then-pending motions to dismiss. (See dkt. 207 at 16–17.)

Plaintiff did not bring this to the Court's attention, however, until after the Court decided

the pending motions to dismiss. (Dkt. 154.) Thereafter, Plaintiff moved for

reconsideration of the decision, which this Court denied. (See dkt. 204.)

     **THE MAGISTRATE JUDGE** denied the Motion to Amend by an Opinion and

Order dated December 8, 2014 ("12-8-14 Opinion and Order"). (Dkt. 220.) The

Magistrate Judge, in support of this ruling, explained that: (1) "Plaintiff's own lack of

diligence ... caused the delay" related to the discovery of the Misfiled Disc, especially in

light of the "repeated opportunities, and repeated clues, that should have made a diligent

attorney aware that something was missing"; and (2) permitting Plaintiff to amend the

complaint would commit "prejudice to the defending parties" who had already "spent

significant resources on this litigation ..." (Id. at 20–21.)

     **THE MAGISTRATE JUDGE** held that Plaintiff's delay was "undue" because,

upon receiving and locating the Misfiled Disc and Supplemental Discovery, Plaintiff

failed to: (1) alert "the Court ... that it impacted the [then] pending Motions to Dismiss";

or (2) request "leave to supplement the record on the Motions to Dismiss or to cross-

move to amend." (Id. at 18.) The Magistrate Judge also rejected Plaintiff's argument

that the proposed amendments were sufficiently related to the original complaint to

permit amendment under Federal Rule of Civil Procedure ("Rule") 15(c). (Id. at 9, 21.)

With respect to the expenditure of judicial resources, the Magistrate Judge noted that the

Court had previously "considered at least four motions to dismiss, four motions for leave

Case: 16-2896   Document: 003112519094   Page: 160   Date Filed: 01/23/2017
Case 3:11-cv-00247-MLC-LHG   Document 229   Filed 07/13/15   Page 3 of 5 PageID: 3724

to amend (including two cross-motions), three motions for reconsideration, one motion for leave to serve late notice of a tort claim, and one appeal – not counting the additional motions that were re-filed at the Court's instruction to address procedural issues." (Id. at 21.) Based on the foregoing, the Magistrate Judge concluded:

> [T]he delay caused by the repeated errors, oversights, and strategy decisions here can only be described as undue. Furthermore, allowing the amendment at this point of the litigation, after so much motion practice, would only cause further delay, to the prejudice of the parties.

(Id. at 22.)

**PLAINTIFF** timely appealed the 12-8-14 Opinion and Order pursuant to Rule 72 and Local Civil Rule 72.1(c). (Dkt. 221.)

**THE COURT** carefully reviewed and considered the papers submitted by the parties and the 12-8-14 Opinion and Order. The Court resolves the appeal without oral argument pursuant to Local Civil Rule 78.1(b).

**IT APPEARS** that a motion for leave to amend a pleading is non-dispositive, and thus, may be entered by a magistrate judge. See 28 U.S.C. § 636(b)(1)(A). A district court, upon reviewing non-dispositive matters, may modify, vacate, or reverse magistrate judge decisions that are "clearly erroneous or contrary to law." Id.; see also Jackson v. Chubb Corp., 45 Fed.Appx. 163, 166 n.7 (3d Cir. 2002) (internal quotation and citation omitted). A finding is clearly erroneous when, although there may be some evidence to support it, the reviewing court on considering all of the evidence is left with the definite and firm conviction that a mistake has been committed. See Kounelis v. Sherrer, 529 F.Supp.2d 503, 518 (D.N.J. 2008). A ruling is contrary to law if the Magistrate Judge

misinterpreted or misapplied applicable law. See Gunter v. Ridgewood Energy Corp., 32

F.Supp.2d 162, 164 (D.N.J. 1998). The reviewing district court under the clearly

erroneous standard of review will not reverse the Magistrate Judge's determination even

if the court might have decided the matter differently. See Wortman v. Beglin, No. 03-

495, 2007 WL 2375057, at *2 (D.N.J. Aug. 16, 2007).

PLAINTIFF argues on appeal that, inter alia: (1) "delay in and of itself is not a

basis to deny amendment of the Complaint absent real prejudice"; and (2) "[t]here is no

prejudice to the defendants in granting the amendment." (Dkt. 223 at 9 (sealed); see also

dkt. 223-2 at 5 (sealed).)

DEFENDANTS Karen Balicki, Robert Paterson, Marie Dunlap-Pryce, Officer

Dimler, and Jane Byrd (collectively, "Defendants") oppose the appeal and argue, inter

alia, that the Magistrate Judge: (1) "properly considered interests of judicial economy and

finality of litigation"; and (2) "correctly found that Plaintiff's proposed amendments were

unduly delayed and prejudicial." (Dkt. 224 at 1, 13; dkt. 225 at 1, 5; see also dkt. 153 at

1; dkt. 94 at 1.)

THE COURT acknowledges that a party seeking to amend a pleading 21 days

after its filing must apply for "the court's leave," which is to be "freely give[n] ... when

justice so requires." Fed.R.Civ.P. 15(a)(1)–(2). A court may deny leave to amend a

pleading, however, upon a finding of "undue delay, bad faith or dilatory motive on the

part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment,

[and] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962).

4

**A83**

**THE COURT** finds that the Magistrate Judge's conclusions were not clearly

erroneous or contrary to law because here: (1) Plaintiff offers no reasonable explanation

for the delay in notifying the Court as to the significance of the Misfiled Disc and

Supplemental Discovery; and (2) permitting the amendment would unduly prejudice

Defendants and place an unwarranted burden on the Court.  (Dkt. 223-1 at 5 (sealed)

(Plaintiff acknowledging "in hindsight … the better course of action would have been to

advise the Court during the pendency of the Motions to Dismiss that the [Supplemental

Discovery] supported plaintiff's pleadings.").)  See also Jang v. Bos. Sci. Scimed, Inc.,

729 F.3d 357, 368 (3d Cir. 2013) (holding that the district court "did not abuse its

discretion in denying [a] post-judgment motion for reconsideration and leave to amend"

where movant "could have moved to amend his complaint at any time before" the district

court granted dismissal); Cureton v. NCAA, 252 F.3d 267, 272–73 (3d Cir. 2001) ("A

district court may deny leave to amend a complaint if a plaintiff's delay in seeking

amendment is undue … or prejudicial to the opposing party.").  Accordingly, the Court

will affirm the 12-8-14 Opinion and Order, because the Magistrate Judge did not commit

any mistake or misinterpret or misapply any applicable law.  See Wortman, 2007 WL

2375057, at *2; Gunter, 32 F.Supp.2d at 164.

**THE COURT** will issue an appropriate order.

_s/ Mary L. Cooper_
**MARY L. COOPER**
United States District Judge

**Dated:** July 13, 2015

5

**A84**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOAN MULLIN, administratrix of the ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually, | : : : : : | CIVIL ACTION NO. 11-247 (MLC) |
| | : | |
| Plaintiff, | : | ORDER |
| | : : | |
| v. | : : | |
| ADMINISTRATOR KAREN BALICKI, et al., | : : | |
| | : : | |
| Defendants. | : : | |

For the reasons stated in the Court's Memorandum Opinion, dated July 13, 2015, **IT**

**IS** on this   13th   day of July, 2015, **ORDERED** that the Magistrate Judge's December

8, 2014 Opinion and Order **(dkt. 220),** from which Plaintiff appeals **(dkt. 221),** is

**AFFIRMED;** and it is further

**ORDERED** that the Clerk of the Court will designate the appeal **(dkt. 221)** as

**TERMINATED.**

_s/ Mary L. Cooper_
**MARY L. COOPER**
United States District Judge

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually, | CIVIL ACTION NO. 11-247 (MLC) |
| | **MEMORANDUM OPINION** |
| Plaintiff, | |
| v. | |
| ADMINISTRATOR KAREN BALICKI, et al., | |
| Defendants. | |

**COOPER, District Judge**

Plaintiff Joan Mullin, individually and as administratrix of the estate of her son,

Robert Mullin ("Mullin"), commenced this action against the following defendants in their

"personal, individual and professional capacities" who represent the Department of

Corrections of the State of New Jersey, South Woods State Prison, and Central Reception

and Assignment Facility ("CRAF"): Administrator Karen Balicki; Director Robert Patterson;

and Director Marie Dunlap-Pryce. (See dkt. 102.)[1] Plaintiff further brought this action

against the following defendants in their "personal, individual and professional capacities":

Jane Byrd, LPN ("Byrd"); Erin Marusky, RN ("Marusky"); Officer Dimler; and Beatrice

Teel, RN. (See id.) Plaintiff also named the Kintock Group and Mercer County as

defendants. (See id.)

---

[1] The Court will cite to the documents filed on the Electronic Case Filing System ("ECF") by referring
to the docket entry numbers by the designation of "dkt." Pincites reference ECF pagination.

Byrd now moves for summary judgment on all claims asserted against her. (See dkt. 234.) Plaintiff opposes the motion. (See dkt. 241.) The Court will determine the motion on the papers and without oral argument pursuant to Local Civil Rule 78.1(b). For the reasons stated below, the Court will grant Byrd's motion.

## BACKGROUND

### I. Factual History

The Court assumes the parties' familiarity with the facts underlying this action and will provide a brief overview of the facts pertaining to this motion.[2] Plaintiff's allegations arise out of Mullin's suicide while incarcerated at CRAF. (See generally dkt. 45.)

### A. CRAF Medical Screening Policy

Pursuant to CRAF's medical screening policy, a newly admitted inmate is screened by the medical staff within four hours of arrival. (See dkt. 234 at 6; dkt. 241 at 11; see also dkt. 241-24 at 2–8.) The medical screening is documented in CRAF's electronic medical records. (See dkt. 234 at 6; dkt. 241 at 13.) If an inmate responds affirmatively to a mental health item during the screening, the inmate is flagged as "special needs" and the screening nurse must immediately refer the inmate to the Lead Psychologist or designee for further mental health evaluations. (See dkt. 234 at 6; dkt. 241 at 13.) This psychological follow-up must occur within seventy-two hours of the medical screening. (See dkt. 234-5 at 27.) If the screening nurse makes a referral of an "emergent nature," the inmate will be placed under "close or constant watch." (See dkt. 234 at 6; dkt. 241 at 11.) An emergent referral requires

---

[2] The Court incorporates by reference its November 1, 2013 Memorandum Opinion, which provides a detailed account of the facts and procedural history of this action. (See dkt. 153.)

2

a psychological evaluation of the inmate within four hours of the medical screening. (See dkt. 234-5 at 27–28.) The inmate will remain under "close or constant watch" until such an evaluation is made. (See id.)

Byrd's testimony indicates that she had knowledge of these policies. (See dkt. 234-5 at 19–23; dkt. 241-14 at 3.) For those policies that Byrd could not recall, she testified that her practice was always to report to her supervisor. (See dkt. 241-15 at 8.) Byrd was trained on how to identify special needs inmates, and was aware of the electronic medical recording requirements regarding special needs inmates. (See dkt. 234-5 at 19; dkt. 241-14 at 5.) Byrd testified that before beginning each medical screening, she checked the inmate's medical records for any mental health history. (See dkt. 241-14 at 8–10.) Byrd stated that she did not read an inmate's entire electronic medical record, but rather searched for whether the inmate was designated as special needs at another facility, or otherwise had a mental health history indicator on the file. (See id.)

Byrd also testified that she was aware of the repercussions of designating an inmate as special needs, i.e., that it would trigger "specific actions regarding how one is to be handled in an administrative detention." (See dkt. 241-14 at 14.) Byrd also knew that she was required to document when an inmate exhibited signs of self-harm or a desire to harm others, and to immediately report it to her supervisor. (See dkt. 234-5 at 20.) Byrd testified that she did not determine inmates' housing assignments, and that this was the role of her supervisor. (See dkt. 241-14 at 4.) Byrd also testified that she did not have control over when the psychologist would see an inmate, besides referring an inmate to her supervisor when she felt the inmate needed emergent care. (See dkt. 241-14 at 12.)

## B.    Mullin's January 2009 Intake

In January 2009, Mullin was removed from a halfway house and taken into the custody of the New Jersey Department of Corrections after being found under the influence and in possession of cocaine and opiates. (See dkt. 234 at 5; dkt. 241 at 6–7.) Mullin was taken to CRAF on January 14, 2009. (See dkt. 234 at 4.) Mullin first met with a social worker and requested to be placed on special needs status for his anxiety. (See id. at 5–6.) The social worker listed him on the special needs roster and referred him to a psychiatrist for possible anxiety medication. (See id.; dkt. 241 at 9.) On January 16, 2009, Byrd conducted a four-hour medical screening of Mullin. (See dkt. 234 at 6; dkt. 241 at 10.) The mental health portion of the intake and Mullin's responses are reproduced below:

| Question | Answer |
| --- | --- |
| Are you currently or have you ever been on psychiatric medication? | No |
| Have you ever been hospitalized or treated for mental illness? | Yes, anxiety and depression – 2006 |
| Are you thinking about killing yourself? | No |
| Have you ever attempted suicide? | Yes, 4 years ago |
| Has any member of your immediate family made a serious suicide attempt or committed suicide? | No |
| Did you hold a position of authority in the community? | No |
| Was your case a shocking crime or given media attention? | No |
| Do you feel hopeless about your future? | Yes |
| Have you experienced a significant loss, such as the loss of a job you valued or the loss of a significant relationship, or death of someone close to you in the past 6 months? | No |

(Dkt. 241-12 at 3.)

4
A89

During the screening, Byrd noted that Mullin did not refuse to answer questions, and did not cry, talk to himself, have noticeable scars on his wrist or neck, or appear agitated. (See id.) Following Byrd's screening, Marusky cleared Mullin for placement in CRAF's Temporary Close Custody Unit. (See dkt. 234 at 7.)[3] On January 17, 2009, Mullin committed suicide in his cell. (See dkt. 153 at 6.) He was pronounced dead at 4:49 a.m. (See id.)

## II.   Procedural History

Plaintiff filed the second amended complaint on September 21, 2012. (See dkt. 102.) Plaintiff alleged several federal constitutional claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), as well as analogous claims under the New Jersey Constitution pursuant to the New Jersey Civil Rights Act ("NJCRA"). (See id. at 9–14.) See also N.J.S.A. 10:6-2. Plaintiff also set forth various claims arising under common law, such as negligent hiring, intentional and negligent infliction of emotional distress, abuse of process, and medical malpractice. (See dkt. 102 at 9–14.)

Mercer County was dismissed from the action by stipulation of the parties on March 22, 2011. (See dkt. 15.) Plaintiff agreed to the dismissal of the claims against Marusky by order of the Court on May 2, 2013. (See dkt. 139.) All claims against Administrator Karen Balicki, Director Robert Patterson, Director Marie Dunlap-Pryce, Officer Dimler, and Beatrice Teel, RN were dismissed on November 1, 2013 by way of the Court's order and

[3] The Temporary Close Custody Unit is designated for inmates who are removed from the general population for disciplinary or administrative reasons including rule infractions, alleged violations of prohibited acts, protective custody, or for special observation. (See dkt. 234 at 7.) Pursuant to CRAF policy, inmates in close custody are monitored by a custody officer every fifteen minutes. (See dkt. 234-6 at 6.)

5
**A90**

memorandum opinion ("11-1-13 Order & Opinion"). (See dkt. 153; dkt. 154.) The 11-1-13

Order and Opinion also dismissed all common law claims against Byrd. (See id.) Kintock

Group was dismissed from the action by stipulation of the parties on November 13, 2015.

(See dkt. 246.) Thus, Byrd is the only remaining defendant, and the only remaining viable

claims are the alleged constitutional violation under the Eighth Amendment and the

analogous provision of the New Jersey Constitution.

## DISCUSSION

### I.    Legal Standard

#### A.    Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment is proper "if the

movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are those "that

could affect the outcome" of the proceeding, and "a dispute about a material fact is genuine if

the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving

party." Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (internal citation and

quotation omitted).  This evidence may include "citing to particular parts of materials in the

record" or a "showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the

fact." Fed.R.Civ.P. 56(c)(1)(A)–(B).

If the movant demonstrates an absence of genuinely disputed material facts, then the

burden shifts to the non-movant to demonstrate the existence of a genuine issue for trial. See

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non–
moving party, there is no genuine issue for trial." Id. (internal quotation marks omitted).
The non-movant must show the existence of issues for trial by referring to the record. See
Fed.R.Civ.P. 56(c)(1).

When determining whether a genuine dispute of material fact exists, the Court must
view the evidence in the light most favorable to the non-movant and draw all reasonable
inferences in that party's favor. See Scott v. Harris, 550 U.S. 372, 380 (2007); Wishkin v.
Potter, 476 F.3d 180, 184 (3d Cir. 2007). If the non-movant fails to demonstrate that at least
one genuine factual dispute exists for trial, then the Court must determine whether the
movant is entitled to judgment as a matter of law. See McCann v. Unum Provident, 921
F.Supp.2d 353, 357 (D.N.J. 2013). "A movant is entitled to judgment as a matter of law if, at
trial, no reasonable jury could find for the non-moving party." Id.

### B.  Section 1983

A plaintiff may have a cause of action under Section 1983 for certain violations of
constitutional rights. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to the party
> injured. . . .

42 U.S.C. § 1983.

To state a claim for relief under Section 1983, a plaintiff must allege: (1) the violation
of a right secured by the Constitution or laws of the United States; and (2) that the alleged

deprivation was committed or caused by a person acting under color of state law. See Harvey v. Plains Twp. Police Dep't, 635 F.3d 606, 609 (3d Cir. 2011). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." West v. Adkins, 487 U.S. 42, 49 (1988) (internal quotation omitted). Further, "a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." Id. at 50.

This Court discussed at length in its 11-1-13 Opinion the circumstances under which the United States Court of Appeals for the Third Circuit ("Third Circuit") recognizes that a court may impose liability under Section 1983 for prison suicides. (See dkt. 153 at 23–33.) See also Colburn v. Upper Darby Twp., 946 F.2d 1017 (3d Cir. 1991) (hereinafter "Colburn II"); Colburn v. Upper Darby Twp., 838 F.2d 663 (3d Cir. 1988). A plaintiff bringing a Section 1983 claim based on a prison suicide must establish three elements: "(1) the detainee had a particular vulnerability to suicide, (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers acted with reckless indifference to the detainee's particular vulnerability." Colburn II, 946 F.2d at 1023 (internal quotation omitted).

A particular vulnerability to suicide exists if the suicide was "a strong likelihood, rather than a mere possibility." Colburn II, 946 F.2d at 1024. The Third Circuit defined a strong likelihood as follows:

8

**A93**

> The strong likelihood of suicide must be "so obvious that a lay person would easily recognize the necessity for preventative action; the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.

Id. at 1025 (internal citation and quotation omitted).

"[I]t is clear that mere negligence on the part of prison officials is insufficient to establish a claim pursuant to § 1983." Kulp v. Veruete, 267 Fed.Appx. 141, 143 (3d Cir. 2008); see also Hinton v. United States, No. 14-854, 2015 WL 737584 (M.D. Pa. Feb. 20, 2015) (granting summary judgment for prison officials because there was not "strong likelihood" that decedent might have committed suicide, as decedent had not demonstrated suicidal ideation in six years).

## C. NJCRA

The NJCRA provides, in part:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State . . . may bring a civil action for damages and for injunctive or other appropriate relief.

N.J.S.A. 10:6-2.

The NJCRA is interpreted as analogous to Section 1983. See, e.g., Szemple v. Corr. Med. Servs., 493 Fed.Appx. 238, 241 (3d Cir. 2012); Trafton v. City of Woodbury, 799 F.Supp.2d 417, 443 (D.N.J. 2011); Rezem Family Assocs., LP v. Borough of Millstone, 423 N.J.Super. 103, 115 (N.J. App. Div. 2011). Plaintiff bases the NJCRA claim on Article I, Paragraph 12 of the New Jersey Constitution, which provides, in relevant part: "Excessive bail shall not be required, excessive fines shall not be imposed, and cruel and unusual

punishment shall not be inflicted." N.J. Const. Art. I, Para. 12. This provision of the New Jersey Constitution is interpreted as corresponding to the Eighth Amendment. See Edwards v. Power, No. 07-4121, 2014 WL 5092916, at *5 (D.N.J. Oct. 10, 2014); see also State v. Des Marets, 92 N.J. 62, 82 (1983).

## II. Analysis

### A. Section 1983

Plaintiff is first required to show that Mullin had a "particular vulnerability to suicide." See Colburn II, 946 F.2d at 1024. "[T]he requirement of reckless or deliberate indifference implies that there must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." Id. (internal quotations omitted). In support of this first factor, Plaintiff argues that there was a strong likelihood of suicide in the present case because Mullin was a special needs inmate, "had a history of suicide," and answered "yes" to when asked if he felt hopeless during the medical screening. (See dkt. 241-1 at 11.)

Byrd argues that Mullin was classified as special needs due to his anxiety. (See dkt. 244 at 6.) She further argues that Mullin denied wanting to hurt himself, was not currently taking any psychiatric medications, and did not present himself with any emergent conditions or suicidal ideation that would require an immediate psychological referral. (See dkt. 234-1 at 9.)

The Court finds that Mullin's previous suicide attempt reflects past suicidal ideation. See Estate of Cills v. Kaftan, 105 F.Supp.2d 391, 398 (D.N.J. 2000). But the Third Circuit instructs that a decedent's particular vulnerability to suicide must be a "strong likelihood" for the purpose of Section 1983 liability to attach. Colburn II, 946 F.2d at 1024. Here, Mullin

indicated during his medical screening that he did not want to harm himself. (See dkt. 241-12 at 3.) This answer was consistent with Mullin's statement to a nurse and the social worker two days prior. (See dkt. 234-1 at 7.) Mullin had no other suicide attempts in the intervening years. (See id.) He was not "acting irate, talking to himself, crying, [or] belligerent" during the medical screening, and thus immediate psychological help was not necessary under CRAF policy. (See dkt. 241-14 at 12.)

Moreover, Mullin's acknowledgement of feeling hopeless about his situation is not unusual given the circumstances: he had previously been serving his sentence in a halfway house, and was sent to CRAF for a violation of probation when he was found in possession and under the influence of cocaine and opiates. (See dkt. 240 at 6.) Although Mullin's past suicide attempt may illustrate a mere possibility of suicide, Plaintiff has not presented further evidence showing that this suicide attempt made Mullin's suicide a "strong likelihood" as required under Colburn II. See Colburn II, 946 F.2d at 1024. The Court, when viewing this evidence in favor of Plaintiff, does not find that there was a strong likelihood of suicide given the facts above.

Plaintiff must next show that the strong likelihood of suicide was so obvious that a layperson would easily recognize the necessity for preventative action. See id. at 1025. "Custodians have been found to 'know' of a particular vulnerability to suicide when they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." Id. at n.1. Here, Plaintiff argues that Byrd knew or should have known of the strong likelihood of suicide because Mullin was designated as a special needs inmate "within hours prior to his

evaluation by Nurse Byrd." (See dkt. 241-1 at 9.)  At the same time, Plaintiff argues that Byrd was under a "duty to specifically put in the chart the classification of Mullin as a Special Needs inmate." (See id. at 10.)  Byrd argues that she could not know of a strong likelihood of suicide in this case because "Mullin did not demonstrate any suicidal ideation in the four-year period prior to his death." (Dkt. 234-1 at 7.)

A fair reading of the record indicates that an inmate can be designated as special needs when he or she "meets criteria of axis I and/or axis II disorder per the most recent edition of the Diagnostic and Statistical Manual (DSM) which interferes with the inmate's ability to meet the functional requirements of prison life without mental health treatment." (See dkt. 241-24 at 3.)  Thus, special needs status does not equate to suicide risk.  Here, there was no obvious suicide threat, no history of repeated suicide attempts, or no psychiatric diagnosis identifying suicidal propensities.  Colburn II, 946 F.2d at 1025 n.1.  It is also inapposite that Byrd herself did not designate Mullin as special needs, as the social worker had already added Mullin to the special needs roster two days prior.  (See dkt. 234 at 5–6; dkt. 241 at 9.)  Moreover, pursuant to CRAF policy, Byrd indicated that Mullin required a psychological follow-up because of his affirmative response to one of the mental health items during her screening.[4]  Even if the Court found that there was a strong likelihood of suicide in this case, the Court cannot conclude that a reasonable jury would find that Byrd

---

[4] Plaintiff also argued that Byrd was "specifically aware that the failure to properly designate the inmate and notify mental health could result in suicide." (See dkt. 241-1 at 10.)  This argument is conclusory.  See Colburn II, 946 F.2d at 1027 ("Only an exercise in impermissible judicial hindsight could justify holding [these officers] responsible for [the subsequent] suicide.").  The record indicates that Mullin was already designated as a special needs inmate by the social worker, and that Byrd had requested a psychological follow-up for Mullin.  (See dkt. 234 at 5–6; dkt. 241 at 9.)

knew or should have known of this strong likelihood based upon Mullin's designation as special needs.

Lastly, Plaintiff must show that the prison officers "acted with reckless indifference to the detainee's particular vulnerability." See Colburn II, 946 F.2d at 1023 (internal quotations omitted). "[T]here can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." Id. at 1025. The record reflects that Byrd understood the CRAF policies on medical screenings and the mental health needs of inmates. See Background, Section I.A., supra. There is no evidence indicating that Byrd deviated from these policies, i.e., acted culpably, with respect to Mullin. Rather, the record indicates that Byrd followed protocol by properly indicating that Mullin required a psychological follow-up because of his special needs status and his affirmative response to one of the screening questions. This was the extent of Byrd's interaction with Mullin; she played no role in his placement within CRAF. Thus, the Court finds that the alleged conduct of Byrd does not amount to reckless or deliberate indifference.

The Court concludes that Plaintiff has not presented evidence from which a jury could reasonably conclude that: (1) Mullin had a particular vulnerability to suicide; (2) Byrd knew or should have known of the decedent's particular vulnerability to suicide; and (3) Byrd acted with reckless indifference to that vulnerability, such that Byrd is liable under Section 1983.

<div align="center">13</div>
<div align="center">**A98**</div>

## B.   NJCRA

Claims asserted under the NJCRA are analyzed analogously to Section 1983 claims. See Discussion, Section I.C., <u>supra</u>. Moreover, Plaintiff has alleged violations of Article 1, Paragraph 12 of the New Jersey Constitution, which corresponds to the Eighth Amendment. See <u>id.</u> Because Plaintiff's Eighth Amendment claim under Section 1983 fails, and Plaintiff has not presented another theory of liability under the NJCRA, the Court will grant Byrd's motion for summary judgment as to the NJCRA claims asserted against her.

## CONCLUSION

The Court, for the reasons stated, will grant the pending motion for summary judgment and enter judgment in favor of Defendant Byrd. The Court will issue an appropriate order and judgment.

<div align="right">

   s/ Mary L. Cooper

**MARY L. COOPER**

United States District Judge

</div>

**Dated:**    May 25, 2016

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually, | CIVIL ACTION NO. 11-247 (MLC) |
| Plaintiff, | **ORDER & JUDGMENT** |
| v. | |
| ADMINISTRATOR KAREN BALICKI, et al., | |
| Defendants. | |

For the reasons stated in the Court's Memorandum Opinion, dated May 25, 2016, **IT IS** on this    25th    day of May, 2016, **ORDERED** that the motion by Defendant Jane Byrd, LPN, for summary judgment **(dkt. 234)** is **GRANTED**; and it is further

**ADJUDGED** that **JUDGMENT IS ENTERED** in favor of Defendant Jane Byrd, LPN, and against Plaintiff; and it is further

**ORDERED** that the action insofar as it had been brought against the defendants State of New Jersey, Department of Corrections of the State of New Jersey, South Woods State Prison, Trenton Psychiatric Hospital, and Kintock Group should be designated as being **TREMINATED** pursuant to previous orders and amended pleadings; and it is further

**ORDERED** that the Clerk of the Court – as no viable claims remain – designate the action as **CLOSED.**

s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

**A100**